Michael Egenthal (Bar # 263127)
EGENTHAL LAW GROUP
5965 Linda Vista Road Suite 4250
San Diego, CA, 92110
(619) 866-3150
(516) 297-5376
michael@elgadvocacy.com
Attorney for Plaintiff LEARNING EVOLUTION, LLC

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEARNING EVOLUTION, LLC, a California Limited Liability Company,<br><br>                Plaintiff<br><br>   v.<br><br>CPG CATNET INCORPORATED dba Category Management Association, a Texas and Minnesota corporation; CATEGORY MANAGEMENT KNOWLEDGE GROUP, a Canadian Company; MGMT3D, LLC, a Minnesota Limited Liability Company; BLAINE ROSS, an Individual; GORDON WADE, an Individual; JOHN DRAKE, an Individual; DANIEL STRUNK, an Individual; MICHAEL SKILLINGSTAD, an Individual; PHIL MCGRATH, an Individual; MICHAEL MCMAHON, an Individual; SUE NICHOLLS, an Individual,<br><br>                Defendants. | Case No: **'20 CV2153 TWR WVG**<br><br>**CIVIL ANTITRUST, UNFAIR COMPETITION, AND TORT COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**REQUEST FOR TRIAL BY TRIAL**<br><br>Date Filed: November 12, 2020<br><br>Trial Date: Not Set. |

Unless explicitly stated to the contrary, all allegations are based upon information and belief. Plaintiff Learning Evolution, LLC (hereinafter "LE") alleges as follows:

# **NATURE OF THIS ACTION**

1. LE herein sues Defendant CPG Catnet Incorporated dba Category Management Association (hereinafter "Defendant CMA") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant CMA for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant CMA for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. Finally, LE sues Defendant CMA for Unjust Enrichment. LE seeks monetary and injunctive relief from Defendant CMA.

2. LE also herein sues Defendant Category Management Knowledge Group (hereinafter "Defendant CMKG") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant CMKG for violations of the Cal. Bus. & Prof. Code §§ 16720 and 16727 (Cartwright Act) and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant CMKG for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant CMKG.

3. LE also herein sues Defendant MGMT3D, LLC ("Defendant MGMT3D") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant MGMT3D for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant MGMT3D for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. Finally, LE sues Defendant MGMT3D for Unjust Enrichment. LE seeks monetary and injunctive relief from Defendant MGMT3D.

4. LE also herein sues Defendant Blaine Ross (hereinafter "Defendant Ross") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant Ross for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant Ross

for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Ross.

5. LE also herein sues Defendant Gordon Wade (hereinafter "Defendant Wade") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant Wade for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant Wade for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Wade.

6. LE also herein sues Defendant John Drake (hereinafter "Defendant Drake") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant Drake for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant Drake for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Drake.

7. LE also herein sues Defendant Daniel Strunk (hereinafter "Defendant Strunk") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant Strunk for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (the Unfair Competition Act or "UCL"). Additionally, LE sues Defendant Strunk for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Strunk.

8. LE also herein sues Defendant Michael Skillingstad (hereinafter "Defendant Skillingstad") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant Skillingstad for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (Unfair Competition Act or "UCL").

Additionally, LE sues Defendant Skillingstad for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Skillingstad.

9. LE also herein sues Defendant Phil McGrath (hereinafter "Defendant McGrath") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant McGrath for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (Unfair Competition Act or "UCL"). Additionally, LE sues Defendant McGrath for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant McGrath.

10. LE also herein sues Defendant Michael McMahon (hereinafter "Defendant McMahon") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant McMahon for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (Unfair Competition Act or "UCL"). Additionally, LE sues Defendant McMahon for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant McMahon.

11. LE also herein sues Defendant Sue Nicholls (hereinafter "Defendant Nicholls") pursuant to §§ 4 and 16 of the Clayton Antitrust Act for violations of §§ 1 and 2 of the Sherman Antitrust Act and for violations of §§ 3, 4 and 16 of the Clayton Antitrust Act. LE further sues Defendant McMahon for violations of the Cal. Bus. & Prof. Code §§ 16720, 16727 (Cartwright Act), and § 17200 et seq. (Unfair Competition Act or "UCL"). Additionally, LE sues Defendant Nicholls for the common law tort claims of Intentional Interference with Contractual Relations and Intentional Interference with Prospective Economic Relations. LE seeks monetary and injunctive relief from Defendant Nicholls.

# **PARTIES**

12. LE is, and at all relevant times was, a California LLC with a principal place of business in the State of California at 1431 Pacific Hwy H2, San Diego, CA 92110. LE is an online e-learning

and training services company that specializes in sales, marketing and category management (hereinafter "CM") training programs and services. LE was formed in 2003 to design, develop and sell training software licenses to companies seeking to train and educate employees of consumer-packaged goods (hereinafter "CPG") and retail industry companies.

13. Defendant CMA is, and at all relevant times was, a for-profit corporation and trade association incorporated in Texas, with a Texas address of 13501 Ranch Road 12 Ste 103, Wimberley, TX 78676 and a principal place of business in Minnesota of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant CMA was founded in 2004 to provide a common language, talent acquisition guidelines, and training standards in the CM industry. Defendant CMA is now a global organization with members from more than 20 countries and is the only professional group solely focused on CM. In the organization's own words, it is looked to as an "unbiased source for industry information and best practices".

14. Defendant CMKG is, and at all relevant times was, a privately held Canadian company with a principal place of business of Suite 26-5440 - 4th Street NW, Calgary, AB T2K 1A8, Canada. The company, founded in 2002, prepares individuals and organizations in retail and CPG through accredited CM training. The company offers "blended learning solutions," including online case studies, webinars and live training. CMKG currently serves over 100 clients, primarily in North America.

15. Defendant MGMT3D is, and at all relevant times was a Minnesota LLC with a principal place of business of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant MGMT3D provides M&A advisory services, "white glove due diligence", outside operating partner services, strategic, IT and operational advisory services, and turnaround management for private equity, investment banking, and corporate clients. Defendant MGMT3D purchased a controlling interest in Defendant CMA in 2014 and is managed by Senior Partner, Defendant Skillingstad, a board member and advisor of Defendant CMA.

16. Defendant Ross is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant Ross is the current President of Defendant CMA.

17. Defendant Wade is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant Wade is the Director of Best Practices for Defendant CMA and co-owner at Retail Performance Group LLC (with Defendant Drake). Defendant Wade was the chairman of the board of CMA before it was

acquired from the private equity firm and currently owns about a 10%-20% stake in Defendant CMA.

18. Defendant Drake is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant Drake is the Senior Vice President of the CM Best Practices Team for Defendant CMA and owner at Retail Performance Group, LLC (with Defendant Wade). On information and belief, he currently owns about a 10%-20% stake in Defendant CMA.

19. Defendant Strunk is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave #980 South Bloomington, MN 55431. Defendant Strunk, instrumental in the development of Defendant CMA's certification program, is the Senior Vice President of Certification & Education of the CMA and Managing Director Center for Sales Leadership at DePaul University. Defendant Strunk has a near-decade long personal relationship with Defendant CMKG's president, Defendant Nicholls.

20. Defendant Skillingstad is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave South #980 Bloomington, MN 55431. Defendant Skllingstad is a board member and advisor of Defendant CMA as well as a Senior Partner with Defendant MGMT3D.

21. Defendant McGrath is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave South #980 Bloomington, MN 55431. Defendant McGrath was Vice President of Business Development at Defendant CMA.

22. Defendant McMahon is, and at all relevant times was, an individual with a business address of 7900 Xerxes Ave South #980 Bloomington, MN 55431. Defendant McMahon was named President of the Association of Retail and Consumer Professionals (hereinafter "ARCP"), which is the umbrella organization overseeing Defendant CMA and the Shopper Insights Management Association (SIMA).

23. Defendant Nicholls is, and at all relevant times was, an individual with a business address of Suite 26-5440 - 4th Street NW, Calgary, AB T2K 1A8, Canada. Defendant Nicholls is the Founder and President of Defendant CMKG.

# JURISDICTION AND VENUE

24. This Court has subject matter jurisdiction over the federal questions in this action arising under §§ 1 and 2 of the Sherman Antitrust Act and §§ 3, 4 and 16 of the Clayton Antitrust Act, federal legislation providing a private right of action to individuals and businesses.

25. This Court also has subject matter jurisdiction under 28 USC § 1332 because of the diversity of citizenship between the parties in this case and an amount in controversy exceeding $75,000.00 as outlined in the Parties and Damages sections herein.

26. LE's state law claims are so related to those under which this Court has federal question jurisdiction that they form part of the same case and controversy. Supplemental jurisdiction is therefore appropriate over LE's remaining claims sounded in California statutory law, tort law and in equity pursuant to 28 U.S.C. § 1367.

27. This Court has jurisdiction over LE's claims for injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

28. Venue is proper in this Court pursuant to 29 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims made herein occurred in this judicial district. Severe economic injuries to LE's business occurred in this judicial district and the agreements interfered with were entered into in this judicial district.

# <u>GENERAL ALLEGATIONS</u>

## <u>(a) Background</u>

29. LE CEO Scott Matthews (hereinafter "Mr. Matthews") was fortunate to work and have a successful career at Apple, Inc. in the mid 1980s and early 1990s. It was at Apple that he learned about the importance of technology, innovation, business and entrepreneurship. He left Apple in 1995 to follow his dream to become a small businessperson. Today, he is LE's Managing Partner and CEO and sits on the boards for two not-for-profit organizations and the advisory boards for several universities.

30. As an entrepreneur, he's a staunch believer in free markets, and in the power of people to be free to build companies that shape our nation and set the stage for future generations.

31. Mr. Matthews would never have guessed that he would be filing a lawsuit to fight for his company, employees, customers, and personal rights to compete in a fair and free market. In his 35 years of business, he has never been compelled to seek legal action against another organization.

32. Unfortunately now, the conduct of two organizations: a leading trade industry association for CPG and retail companies (Defendant CMA) and a private Canadian consulting and training company (Defendant CMKG) have embarked upon and are succeeding in coordinated efforts to directly interfere with his company's business affairs as a means of eliminating it and other US firms from the market altogether.

33. In 2003, Mr. Matthews moved to San Diego, CA with his wife Susan and three children. The purpose was to help launch LE. The company's vision and mission were simple– to focus and apply its expertise in technology to help build better online education software tools and programs to help CPG and retail companies develop their employees' skills and competencies in data, analytics, and sales and marketing processes (CM).

34. CM is a practice developed almost 20 years ago as a way to use data and information intelligently as a means of developing insights into consumer purchasing habits and shopper behavior. The now well-developed discipline enables both CPG brands and retail companies to work together to increase sales opportunities at retail locations. CM processes are based an *unbiased* approach that values collaboration between brands and retailers. The practice's primary idea is to undertake whatever course of action is best for the consumer by offering multiple brands and options in a "category" – in other words, do what's best for the category (like toothpaste), not just a brand (like Target). Today, CM is the industry standard, practiced by thousands of manufacturers like PepsiCo, The Hershey Company (hereinafter "Hershey"), Procter and Gamble (hereinafter "P&G"), and Johnson and Johnson. Together, both CPG companies and retailers, such as Walmart, Kroger, and CVS, work to implement these practices.

35. In 2004, a woman named Donna Frazier founded the CMA, which would provide for a common language, a set of talent acquisition guidelines and training standards in the CM field. As a trade association, the CMA understood the significane of adhering to the very same core principles that had become hallmarks of the CM industry– that of remaining *unbiased*. To its credit, the CMA did, in its early days retain these values in its promotion and facilitation of strategic collaboration between retailers, suppliers and third-party solution providers.

36. In 2008, Defendant CMA recognized a growing industry and thus assembled a steering committee of executives from CPG retailers and suppliers (CMA members) with the goal of establishing industry "Certification" and training standards. The goal was to agree upon the

fundamental skill sets for effective CM professionals. Key subject matter experts included Laura Lee Larson from Wrigley (with whom LE worked before she became VP Global Education and Certification for Defendant CMA from March 2010 through February 2015) and Tom Burkemper, then of former LE client Anheuser Busch InBev (hereinafter "AB InBev"), now of Walgreens and an existing CMA Advisory Board member.

37. In 2009, the committee developed the "Professional Standards Guide" (hereinafter "PSG") for CM certification and created the CMA's industry credentials for Certified Professional Category Analysts (hereinafter "CPCA"), Certified Professional Category Managers (hereinafter "CPCM") and Certified Professional Strategic Advisors (hereinafter "CPSA"). A year later, in April 2010, the guide was released to the public.

38. Beginning around 2010, existing LE clients (already members of the CMA) informed LE that they would benefit from online training built around these professional standards. To date, this CM training had been confined to industry programs led by industry practitioners and subject matter experts in a brick and mortar setting. There was no technology-based, quality software platform to deliver online CM training built around these standards.

39. Assessing this opportunity, that same year, LE endeavored to create the first series of online e-Learning coursework modules based on Defendant CMA's PSG, and eventually did develop its 33-course CM Training library in alignment with this guide. The online e-Learning coursework is sold as a software license to CPG and retail industry clients.

40. This was a new product, service and market, created by LE. LE's innovation was in its ability to leverage technology to offer a more effective and cost-efficient and way of training and developing skills and knowledge online, instead of via the traditional classroom-based approach. Training could now be delivered at a corporate scale, not merely on an individual scale.

41. At this point, however it was unknown whether Defendant CMA would "certify" this training and thus was taking on the calculated risk for the $500,000 in development and technology infrastructures.

### (b)  LE Growth

42. Ultimately, though, on December 28, 2010, LE was informed by Defendant Strunk, that it had achieved Certification (a moniker later changed to "Accreditation") status and was now officially the first company to design, develop and build a series of e-Learning coursework modules and assessment tests and become CMA certified.

43. LE thus joined the list of accredited training providers (now including LE and other entities employing the more traditional training model) that Defendant CMA provided to its corporate members seeking training. (The training providers would compete with one another to secure the business of these corporate clients).

44. Defendant CMA's fee for Certification was approximately $4,000.00 per course, which for 33 courses, cost LE $132,000.00, an amount tendered to Defendant CMA in a timely fashion. Renewals were priced at $8,000.00 - $10,000.00 every three years thereafter. LE paid these fees in a timely fashion.

45. In 2011, LE provided Mr. Strunk and DePaul University with free access to its content in exchange for an Advisory Board seat within Defendant CMA's Sales and Marketing Group.

46. Subsequently, LE secured licenses with University of Arkansas, University of Texas at Tyler (hereinafter "UTT"), Western Michigan University (hereinafter "WMU"), Texas Tech University (hereinafter "TTU"), Ryerson University, University of North Alabama, University of Monterrey (hereinafter "MX UDEM"), and St. Joseph's University.

47. From 2013-2017, LE grew its CM training and services business substantially (an average of 23% per annum), reaching $1,149,676.00 in annual revenue in 2017.

48. CM as an industry was more than "on the map"; it was now becoming necessity for retailers. Companies like P&G began to devote significant resources to train, develop, and certify their employees in CM.

49. Defendant CMA had grown into a global organization with members in 20 countries and, for the time being at least, remained unbiased, existing to help guide and govern the development of these neutral CM principles.

50. In 2016, LE paid $10,000.00 to Defendant CMA to become a member of a 20-company committee of thought-leading manufacturers, retailers and solution providers that would assist in the development of CatMan 2.0, an update to the PSG. The committee was led by Defendants Wade and Drake. LE is still cited today by Defendant CMA as a company that assisted in the development of CatMan 2.0 and LE's content and resources remain available online for Defendant CMA's members to access.

51. That same year, Mr. Matthews, was named to the CMA's Higher Education Advisory Board (hereinafter "HEB") to advise and support universities, bringing in his expertise in digital learning technologies and best practices. The goal was to help universities develop a curriculum that would educate the next generation of CM professionals. The HEB was

supported by faculty from DePaul University, Northwood University, St. Joseph University, University of Arkansas, University of North Alabama, Western Michigan University, and Xavier University (Ohio).

52. The HEB produced the first CM program development plan that guides universities in how to establish CM as an educational option for their students. The "Starter Kit" for CM education includes an environmental analysis, a formal business model and plan, advice on hiring instructors, and prototypical syllabi for recommended courses. The document utilizes Defendant CMA's standards as the foundation for curriculum development.

53. Leading up to 2017, many of LE's clients and partners (including Diageo, 7-Eleven, Acosta, AB InBev, Sims/Smollen, Strategix and others) were finding Defendant CMA's current system of testing/certification difficult to coordinate, and thus expressed a desire for LE to create a more streamlined process for accredited training and CMA Certification testing. Defendant CMA itself had concern about being able to employ the proper rigor and oversight for its accreditation training and testing processes -- in particular its ability to proctor its exams.

54. Defendant CMA's CPCA exams could be easily integrated into LE's Learning Management System (hereinafter "LMS") and LE could easily register users/learners directly into Defendant CMA's system. Thus, Mr. Matthews submitted a proposal to Defendant CMA to assist mutual clients and members in gaining CMA-certification -- to streamline the testing process, while maintaining the integrity of the certificate.

55. Specifically, LE proposed that Defendant CMA empower LE to be both an accredited training provider and a CPCA certification test center. LE would make it easier for clients to access the CMA directly from a hyperlink within courses and its own LMS. By creating a unique identification number for each learner, LE users would be able to complete a learner's digital training and directly pass that person into the CMA system for testing in a fluid sequence.

56. This would create a one-stop shop for training, test prep, and CMA examination to help end the CMA certify more members and LE-shared clients and *could be something Defendant CMA could do with all third-party accredited training providers, i.e. non-exclusive.*

57. In January 2016, Defendant CMA and LE executed a basic agreement to this effect (hereinafter "CMA Services Agreement"). Per the agreement, LE developed the process for LE to pass to Defendant CMA the names and email addresses of the employees of LE's

clients who sought certification and provided Defendant CMA with a "Confidential Client List" (incorporated as Addendum A in the CMA Services Agreement). CMA agreed to build a technical integration with the CMA system and provide a full accounting or reporting of certifications purchased, passed or failed to LE.

58. Unfortunately, Defendant CMA failed to fully perform its obligations, never developing a technical integration with the CMA system nor providing LE with a full accounting or reporting of certifications purchased, passed or failed. LE only received a minimum of Quarterly Payments as part of its "Service Fees" under the CMA Services Agreement.

59. Despite Defendant CMA's lack of performance, LE remained a CMA-accredited training provider, advocate and ambassador for certification, attending and sponsoring CMA Annual Conferences (priced from $5,000 - $15,000 per event) through 2019.

60. LE was blindsided by what occurred next.

(c) Defendant CMA's Shift in Approach and Joint Anticompetitive Efforts with Defendant CMKG

61. Back in *2014, Defendant MGMT3D, a venture capital & private equity firm based in Minneapolis, MN acquired the controlling interest in Defendant CMA.* Defendant MGMT3D's Managing Partner, Defendant Skillingstad was also the Chairman of the Advisory Board at Defendant CMA.

62. Throughout this period, up in Canada, Defendant CMKG had been providing instructor-led training, consisting of the traditional model of in-person classes and consulting. Defendant CMKG did also offer a digital format for learning, yet not an LMS platform as LE did. *Defendant CMKG was actually in competition with Defendant CMA at this time.*

63. Gradually though, through the personal relationship of Defendant CMKG's president and Defendant CMA's Chairman of the Certification Committee, Defendant Strunk, Defendant CMKG came to the realization that if it wanted to do business in the U.S., it ought to obtain accreditation with Defendant CMA, instead of trying to compete against it. As will be detailed herein, they did a great deal more than just that.

64. LE first became suspicious of Defendant CMA's activity when the CMA refused to allow LE to register for the upcoming CMA Annual Conference on February 25-27, 2019, an event at which LE had maintained a *consistent presence* through the years as many of LE's most important and long-time customers and prospects were regular attendees.

65. LE would later find out (on January 28, 2019) that it would *not be allowed to attend nor send employees to the conference* due to the new strategic relationship that would be officially

announced at this event. Up until this point, approximately two-thirds of LEs business opportunity for the year would be created during this event.

66. Unbeknownst to LE, in 2018, Defendant CMA decided to shut down its entire relationship with LE and begin working with Defendant CMKG to displace other partners, negotiate terms of an exclusive agreement and monopolize the market that had been invented by LE. These events unfolded swiftly over the course of two years.

67. As a reminder, it was LE's creation of the online training program and this LE-proposed market opportunity (which Defendant CMA failed to initially seize upon through its willful non-performance of the CMA Services Agreement) that provided for Defendant CMA a new revenue stream in the training market.

68. Defendant CMA and CMKG indeed announced at Annual Conference that the two had entered into an exclusive joint partnership whereby *Defendant CMKG would be Defendant CMA's only accredited provider*. The agreement became the subject of the following joint press release that followed a week later:

> "CMA has entered into an *exclusive* joint venture with the CMKG...a partnership that will provide a premier CM training platform and training courses for members and employees. For the first time, the CMA will have the ability to offer best-in-class free training as a part of its membership benefits. The partnership rounds out the CMA's robust portfolio of professional resources to include training, education and more certification options for industry professionals."

69. It was also around this time that Defendant Strunk and others at Defendant CMA began to *spread misinformation to existing and prospective LE clients regarding LE and its content. CMA approached these LE clients and informed them of the following: 1) Defendant CMA's content is of superior quality to LE content; 2) LE's content is not accredited content; and 3) Defendant CMA/CMKG's content is the only option to pursue a path to professional certification.*

70. The next month, March 2019, Defendant CMA disbanded the HEB Advisory Board and began a process to create a new board, under a new moniker with all the same members and *one notable absence – LE*.

71. Understandably, the university representatives that comprised the board were confused and inquired of Defendant Strunk whether they would still be allowed to utilize LE's training content and services, which was their preference. Over the course of several months, Defendant Strunk continually reassured them that they could, but when pressed on whether

LE's content would remain accredited going forward, Defendant Strunk became evasive and employed a series of dilatory tactics.

72. Ultimately, Defendant Strunk's repeated promises were exposed for what they were when he revealed to the universities that, while they can continue to use LE and its training, LE training would no longer be CMA-accredited.

73. One of several such instances is when Defendant Strunk (with Defendant Nicholls of CMKG in the room) informed Interim Dean of UTT's Soules College of Business, Krist Swimberghe of the CMA/CMKG joint venture and the membership bundling arrangement. Mr. Swimberghe was given the hard sell on the benefits of CMKG training and was offered students free access to attend. In response, Mr. Swimberghe told Defendant Strunk and Defendant Nicholls that LE's content and services were superior and that UTT would like to continue its relationship with LE. In response, Defendant Strunk "backed down" and agreed to "allow" the university to continue to use LE's training content and services but remarked that such a decision was "not wise".

74. In August 2020 (a time when Defendant Strunk and DePaul were still using LE training materials in their program), Defendant CMA put out the following press release:

> "In February, the CMA and SIMA added industry-leading training to their list of services, when they entered into an exclusive partnership with [CMKG]. This move *consolidated* all training and certification services for the professions under one roof. CMA [VP] of Certification and Education Dan Strunk will be working hands-on with the university to implement this new curriculum. …CMKG President Sue Nicholls will also be highly involved in shaping the class-leading program. Several other schools are expected to announce participation next month."

75. While Defendant CMA's "consolidation" plan was now clearer, several uncertainties remain on the university front.

76. It remains unclear still unclear if the universities have also lost their accreditation.

77. It remains unclear if Defendant CMA will allow university members to earn an accreditation and offer their own training to students and professionals.

78. It remains unclear from if a university that is accredited will need to use content from a single supplier, Defendant CMA/CMKG or be allowed to develop their own materials at their own expense. To operate and establish these programs the universities had leveraged and relied heavily on LE materials, people, and software to support their faculty and students.

79. It also remains unclear if Defendant CMA will reaccredit a university program which chooses to remain with LE.

80. As of October 2020, LE content is in use with WMU, TTU, Ryerson University, and UTT. The following statement has been made to LE from its partners regarding the current status of accreditation with CMA:

> "We were never told we were not accredited.  However, content is more important than accreditation.  As long as our students with LE content are able to credibly market themselves to industry and differentiate themselves from those students that don't have that knowledge, that is what is most important."

81. The statuses of the *competing corporate entities* in the training and services industry was clearer: *All former corporate training providers (Acosta, TPG, Nielsen, IRI) were informed by Defendant CMA that they would either need to get re-accredited (if they had used LE content to help do so originally) or could no longer be accredited.*

82. As to *LE's corporate clients*, Defendants CMA and CMKG representatives employed a *similar tact*. One such example is Defendant CMA representatives' statements to key AB InBev (an LE client) executives to the effect that "several key retailers, including Walmart and Kroger, were supporting the CMA/CMKG program". LE has received confirmation that this statement led to AB InBev's decision to override its original decision to continue its contractual relationship with LE.

83. The behavior and the public statements of Defendant CMA and Defendant CMKG were becoming increasingly coordinated -- mirror images of one another. Both firms began to (and continue to) follow a uniform sales and marketing 'pitch' approach that makes claims to the effect that the two entities are collectively the only place for "accredited training" and that Defendant CMKG's training is far superior to other providers.

84. One example of the latter pitch is contained within an email from new CMA President McMahon to former LE client Mr. Burkemper shows clear bias (supported by false and unscientific analysis) against all competitor third-party training solutions providers.

> "The reason we partnered with CMKG was the quality and efficacy of their training was far and away the best. As a point of reference - CMKG pass rate is in the 90% level and the closest next training company was at about 60% of that."

85. The training companies referred to in this quote included TPG, RI and Nielsen (which were accredited for classroom training), Defendant CMKG, ROI, Acosta (which used or partnered with LE) and the aforementioned universities (most of which used or partnered with LE).

86. LE was confident, though, in the effectiveness of its materials and in the satisfaction of its clients, so LE questioned the veracity of these percentages McMahon ha quoted and attempted to confirm with Defendant CMA precisely which LE customers Defendant CMA had used to calculate these figures.

87. Defendant CMA was reticent to provide a response. After all, it had never before publicly shared or published "passing rate" percentages categorized by training provider, nor any details around how, who, or in what years this "analysis" was done.

88. Eventually, Defendant CMA began sharing piecemeal, cryptically delivered "data"-- only after they had entered the Excusive Joint Venture with Defendant CMKG.

89. The pass rate data that was finally shared with LE is inaccurate and misleading for several reasons: (1) Defendant CMA performed no independent audit or analysis to evaluate accredited content and correlation to passing rates as means of verifying these figures; (2) Defendant CMA did not seek input from any of LE's existing clients in acquiring their data; (3) Defendant CMA did not survey any of the Higher Education University Partners; (4) the data that was provided LE pointed out numerous non-LE non-passing customers that were attributed to LE and passing LE customers that were not attributed to LE.

90. Defendant CMA has not demonstrated that they ever employed a reliable process by which it could be validated which entity (LE, CMKG, or otherwise) provided training to an individual who took the exam. Thus, in some cases a passing score by an individual from one of LE's clients was not reported as a passing score in calculating LE's statistics. Defendant CMA instead arbitrarily attributed non-passing scores to LE and passing scores to Defendant CMKG.

91. As an illustration: If Company A licenses LE. Person X is hired by Company A and takes LE CM training at Company A (she may or may not know who is actually the provider of this training). After a year as a category analyst and completion of Person X's CM training at Company A, she decides to get certified by Defendant CMA. She registers and puts Company A as her CM training provider. She passes. In a CMA report, she is not part of LE results in passing rates.

92. Casting further doubt on the accuracy of these statistics were the remarks of Defendant Strunk shortly after the announcement of the Defendant CMA and CMKG joint venture:

> "[LE] has been a valuable part of our CM curriculum at
> DePaul. Students are exposed to [LE]'s learning modules across all 3
> classes in the CM track and they are used in the classroom as a

foundational tool to help prepare students to sit for the CPCA exam. I have had many students tell me that they have gone on to leverage this knowledge in future classes and in their full-time careers post-graduation."

93. Their efforts to suppress competition clearly going as planned, Defendants CMA and CMKG then sought to enjoy the fruits of their efforts and launched the "Member Training Credits" pricing model. *As part of Defendant CMA's fixed annual membership fees charged to members*, the *trade association now "bundles" "Member Training Credits"* to be used for online and ILT training programs and services *provided by Defendants CMA and CMKG exclusively*. This was the formal tying together of Defendant CMA membership and accreditation. This practice establishes a stabilized or fixed price for training and allows no competitive alternatives for CMA certification.

94. And it worked. Dr. Robert Jones, who heads TTU's program, told LE that the reason he switched from LE to CMA/CMKG training was because CMA/CMKG's training was "tied" to CMA membership.

95. It was now clear what was going on here. The private equity control of Defendant MGMT3D had transformed a once unbiased trade association, one that fervently advocated for free and open competition, to *an environment where Defendant CMA and individual former competitor (CMKG)* were now colluding to leverage connections and influence to become a single provider of certain goods and services across the entire industry.

96. The damage to LE and the marketplace was brutal and complete.

97. As to LE, following the February 2019 announcement of the Joint Venture, LE's revenue was down 40% from the prior year (fiscal year 2018) and down 60% from fiscal year 2017 (its peak revenue year for CM training and education services).

98. LE's 2020 projected revenue from CM training and education services revenue decreased to $350,000.00, an amount that represents a 70% from peak fiscal year 2017 revenue.

99. Put simply, within 20 months of the Defendants' announcement, LE's revenue is down 70%.

100.    In March of 2020, Defendant CMA sent LE a cease and desist letter threatening serious legal ramifications if LE did not remove from its website CMA logos and language that referred to LE as a "CMA Accredited Training Provider". Despite sound evidence that Defendant CMA and Defendant CMKG had been acting unscrupulously in an effort to suppress competition and unfairly push LE and others out of the CM training market, LE complied with this request.

101.    To date, LE has experienced $8,000,000+ in lost revenue due to the actions of Defendants.

102.    Its business model and revenue stream gutted, LE commenced this action.

(d)Existence of Relevant Markets and Their Geographic Scope

103.    Defendant CMA's and Defendant CMKG's anti-competitive conduct (under both federal and CA law) has occurred in the context of a defined relevant economic market. No economic forces can restrain Defendant CMA's and Defendant CMKG's freedom to restrict the market, and Defendant CMA and Defendant CMKG now have freedom to set the prices charged to customers. The most likely and most important restraining force would be the actual and potential competition from other firms and their products that would act as restraints on Defendants' power to set prices as they please – these other firms, including LE, have been rendered powerless. All the firms and products that would have exerted this restraining force are considered to be within the "Relevant Markets".

104.    A relevant market includes all products and services that are reasonable substitutes for each other from a buyer's point of view; that is, the products and services compete with each other. This includes the products and services that a consumer believes are reasonably interchangeable or reasonable substitutes for each other, as assessed through actual behavior of buyers and marketing efforts of sellers.

105.    The relevant geographic market for a given relevant product or service market is the area in which the Defendants face competition from other firms that compete in that relevant market and to which customers can reasonably turn for purchases. The relevant geographic market takes into account whether changes in prices or offerings in one area have substantial effects on prices or sales in another area -- this would tend to show that both areas are in the same relevant geographic market.

106.    The Relevant Product and Service Markets impacted by Defendants' conduct and those Markets' geographic scope are set forth below.

**(i)  Category Management Online Coursework Software (as Strategic Business Practice for Retailers and CPG Companies) is a Relevant Product Market**

107.    CM Online Coursework Software as Strategic Business Practice for Retailers and CPG Companies is a Relevant Product Market.

108.     Prior to discussing the online coursework, a slightly more in-depth description of CM as an industry is appropriate. Three mainstream definitions of CM are: (1) a process that involves managing product categories as business units and customizing them [on a store by store basis] to satisfy customer needs; (2) the strategic management of product groups through trade partnerships which aims to maximize sales and profit by satisfying consumer and shopper needs; (3) marketing strategy in which a full line of products (instead of the individual products or brands) is managed as a strategic business unit. In essence, it is a systematic, disciplined approach to managing a product category as a strategic business unit. Each category is run as a "mini business" in its own right, with its own set of turnover and/or profitability of targets and strategies. Most retailers will segment stores at least by size, and select product assortments accordingly. Some retailers feature product offerings tailored right down to the specific store.

109.     Introduction of CM in a business tends to alter the relationship between retailer and supplier: instead of the traditional adversarial relationship, the relationship is collaborative with exchange of information, sharing of data and joint business building.

110.     The focus of all supplier negotiations is the effect on turnover of the category as whole, not just the sales of individual products. Suppliers are expected, indeed in many cases mandated, to only suggest new product introductions, a new planogram or promotional activity if it is expected to have a beneficial effect on the turnover or profit of the total category and be beneficial to the shoppers of that category.

111.     The concept originated in grocery (mass merchandising) retailing, and has since expanded to other retail sectors such as DIY, cash and carry, pharmacy and book retailing.

112.     One key reason for the introduction of CM was the retailers' desire for suppliers to add value to their (i.e. the retailer's) business rather than just the supplier's own. For example, in a category containing brands A and B, the situation could arise such that every time brand A promoted its products, the sales of brand B would go down by the amount that brand A would increase, resulting in no net gain for the retailer. The introduction of CM imposed the condition that all actions undertaken, such as new promotions, new products, re-vamped planogram, introduction of point of sale advertising etc. were beneficial to the retailer and the shopper in the store.

113.     A second reason was the realization that only a finite amount of profit could be made from price negotiations and that there was more profit to be made in increasing the total level of sales.

114.     A third reason was that the collaboration with the supplier meant that supplier's expertise about the market could be drawn upon, and also that a considerable amount of workload in developing the category could be delegated to the supplier.

115.     Nielsen defines a 'category' as products that meet a similar consumer need, or products that bare interrelated or substitutable. Products placed together in the same category should be logistically manageable in store (for example there may be issues in having room-temperature and chilled products together in the same category even though the initial two conditions are met).

116.     The next step of CM is to understand the mechanism of the customer's decision concerning purchases of a given category. The decision-making process is usually analyzed by observing customers directly in the store and by direct surveying. The result is recorded in the Customer Decision Tree (CDT). The industry standard model for CM in retail is the 8-step process, or 8-step cycle developed by the Partnering Group. The eight steps are:

1.   Define the category (i.e. what products are included/excluded).
2.   Define the role of the category within the retailer.
3.   Assess the current performance.
4.   Set objectives and targets for the category.
5.   Devise an overall Strategy.
6.   Devise specific tactics.
7.   Implementation.
8.   The eighth step is one of review which takes us back to Step 1.

117.     The current industry trend is for supplier companies to use the standard process as a basis to develop their own more streamlined processes, tailored to their own particular products. Nielsen has a similar process based on only 5 of these steps.

118.     CM Training Accreditation was a process Defendant CMA uses/used to "accredit" third party training providers (traditionally in person educators, and more modernly in digital form through LE's innovation to this Market). CMA Certification refers to the process used to "certify" individuals and provide a CMA credential in CM for three job roles with cumulative levels of skills and knowledge: Level 1: CPCA, 10 Core competencies; Level 2: CPCM (Level 1, plus Level 2, 15 additional/advanced core competencies); and Level 3: CPSA - Level 1, 2, plus 8 additional core competencies for a total of 33.

119.     Defendant CMA actively promotes the CMA Industry Certification as the best way to quantify an individuals' skills and to add value for both employer and employee.

120.     As noted, Defendant CMA originally charged LE $132,000 in 2012 to become a CMA Accredited Training Provider and then an $8,000 renewal fee every 3 years.

121.     The market for CM online coursework includes all accredited and non-accredited coursework that builds CM knowledge and expertise in the practice of CM principles. Products include all 33 accredited courses, non-accredited courses in strategic areas like ecommerce, practice tests for professional certification, and competency assessments. E-Learning coursework modules are a tangible good (digital asset) like a video or movie.

122.     Also part of the market is the 'optional' LMS software platform as service (SaaS - Software as a Service). An LMS provides a company a secure way to track and deliver desired training content to individuals or teams within their organization. The LMS digitally tracks and reports progress and results so that a return on investment or key performance indicators can be established to benchmark individuals or teams. To many companies, the LMS is as valuable as the training content itself.

123.     This "Relevant Market" includes both software aimed at Accreditation (of third-party training providers) and Certification (individuals seeking industry acknowledgment). Players include CMA corporate members, universities (students), and individual sales and marketing professionals working in the CPG and retail industries.

124.     Defendant CMA markets and sells globally to CPG manufacturers, retailers and universities that offer Food Marketing degrees worldwide.

125.     The geographic area in which CM Online Coursework Software (as Strategic Business Practice for Retailers and CPG companies) is sold is the U.S. and worldwide. The geographic area to which customers turn for supply of the CM online coursework and services or have seriously considered turning is the US and worldwide. The global and U.S. markets for CM Online Coursework Software (as Strategic Business Practice for Retailers and CPG companies) are referred to as the "Relevant Product Market".

**(ii)     Category Management Training and Education Services is a Relevant Service Market.**

126.     CM Training and Education Services is a Relevant Services Market. The market for CM Training and Education services is *the delivery of* online coursework, practice tests, competency assessments, and customized consulting workshops to any organization in which

the execution of CM principles provides value to that organization. This market includes Defendant CMA's corporate members, universities (students), and individual sales and marketing professionals working in the CPG and retail industry. The 'Optional' LMS software platform is a service (SaaS - Software as a Service) for customers that lack their own internal LMS to deliver online coursework to their employees.

127.     CM Training and Education Services cannot always be provided efficiently in house by corporate customers because it requires specialized knowledge and training. Also, customers lack the software hosting capabilities to deliver the training to their employees. In addition, customers must be accredited by Defendant CMA in order to ensure the delivery of training content that meets the requirements to successfully complete and pass the CMA certification exam for professional certification. For instance, only Defendant CMA is able to provide access to updated Certification requirements and the delivery of the required content and the exam itself is controlled by Defendant CMA, thus customers must use Defendant CMA as one of their service vendors even if they purchased CM Training and Education services from other vendors (again, prior to the anticompetitive conduct alleged herein).

128.     Thus, customers in the CM Training and Education Services Market are not be able to turn to alternative training providers, such as training providers with CM subject matter expertise that are unaccredited in response to a Defendant CMA/CMKG's price increase above the competitive level for necessary services, such as updated content to pass the CMA certification exam or delivery of Defendant CMA "Accredited" coursework.

129.     Customers for CM Training and Education Services are located in the U.S. and worldwide. The geographic areas that suppliers of CM Training and Education Services view as potential sources of competition are the US and worldwide.

**iii. Category Management Hosting and Support is a Relevant Service Market.**

130.     CM Hosting and Support is a Relevant Services Market.

131.     When an organization determines there is value in *virtually* delivering online coursework to employees, it may require software support and hosting licenses to maintain that delivery of content through a 3rd party. CM accredited and non-accredited training can be hosted and delivered to support CM organizational needs.

132.     This includes the online access, maintenance, reporting, and support required to deliver CM coursework through a third-party hosted platform. Players include CMA

corporate members, universities (students), and individual sales and marketing professionals working in the CPG and retail industry.

133.    Customers for CM Hosting and Support Services are located in the U.S. and worldwide. The geographic areas that suppliers of CM Hosting and Support Services view as potential sources of competition are the US and worldwide.

134.    The global and U.S. markets for CM Hosting and Support services *and* CM Training and Education Services are collectively referred to as the "Relevant Service Markets".

135.    Thus, there are relevant product market and service market(s) that includes all reasonably interchangeable products or substitutes.

(c) The Actions of Both Defendants CMA and Defendant CMKG Substantially Affect Interstate Commerce.

136.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

137.    Defendant CMA and Defendant CMKG's marketing, selling and dealing have occurred within the flow of, and have substantially affected, interstate trade and commerce, impacting the CM market and more specifically, the CM Coursework Software, CM Education and Training Services, CM Hosting and Support markets in multiple states and globally. Consequently, such actions are governed by the Sherman Antitrust Act §§ 1 and 2.

138.    No such requirement exists for Defendants' California antitrust violations.

(e)Injury: LE Has Sustained An Antitrust Injury As A Direct And Proximate Result Of Both Defendant CMA And Defendant CMKG's Course Of Conduct

139.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

140.    LE was in fact injured as a result of Defendants' violation of both federal and California antitrust laws insofar as it suppressed sales of LE's products and the products of other competitors and diminished LE's future sales opportunities and the sales opportunities of other competitors, and increased LE's operating costs and the operating costs of other competitors.

141.    As noted, LE invested over $500,000 and took the initial risk in creating the first online CM coursework modules and technology platform to 100% align with the CMA PSGLE is no longer allowed to provide "accredited" training, and its business model has

been left it tatters necessitating a total shift in direction in a bid to stay afloat. LE has lost numerous client accounts, ranging from tens of thousands of dollars to over a hundred thousand dollars per year (as laid out in tort claims below), with very little chance these clients return.

142.     LE experienced damage as a result of Defendant CMA and Defendant CMKG's antitrust violation and no other cause – LE's business was in great health prior to this development as evidenced by the fact that *7 out of the top 10 CPG companies worldwide using LE CM training software and services*. LE also had contracts with top retailers including Kroger, Safeway, Dierbergs, 7-Eleven, Chevron and others. These corporations' employees used LE CM online training programs, practice tests for exam preparation as well as instructor-led training programs.

143.     LE recognizes that businesses may incur losses for many reasons that the antitrust laws are not designed to prohibit or protect against - such as where a competitor offers better products or services or where a competitor is more efficient and can charge lower prices and still earn a profit. LE also recognizes that antitrust laws do not permit recovery for losses that were caused by the competitive process or conduct that benefits consumers. However, LE's injury is the type of injury that the antitrust laws were intended to prevent –that is they were caused by a reduction in competition, acts that would lead to a reduction in competition, and acts that harm consumerism. LE's' injuries were not caused by heightened competition, the competitive process itself, or by acts that would benefit consumers. In fact, there was no decline to speak of in LE's revenue or that of its competitors until this course of conduct was initiated by Defendants CMA and CMKG.

144.     LE was in fact injured by Defendant CMA's conduct, conduct that was a material, direct and proximate cause of LE's injury, an injury of the type antitrust laws were designed to prevent. As a matter of fact and with a fair degree of certainty, Defendants materially caused LE to lose sales from the ability to renew CM Training licenses with several key accounts and impacted LE's ability to market and sell directly to individual consumers seeking training and certification preparation exams.

145.     The total estimated harm attributable to Defendants coordinated anti-competitive conduct is $8,209,621.54, an amount that represents the lost revenue for years 2018-2020, and expected revenues in 2021-2025, a reasonable period of time during which LE is substantially

certain that it would have maintained its existing customers and gained new customers at the same pace it had in the previous six years.

146.     These damages are provable with reasonable and sufficient certainty, having properly been attributed to Defendant CMA's' unlawful causes as set forth herein. To the extent LE has pleaded damages that fall outside of an "antitrust injury", a remedy is sought through other claims in this Complaint.

147.     LE could not have avoided any demanded damages through the exercise of reasonable care and prudence and has not increased any damages through inaction. To the contrary, LE has taken all reasonably prudent and commercially available steps to avoid further injury and thereby reduce its loss through its pivot to a new business licensing model that enabled its existing clients to acquire an 'ownership' license to its software and the training course contents. This includes all the source code to coursework modules, videos, assessment tests and digital learning resource materials. The idea was to empower and enable its clients to create their own customized and derivative works (e-learning and ILT training) that could then be used and possibly even accredited by Defendant CMA.

148.     The other players in the market hindered by Defendant CMKG's agreement or conspiracy include Acosta Sales and Marketing (which uses LE's program internally for employees and is an LE-authorized re-seller partner to deliver a course via its Acosta University online LMS), TPG, a non-accredited training provider who offers online training and is named in the above email, and LE's higher education partners: the WMU, University of Texas Tyler, Texas Tech University, and Ryerson University.

149.     The injuries to LE's business and property are a direct result or likely consequence of the Defendant CMA and CMKG's antitrust violation and LE seeks to be put in as near as possible in the position in which it would have been if this violation not occurred.

150.     LE seeks trebling of damages where appropriate as prayed for herein.

(e) Standing: LE's Federal Anti-Trust Causes of Action brought pursuant to §§ 4 & 16 of the Clayton Antitrust Act

**Section 4 Standing**

151.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

152.     LE brings all federal claims against Defendants CMA and CMKG under §§ 4 and 16 of the Clayton Act for violations of Sherman Antitrust Act (§§ 1 and 2) and Clayton Act (§ 3).

153.     Section 4 of the Clayton Act provides a cause of action to any person injured in his business or property by reason of anything forbidden in the anti-trust laws. A person or business who prevails in a private anti-trust action is entitled to recover threefold (treble) the *damages* by him sustained, and the cost of suit, including a reasonable attorney's fee. The reference to anti-trust laws in § 4 is to the federal antitrust laws generally, including the Sherman Act (§§ 1 & 2 – violations alleged herein) and the Clayton Act (§ 3 violations alleged herein). The "persons" authorized to bring a suit under federal anti-trust laws include entities like LE, a California-organized LLC.

154.     LE has standing to sue under § 4 of the Clayton Act because it has experienced an injury to its business and property, this injury is of the type the anti-trust laws were intended to prevent, and there is a lack of remoteness, i.e. the injury flows from that which makes Defendants CMA's acts unlawful.

155.     The antitrust violations of Defendants CMA and CMKG's were material or substantial causes of injury to LE's business and property. As set out in greater detail throughout this Complaint, LE has experienced severe economic loss for which recovery is sought. LE has sufficient intent and capabilities to maintain and grow its place in the market, thus LE's potential profits from anticipated business are recoverable.

**Section 16 Standing**

156.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

157.     A private plaintiff can also seek an *injunction* against threatened loss or damage by a violation of the anti-trust laws under § 16 of the Clayton Act. To obtain a preliminary injunction, a plaintiff typically must show all of the following: a likelihood of success on the merits, a threat of irreparable harm with no adequate remedy at law, a threatened injury that outweighs the harm that the injunction may create for the defendant, and that the granting of the injunction is in the public interest.

158.     LE has likely established a per se antitrust violation under Sherman Act §§ 1 and 2 for the reasons set for the herein.

159.     If an injunction is not issued LE will continue to sustain severe, unceasing and irreparable harm to its business model and revenue streams due to its inability to regain its accreditation status, its platform for n for its content and services, and its reputation as a trusted provider in the Relevant Markets. These injuries outweigh any harm to Defendants CMA and CMKG because the partners would still be permitted to carry out their arrangement on a non-exclusive basis and without some of the anti-competitive attributes of their arrangement.

160.     The public interest is best served by granting an injunction here because the current state of Defendant CMA, in its relationship with Defendant CMKG is actively harming the marketplace. Before the Defendant MGMT3D acquisition, the CMA was an unbiased industry trade association which promoted and facilitated strategic collaboration between retailers, suppliers and third-party solution providers. CMA events offered an open marketplace for many accredited training providers to offer its services to CPG manufactures and retailers to help them train and skill up their people to industry standards developed by the CMA members. Today, however that marketplace is under attack from Defendants CMA and CMKG in an attempt to monopolize the training and online education business. The CMA and CMKG exclusive joint venture effectively blocks and ultimately works to eliminate companies like LE from the Relevant Markets altogether.

161.     Defendant CMA has a record and reputation as difficult to deal with and outdated in its general approach to serving members. In contrast, LE has a strong reputation as an innovative partner, one that is easy to do business with. As Defendant CMA's mission continues to gain influence in the market of certifying professionals, members are being harmed by forcing these professionals to use single-sourced content and lesser software to help companies measure performance of their employees taking this training.

162.     As noted, LE invested over $500,000 and took the initial risk in creating the first online CM coursework modules and technology platform to 100% align with the CMA PSG. An injunction would not just remedy the fact that LE is no longer allowed to provide "accredited" training, but remedy the suppression of competition, and the restriction of options from a once unbiased trade industry association.

163.     The most sweeping ramifications to the market of Defendant CMA and CMKG's conduct will be felt in ways that might not be immediately obvious. Yet, this type of conduct will likely lead to the larger and more powerful organizations exerting influence over CMA

and affecting the way retailers, manufactures, and shoppers get serviced. The importance here reaches down through the supply chain and is likely to directly impact how the average American household buys products. For example, if a smaller company (i.e. an "off-brand") cannot afford membership and training with Defendant CMA, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

# CLAIMS

## A.   LE'S CLAIMS AGAINST DEFENDANT CMA

### 1. FIRST CLAIM AGAINST DEFENDANT CMA
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

164.   LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

165.   Antitrust laws preserve and advance our system of free and open competition and seek to secure to everyone an equal opportunity to engage in business. Free competition results in the best allocation of economic resources, the lowest prices, the highest quality, and the greatest material progress.

166.   LE brings this antitrust claim under § 1 of the Sherman Antitrust Act, seeking redress for and deterrence of the type of conduct engaged in by Defendant CMA.

167.   Section 1 prohibits into contracts, combinations and conspiracies that unreasonably restrain trade, i.e. produce adverse, anti-competitive effects within a relevant product/service and geographic market.

168.   To establish a violation of § 1, LE must prove (1) the existence of a contract, combination or conspiracy between or among at least two separate persons; (2) that the contract, combination or conspiracy unreasonably restrains or will unreasonably restrain trade; and (3) that the restraint caused LE to suffer an injury to its business or property.

#### (i) Existence of a Contract, Combination or Conspiracy
##### Agreement

169.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

170.     Two separate entities have reached an agreement or understanding as evidenced by Defendant CMA's exclusive Joint Partnership with Defendant CMKG for Defendant CMKG to provide exclusive CM training services for Defendant CMA and the arrangement's public announcement and press release. This agreement, when fused with the surrounding words and conduct of both Defendant CMA and CMKG alleged in this Complaint, demonstrates a collective desire to unfairly control the Relevant Markets.

<u>Conspiracy</u>

171.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

172.     Defendants CMA and CMKG entered the exclusive joint partnership agreement that they would act together for the unlawful purpose of restraining trade in the Relevant Markets. Defendants CMA and CMKG knowingly became members of this conspiracy with the intent to further its purposes. Defendants CMA and CMKG's "Exclusive Joint Venture" strategy to undermine competition (including LE) began in 2018 or before. A formal or written agreement (though not required) is evidenced by the language in the February 25, 2019 joint press release regarding the CMA and CMKG Joint Venture.

173.     The email from new CMA President McMahon to former LE client Mr. Burkemper shows clear bias (supported by false and unscientific analysis) against all competitor third-party training solutions providers and the accuracy of the data used to support the claim of Defendant CMKG superiority is dubious and contradicted by Defendant Strunk's comments and other evidence described in this Complaint.

174.     The coordinated words and conduct of Defendants' CMA and CMKG demonstrates a conscious commitment to a common scheme and purpose designed to force competitors (including LE) out of the CM training market altogether, an unlawful objective suppressing competition, and thus evinces a conspiracy to restrain trade.

**(ii) Unreasonable Restraint on Trade: Anti-Competitive Purpose or Effect**

175.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

176.     The agreement between Defendants CMA and CMKG is an unreasonable restraint on trade whether analyzed through the per se illegality test, the Rule of Reason, or the Quick Look Test.

(a)     Per Se Illegality:

177.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

178.     The agreement or conspiracy between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and is thus per se illegal for the reasons set forth below.

*Evidence of Price Fixing and/or Tying*

179.     The activities of trade associations allow members to work cooperatively in a manner that is generally considered procompetitive, but when two competitors unite in an effort to hinder a group of their competitors' ability to compete, an actionable antitrust injury is present.

180.     The exclusive agreement between CMA and CMKG (a single competitor, now partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and tying of "Training Credits" as part of membership -- dub. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. CMA/CMKG training and CMA accreditation are now tied. This practice establishes a stabilized or fixed price for training and does not allow for competitive alternatives CMA certification. The Joint Venture is a direct written agreement with a competitor (now exclusive partner).

181.     Here, CMKG and LE were both CMA members and "Accredited" Training Providers, once CMA and CMKG formed an exclusive joint venture to bundle "Member Training Credits" as part of CMA Membership fees they directly set and fixed the price members are charged for accredited training, now only available from Defendants CMA/ CMKG.

182.     Both Defendants' Joint Venture and the bundling (tying) of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix and tie the price and conditions for CMA certification.

183.     Agreements by trade association members that compete with each other outside the association to set or fix and tie the prices that the members charge (or will pay) for a particular good or service are likely to present significant antitrust risks and could be challenged as *per se* unlawful, whether the agreement is entered directly or through association rules. There are no other vendors for "Member Training Credits" and no there is no negotiation as to the amount of "Member Training Credits" a customer obtains. There is, in essence, no price because Defendant CMA has bundled it as part of the relationship.

*Evidence of a Group Boycott*

184.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

185.     Trade association rules and conduct can give rise to antitrust risks if they could be viewed as an agreement among members to refuse to deal with a non-member competitor. Similarly, if participants in a trade association jointly agree not to buy from or sell to a company, this also could present risks under the antitrust laws.

186.     Here, when Defendants CMA / CMKG formed their exclusive joint venture agreement they directly refused LE ability to continue to be a full participating member and to achieve accreditation as a third-party solutions provider.

187.     Defendants CMA and CMKG in effect collaborated and agreed not to deal with competing firm LE, a pure form of a group boycott. Defendant CMA used its dominant market power to affect suppliers or customers through its words and by forming this exclusive joint venture agreement, colluding with a single competitor, Defendant CMKG. The effect of the arrangement anointing Defendant CMKG as the only accredited provider is to suppress competition and is buttressed by the fixing of prices of accredited training programs by bundling and tying Defendant CMKG training products and services inclusive with all CMA membership levels. What Defendants CMA and CMKG are claiming is that for example, Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of Defendant CMA/CMKG training only.

188.     Defendant CMA's new "membership" requirements, decisions surrounding access to association services and activities and agreement between Defendant CMA and CMKG unreasonably restrains competition in trade or commerce and is thus per se illegal.

189.     The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and reduces output. Intent is not required here. Both

Defendants' Joint Venture and the tying of "Member Training Credits" to CMA Membership fees are a direct and successful attempt to lock-out competition.

*Substantial Competitive Harm in the Relevant Markets*

190.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

191.    Defendant CMA's conduct has or is likely to have a substantial harmful effect on (reduction in) competition in that market that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality. Higher prices and lower quality have and will continue to ensue in the market, rendering Defendant CMA and CMKG's conduct wholly unreasonable.

192.    The other players in the market hindered by the conduct of CMA include Acosta (which uses LE's program internally for employees and is an LE-authorized re-seller partner to deliver a course via their Acosta University online LMS), TPG (a non-accredited training provider who offers online), LE's higher education partners: the WMU, University of Texas Tyler, Texas Tech University, and Ryerson University.

193.    Beyond the obvious and immediate effects, ramifications to the market resulting from Defendant CMA and CMKG's conduct will likely be felt in ways not immediately obvious to those outside the retail and CM industries. Yet, it is likely that this type of conduct will lead to the larger and more powerful organizations exerting increased influence over CMA and affecting the way retailers, manufactures, and shoppers get serviced. What Defendants CMA and CMKG are claiming is that Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of CMA/CMKG training only. Defendants CMA and CMKG are now getting Walmart, Sam's and Kroger to say, "Don't put sales and marketing CM professionals in front of us unless they're CMA-certified". Defendant CMA has always wanted retailer endorsement from companies like Walmart, Sam's and Kroger, but now they want it all -- the joint partnership creating one "required" go-to for training that results in certification and the big retailer push to their platform only -- that's the whole market. This results in substantial competitive harm due to the size and influence Walmart/Sam's and Kroger have over CPG brands and suppliers.

194.    This is the stated reason for AB InBev, Hershey and others to cut ties and terminate their relationships with LE. As one illustration, Dr. Robert Jones of Texas Tech University

told LE that the reason his school went with CMA/CMKG's training is because the training credits were "tied" to CMA membership.

195.     Those harmed include LE, but also Acosta, the aforementioned universities and all others who would provide training outside of that offered by Defendant CMA and its new exclusive partner, Defendant CMKG.

196.     The importance here reaches down through the supply chain and is likely to directly impact how the average American household buys products. For example, if a smaller company ("off brand") cannot afford membership and training with Defendant CMA, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

197.     In sum, the harm to competition generally here is the inability and deterrence of any new players to enter the markets for education, training, software, and hosting in the CM industry.

*Denial of Access to Trade Show*

198.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

199.     LE was also denied access to a trade show sponsored by Defendant CMA. Defendant CMA has not offered LE a legitimate rationale as to why LE was excluded and there is no evidence that the rules dictating presence at this trade show were objective. Further, LE's presence at the trade show is very important to competition in the market because the CMA Annual Conference showed LE's commitment and support of the Industry and enabled LE to set up meetings between existing clients and higher education partners and presented LE with an opportunity to present goods and services to new CMA member companies and contacts. Any argument by Defendant CMA about "limited room" will be contradictory as Defendant CMA's leadership itself (in the persons of Defendant Ross and Tom McDonald (hereinafter "Mr. McDonald"), Chairman of the Advisory Board at CMA) informed LE that "under the circumstances" (the CMA and CMKG Joint Venture announcement), LE would not be allowed in attendance or welcomed to sponsor the CMA conference. It appeared that

the once neutral trade association had modified its rules regarding presence at this trade show to be entirely subjective and applied in a discriminatory manner.

*Denial of Ability to be Certified*

200.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

201.     Certification programs can determine whether products comply with a standard or whether professionals have sufficient ability, education and experience. Not certifying a product or a professional can create competitive harm. The manner in which this joint and exclusive certification program is being implemented ultimately harms rivals like LE and is detrimental to the consumer.

202.     The "decision-maker" in the certification process is actually a competitor (Defendant CMA, now aligned with Defendant CMKG). As well, even after repeated attempts by LE to receive certification criteria, Defendant CMA has not provided as much and has left LE uncertain as to whether such criteria are indeed objective and related to the function being certified. The criteria is clearly being applied in a discriminatory manner. It is also unknown whether Defendant CMA's procedures were followed in the certification process, which would be important to the extent that it will show that a refusal to certify was fueled by anti-competitive goals.

*Standard Setting as Anti-Competitive Tactic*

203.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

204.     Defendant CMA is using standards to insulate itself and Defendant CMKG from competition by excluding competing companies and products from conforming to the industry standard.

205.     Even if Defendant CMA's standards promote the goal it is seeking to advance, such as safety, uniformity, or quality, timely notice for standard setting was not given to all parties believed to have direct and material stake in the standard. The standard setting process did not permit all parties with a direct and material stake in the standard (including LE) the right to participate in the process as evidenced by the fact that the CMA PSG and the process by which it is updated and revised is carried out by a CMA industry committee (members). The chairperson providing "oversight" of this is Mr. Strunk, both a minority equity owner in CMA and a head of Higher Education Committee (University partners). This causes a conflict

of interest and bias for the CMA/CMKG partnership and harms competition. Also, the ad-hoc standard update process is not done on a defined, regularly scheduled basis. Due to this exclusive arrangement between Defendant CMA and Defendant CMKG, members of the standard setting process did not hail from various parts of industry. To date, LE has been denied a written record of the standard setting process and knows of no unbiased review or appeal process if LE has questions about the chosen standard.

206.    To the extent this new standard is limiting access to the market for some firms (LE), that exclusion must be justified.

207.    The process of standard setting within CMA appears to be dominated by economically interested parties and not all parties that had a stake in the standard had an opportunity to participate meaningfully in the process.

208.    Defendant CMA's arrangement with Defendant CMKG appears to be a concerted effort to enforce the standard.

*Lack of a Compliance Program*

209.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

210.    Strong compliance programs may ensure that a trade association such as CMA and its members, (Defendant CMKG), comply with the antitrust laws. Compliance programs that go beyond mere policy statements and create a "culture of compliance". There is no evidence that CMA has instituted a program to ensure all staff and members are sensitive to antitrust issues, containing features like regular training for association staff and member representatives, training for new member representatives prior to participating in association activities, review of agendas by counsel in advance of association meetings, providing a reminder of antitrust rules at the start of association meetings, monitoring of association meetings by counsel, checkpoints for antitrust risk assessments before new resolutions or policies are adopted, review of new programs or activities by counsel prior to launch, and audits of existing programs, including information sharing programs or benchmarking studies.

211.    At minimum the joint agreement between Defendants CMA and CMKG (and CMA's other concerted actions toward LE) should have been put to board as a resolution and vote.

*No Countervailing Pro-Competitive Benefits*

212.    There are no countervailing pro-competitive benefits. There is no evidence that Defendants CMA and CMKG's conduct resulted or will result in increased product quality

and consistency, improved efficiency, greater predictability, greater availability of consumer information, expanded product/service availability, etc.… The purported pro-competitive aspects of such agreements like encouraging a retailer to provide a high level of service by focusing on a single manufacturer or ensuring consistent supply and predictable pricing to consumers don't hold sway here because no such danger was present and LE consistently produced quality material.

213.    To the extent there are benefits, the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, and thus they cannot be used to justify the restraint.

214.    Consequently, there exist no pro-competitive benefits and even if there were, the restraint was not necessary to achieve the purported benefits.

215.    LE asserts that even if not deemed per se illegal, and a naked Rule of Reason analysis is applied and pro-competitive benefits are deemed to exist, the agreements between Defendant CMA and Defendant CMKG nonetheless have anticompetitive that outweigh the pro-competitive benefits.

216.    The harm here is to competition and consumers, not just to a single competitor or group of competitors.

  (b)    On Balance, Anti-Competitive Benefits are Outweighed under the Rule of Reason:

217.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

218.    There exists an unreasonable restraint of trade considering the circumstances surrounding the agreement, including, among other things: the nature of the CM training services/products/accreditation industry, the exclusive nature of the alleged agreement and restraint, the actual effect of locking LE out of the industry, the history of Defendant CMA and CMKG's conduct in carrying out the restraint, the Defendants' reasons for adopting the practice -- to lock competitor LE out through an exclusive dealing contract, the fact that an individual competitor LE has lost its freedom to compete on an even plane, and the fact that prices and output will now be unresponsive to consumer preferences in this market.

  (c)  Quick Look Test

219.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

220.     In the alternative and should the court not deem this agreement per se illegal, the anticompetitive effect is nonetheless clear, and thus the "Quick Look Test" or "Abbreviated Rule of Reason" is the applicable test. The arrangement between Defendants CMA and CMKG has the aforementioned anticompetitive effects, but procompetitive justifications are wholly implausible, and this agreement does arise in a familiar context -- between a trade association and one of its members. Any purported procompetitive effects of this arrangement are unpersuasive.

### (iii) Antitrust Injury to LE

221.     LE repeats each and every allegation contained in paragraphs 139-150 above and incorporates by reference each paragraph as though fully set forth at length herein.

222.     As will be set forth in greater detail herein, Defendants CMA and CMKG hatched a conspiracy against LE and competition in the Relevant Markets more broadly causing the type of injury that antitrust laws were designed to protect against.

223.     The full amount of damages will be calculated after discovery and upon proof at trial.

## 2. SECOND CLAIM AGAINST DEFENDANT CMA
### (FOR MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, OR COMBINATION OR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

224.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

225.     LE's second claim is lodged under § 2 of the Sherman Antitrust Act, which prohibits monopolizing, or attempting to monopolize, or combining, or conspiring with any other person or persons, to monopolize any part of the trade or commerce.

226.     Defendant CMA unlawfully gained and maintained a monopoly in each of the Relevant Markets, conspired to gain and maintain a monopoly in the Relevant Markets, or, in the alternative, attempted to gain and maintain a monopoly in the Relevant Markets.

### Monopolization and/or Conspiracy or Combination to Monopolize

227.     Defendant CMA's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product Markets, in violation of § 2 of the Sherman

Act and LE was injured by the Defendants' unlawful monopolization of the Relevant Markets. A conspiracy or combination to monopolize is evidence by Defendant CMA's exclusive joint venture and joint marketing tactics with Defendant CMKG as alleged herein.

*Defendant CMA's Market Power*

228.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

229.     Market power is an ability profitably to raise prices charged above those that would be charged in a competitive market for a sustained period of time, or to pay lower prices that would be charged in a competitive market for a sustained period of time. A firm that possesses market power generally can charge higher prices for the same goods or services than a firm in the same market that does not possess market power.

230.     Defendant CMA's market share (its percentage of the products or services bought or sold in the relevant market by all competitors) is now 100% market share for training for certification, eliminating third party accredited providers). The textbook rule is that 30% to 40% or more market foreclosure is likely to have cognizable anticompetitive effects.

231.     Defendant CMA is unique in that it is the only CPG/retail trade association that offers industry "Accredited" training programs and an industry "Certification" specific to the CPG professionals who practice CM.

232.     Defendant CMA is now unrestrained by true competition and can set prices for services and products in the Relevant Markets as it pleases, as evidence by its tying of "Member Training Credits" to membership in its trade association.

*Market Foreclosure.*

233.     Defendants" exclusive-dealing agreement *substantially foreclosed* LE from competing in a substantial share of the market *because the collusion between CMA and CMKG creates a business environment in which only CMKG is provided formal "Accreditation" (e.g. endorsement), thus creating a single-only source for "Accredited Training". This limits fair trade, choice for consumers and members, and suppresses (and indeed has eliminated) competition.* The extent of the foreclosure of competition here is substantial in that CMA is the only CPG/Retail trade industries association for CM and as the only "accreditation body" for Certified CM Professionals certification is blocking competition by creating an exclusive joint venture with CMKG and only offering third party

training programs accreditation only to CMKG, and further outright blocked LE as of February 2019 to renew its accreditation or use "CMA Accredited" on its website and marketing.

234.     In February 2019, when Defendant CMA formally announced the exclusivity agreement with CMKG it crossed the line from pro-competition to anti-competition. The restraint here is the exclusivity agreement, a non-price vertical restraint that affected product and service distribution. Defendant CMA agreed to only purchase from one particular "Seller", Defendant CMKG for a set period of time. This arrangement harms competition either by foreclosing sales outlets to Defendant CMKG's competitors (namely LE) and by cutting off other market participants' (namely LE) access to important business relationships.

235.     Defendant CMKG is now the only CMA accredited training provider. (others would have been TPG, a direct LE competitor and others - Acosta, Nielsen, IRI, and any higher education that wants to have an accredited program. These latter companies have other branches of their business and training is just an offshoot for their overall enterprise.)

236.     In the past Defendant CMA's website would list all CMA accredited companies – it now only shows accredited university programs, with all the third-party training companies having been deleted.

*Barriers to Entry*

237.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

238.     The Relevant Markets are characterized by high barriers to entry and expansion including Defendant CMA's rules and regulations and controls over necessary inputs (requiring of CMA/CMKG training required in order to be accredited/certified), specialized joint marketing practices (CMA/CMKG tactics as described herein), and the reputation of the entities already participating in the market or the brand name recognition of their products or services (i.e. Defendant CMA's usage of its status as a "trade association" to imply that training, education, software, hosting must occur through its now exclusive partner). These barriers to entry make it difficult for new competitors to encounter the Relevant Markets in a meaningful and timely way.

239.     First, the costs to develop professional corporate quality e-learning coursework modules is substantial. It required tens of thousands of dollars for LE's initial development, and then hundreds of thousands more to sustain and maintain the product content relevancy

to meet specific new CMA updates made to the CMA Professional Standard Guide over the years. For instance, LE has invested over a million and a half dollars in research and development to develop content, sustain content relevancy and maintain technical usefulness of its CM Training Library consisting of 34 course-work modules ranging from 30 minutes to 1 hour each, associated pre- and post-assessment tests and CMA Professional practice exams.

240.     Second, there barriers exist in customers' long purchase cycles when implementing off-the-shelf training programs for sales and marketing teams. For example, it took approximately nine (9) years for LE to build its customer base with an average sales cycle of 9-12 months. This means that competitors have limited opportunities to significantly enter and expand their market share in this specific market space.

241.     Third, the simple fact of Defendant CMA's dominance as a trade association and exclusive arrangement with Defendant CMKG. As Defendant CMA publicly promotes, its exclusive joint venture with Defendant CMKG has rendered Defendant CMA (via Defendant CMKG) the leader in CM training. Given the costs for customers, and the presence of bundled offerings as part of CMA membership, any potential new CM training provider entrant would not be able to receive endorsement or accreditation as once granted by Defendant CMA.

242.     Alternatively, if a new entrant offers only a limited number of courses, those products must greatly exceed the quality of Defendant CMA's and at a much lower price to induce a customer to switch. Defendant CMA's conduct will reduce the number of 'accredited' training coursework programs available from a customer perspective, and only serves to further increase these already very high barriers to entry.

243.     Defendant CMA's anticompetitive policy changes with respect to revoking LE's ability to receive CMA accreditation creates a particularly insurmountable barrier to sell into the market. Defendant CMA's demand to cease and desist the use of copyright and trademark of "CMA Accredited" training logo and language forces customers who wish to use LE as an alternative program to forgo the use of LE's competitive products.

244.     Defendant CMA's subsequent announcement in February 2019 to members and the market that it had entered into an exclusive joint venture with CMKG (notwithstanding prior neutral representations) and its communications to the industry that LE is not an "accredited" training provider and that LE does not follow "CMA industry standards," have created a barrier for LE and other potential third party training providers to sell into the

market. Defendant CMA's cease and desist demand to LE to no longer use Defendant CMA accredited logos or language has caused some members and customers to refrain from purchasing a non-Defendant CMA/CMKG training product.

245.     Defendant CMA's own website and marketing statements using "Accredited Training", demonstrates how its revoking accreditation to LE and others acts as a barrier to compete. As Defendant CMA knows, its members, LE and other training solutions providers have made a significant investment over the years with the CMA, and in the creation and support of an industry CatMan 2.0 and the "Certified Professional" credential an individual may achieve through training and certification.

246.     *LE built its business and reputation in alignment and reliance on Defendant CMA's prior representations of being a neutral and unbiased industry advocate, providing CMA Accreditation to third party solutions providers who qualified.* Being denied the ability to achieve CMA Accreditation for its training programs has imposed on LE a fear, an uncertainty and a doubt about the viability of its entire business and customer base and harms the market more broadly. Defendant CMA, in its anticompetitive conduct, substantially suppresses competition and increases barriers to entry for others in the market.

247.     Given these barriers to entry and expansion, competition on the merits in the Relevant Markets is critical to ensure the resulting benefits to consumers and the market. If Defendant CMA's anticompetitive conduct is not stopped, the anticompetitive harm in the Relevant Markets will be long term and likely irreversible.

*Number and Size of Competitors*

248.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

249.     Defendant CMA's competitors are not capable of effectively competing. The financial strength, market shares and number of competitors cannot act as a check on the Defendant CMA's ability to price its products or services. Defendant CMA's competitors (including LE) have been rendered weak with a now declining market share

250.     Defendant CMA's can profitably lower and maintain the prices it pays for its inputs substantially below the competitive level for a significant period of time (indefinitely) and it can profitably and confidently raise and maintain the prices it charges for its outputs substantially above the competitive level for a significant period of time.

251.     Defendant CMA has the ability to profitably lower and maintain these input prices substantially below the competitive level for a significant period of time. Defendant CMA has the ability to profitably raise and maintain these output prices substantially above the competitive level for a significant period of time. Defendant CMA has the power to do so by themselves, that is, without the assistance of (and despite competition from) any existing or potential competitors.

252.     Defendant CMA has the ability to exclude competition. If Defendant CMA attempted to maintain prices above competitive levels, new competitors would not be able enter the Relevant Markets and existing competitors (like LE) now lack the ability to expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn.

253.     For the indefinite future, Defendant CMA will have an ability to sell at higher prices and earn higher profit margins than other companies for similar goods or services in the Relevant Markets.

254.     Defendant CMA has no valid claim that its success is due to a superior products or services, the ability to maintain an efficient business operation, superior advertising or marketing, or unique structure of the industry.

255.     Defendant CMA wouldn't lose a substantial amount of sales if it raised prices substantially as they have in effect locked out the competition through the CMKG joint venture, bundling and tying tactics and other affirmative interference efforts to deter parties from using LE's services.

256.     Defendant CMA has excluded competitor LE, from each of the Relevant Markets and has deprived consumers of the benefits of a free and open market system that derived from the law of supply and demand.

*No Legitimate Business Purpose*

257.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

258.     Defendant CMA's actions cannot be construed as anything but an attempt to dominate the Relevant Markets through the exclusion of and harm to competitors (LE), and ultimately harm to the consumer. Truly, an illegitimate aim sought through illegitimate means.

259.    Even if one grants the for-profit pursuits of trade association, Defendant CMA as legitimate, turning a profit to better serve the industry can be clearly distinguished from the cherry-picking of one particular competitor-member to form an exclusive agreement with to the harm of other existing members.

260.    Defendant CMA's current dominant position is not due to superior foresight and skill, natural advantages, economic or technological efficiency, securing of an elusive patent or because changes in cost or taste have driven out all but one supplier. Indeed it was LE's foresight and skill that created the very market they now monopolize. The advantages enjoyed by CMA can be appropriately seen as unnatural due to the fact that they are a trade association. There have been changes in cost or taste, changes that were foreseen by LE and provided the impetus for its business model, not changes in cost or taste that have driven consumers to Defendant CMA/CMKG and away from LE.

261.    Defendant CMA's position was won by leveraging its position as a trade organization and coordinating its action with *one* of its members to the exclusion of all others to become the only product and service source in the Relevant Markets.

262.    Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. Defendant CMA's conduct does not result in any greater ability to reduce costs in producing or innovating CM training services, software, or hosting that could result in reduced prices, higher quality, or greater availability to customers. Its efforts to demonstrate as much are spurious at best. Nor does Defendant CMA's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets.

263.    The only "benefit" of Defendant CMA's conduct is a reduction in competition, and that benefit inures solely to Defendant CMA (and CMKG), not to customers nor to competition on the merits.

**Attempted Monopolization**

264.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

265.    If Defendant CMA have not yet achieved an actionable "monopoly", Defendants nonetheless attempted to monopolize the Relevant Markets, having a specific intent to do so.

- 43 -

266.     Direct evidence indicates that Defendant CMA's actions were taken with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the Relevant Markets. Statements to LE's clients and others made by Defendant CMA's representatives at CM trade shows demonstrate the association's intent to obtain a monopoly in the Relevant Markets.

267.     Defendant CMA's words and conduct indicated not merely an intent to compete aggressively, but rather a true intent to acquire monopoly power using anticompetitive means as described herein.

268.     Even if no direct evidence that Defendant CMA actually intended to obtain a monopoly, the natural and probable consequences of Defendants' conduct in the Relevant Markets was to give Defendant CMA control over prices and to exclude or destroy competition. This was plainly foreseeable by Defendant CMA's conduct in:

269.     (i) Reversing a decade long policy (since its inception) that encouraged both members and independent third party training and solutions providers to become active CMA members and sponsors, to participate in Defendant CMA events, and to support and utilize Defendant CMA's Professional Standards Guide for individual certifications, in favor of a new policy selecting only one "acceptable" provider in the Relevant Market, its new exclusive partner Defendant CMKG, and simultaneously revoking LE's ability to compete as an accredited product/service in the market;

270.     (ii) Engaging in associated intimidation sales and marketing tactics to LE clients and other firms pursuant to its policy change and overall scheme to hinder competition;

271.     (iii) Unfairly influencing Defendant CMA members seeking to renew their memberships to implement the CMA's new "Training Credits with Membership" programs into their organizations. Membership in the CMA is now conditioned on the purchase of these "Member Training Credits" that then get distributed to and then spent by members on accredited courses and programs, case studies, and certification prep materials. The benefactor of this tying arrangement is the joint CMA / CMKG bottom line;

272.     (iv) Unjustifiably revoking of LE's accreditation status;

273.     (v) Unjustifiability denying a board seat to Mr. Matthews;

274.     (vi) Unjustifiability denying LE access to CM trade shows;

275.     (vi) Unjustifiably revoking the accreditation of providers, specifically, universities, which utilized LE to gain accreditation, and now forcing them to redevelop and become re-

accredited at a substantial cost to them (yet ensuring guaranteed revenue stream to Defendant CMA/CMKG).

276.     When coupled with the fact that LE has proven (as affirmed by its clients) to design, build and deliver superior quality training and technology delivery systems, at lower prices and provides higher quality and faster service (including its LMS technology platform used to deliver, track and report results of training programs), these actions show at a minimum, a dangerous probability (a real likelihood) that Defendant CMA would ultimately acquire monopoly power if they continued to engage in the same or similar conduct.

**Injury**

277.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

278.     Defendant CMA has and will continue to, inter alia, maintain supra-competitive prices to customers in each of the Relevant Markets, harm innovation associated with the products offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice of technology.

279.     Defendant CMA's unlawful monopolization, conspiracy to monopolize, or attempted monopolization has injured competition in each of the Relevant Markets, suppressed sales of LE's products and the products of other competitors, diminished LE's future sales opportunities and the sales opportunities of other competitors, and increased LE's operating costs and the operating costs of other competitors as alleged in this Complaint.

280.     LE has been harmed by the Defendant CMA's willful anticompetitive maintenance of its monopoly and its exclusion of all competitors, the true sum of damages to be proven at trial.

## 3. THIRD CLAIM AGAINST DEFENDANT CMA
### FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT

281.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

282.     Section 3 of the Clayton Act rules out practices that lessen competition such as exclusive dealings or the attempt to create a monopoly. A manufacturer who offers service

for the goods or service it sells is prohibited from favoring its own service organization. *Generally, a seller may not require the use of the its own service.*

283.    The activities of trade associations allow members to work cooperatively in a manner that is generally considered procompetitive, but when two competitors unite in an effort to hinder a group of their competitors' ability to compete, an actionable antitrust injury is present. The exclusive agreement between Defendants CMA and CMKG (a single competitor, now exclusive partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and tying of "Member Training Credits" as part of membership. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. This practice establishes a stabilized or fixed and tied price for training and does not allow for competitive alternatives CMA certification.

284.    CMKG and LE were both CMA members and "Accredited" Training Providers. Once CMA and CMKG formed this exclusive joint venture, they directly set and fixed and tied the price members are charged for accredited training, now only available from Defendants CMA/CMKG.

285.    Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix the price and conditions for CMA certification.

286.    Agreements by trade association members that compete with each other outside the association to set, fix or tie the prices that the members charge (or will pay) for a particular good or service present serious significant antitrust risks and are often *per se* unlawful, whether the agreement is entered directly or through association rules. There are no other vendors for "Member Training Credits" and no negotiating the amount of "Member Training Credits" one receives. In essence, there exists no price because Defendants CMA and CMKG have bundled it as part of the relationship.

287.    These actions fused with Defendant CMA's conduct in interfering with LE's customers as part of its plan with Defendant CMKG constitute a violation of § 3.

## 4. FOURTH CLAIM AGAINST DEFENDANT CMA

<u>(FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. &</u>
<u>PROF. CODE)</u>

288.     LE repeats each and every allegation contained in the paragraphs above and
incorporates by reference each preceding paragraph as though fully set forth at length herein.

289.     Section 16720 of the Cal Bus. & Prof. Code prohibits trusts, defined as any
"combination" of capital, skill or acts by two or more persons to, inter alia, carry out
restrictions in commerce, prevent competition, or fix prices.

### <u>(i) Combination of Capital, Skill, or Acts by Two or More [Entities]</u>

<u>Agreement</u>

290.     Two separate entities have reached an agreement or understanding as evidenced by
Defendant CMA's exclusive Joint Partnership with Defendant CMKG for Defendant CMKG
to provide exclusive CM training services for Defendant CMA and the deal's subsequent
announcement, described in detail in this Complaint. This agreement when fused with the
surrounding words and conduct of both Defendant CMA and CMKG demonstrates a
collective desire to unfairly control the Relevant Markets.

<u>Conspiracy</u>

291.     Defendants CMA and CMKG participated in a conspiracy to restrain trade in their
agreement. Defendants CMA and CMKG entered the exclusive joint partnership agreement
that they would act together for the unlawful purpose of restraining trade and monopolizing
the CM training services market. Defendants CMA and CMKG knowingly became members
of this conspiracy with the intent to further its purposes. Defendants CMA and CMKG's
"Exclusive Joint Venture" strategy to undermine competition (including LE) began in 2018
or before. A formal or written agreement (though not required) is evidenced by the joint
press release regarding the CMA and CMKG Joint Venture.

292.     The aforementioned email from new CMA President McMahon to former LE client
Mr. Burkemper shows clear bias (supported by false and unscientific analysis) against all
competitor third-party training solutions providers and data that was shared with LE to

support this claim is misleading and inaccurate as evidenced by Defendant Strunk's comments and other evidence alleged in this Complaint.

293.     The agreement between Defendants CMA and CMKG demonstrates a conscious commitment to a common scheme and purpose designed to force competitors (including LE) out of the CM training market altogether, an unlawful objective suppressing competition.

## (ii) Restrictions in Commerce, Prevention of Competition, Price Fixing and/or Tying, Monopoly

294.     The actions of Defendant CMA constitute an unreasonable restraint on trade on several grounds.

### Evidence of Price Fixing, Exclusive Arrangement and/or Tying

295.     The exclusive agreement between CMA and CMKG (a single competitor, now partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and tying of "Member Training Credits" as part of membership as described in detail in this Complaint. This practice establishes a stabilized or fixed price for training and does not allow for competitive alternatives CMA certification. The Joint Venture is a direct written agreement with a competitor (now exclusive partner).

296.     CMKG and LE were both CMA members and "Accredited" Training Providers, once CMA and CMKG formed an exclusive joint venture to bundle "Member Training Credits" as part of CMA Membership fees they directly set and fixed the price members are charged for accredited training, now only available from Defendants CMA/ CMKG.

297.     Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix and tie the price and conditions for CMA certification.

298.     Agreements by trade association members that compete with each other outside the association to set or fix and tie the prices that the members charge (or will pay) for a particular good or service presents significant antitrust risks and are *per se* unlawful, whether the agreement is entered directly or through association rules. In the case of Defendants CMA and CMKG, there are no other vendors for "Member Training Credits" and no

negotiating the amount of "Member Training Credits" you get. There is, in essence, no price because they've bundled it as part of the relationship.

### Evidence of a Group Boycott

299.     Trade association rules and conduct can violate §16720 if they are an agreement among members to refuse to deal with a non-member competitor. Similarly, if participants in a trade association jointly agree not to buy from or sell to a company, this also constitutes a §16720 violation.

300.     When Defendants CMA / CMKG formed their exclusive joint venture agreement they directly refused LE ability to continue to be a full participating member and to achieve accreditation as a third-party solutions provider.

301.     Defendants CMA and CMKG, in effect, collaborated and agreed not to deal with competing firm LE -- a pure form of a group boycott. Defendant CMA used its dominant market power to affect suppliers or customers by forming this exclusive joint venture agreement, colluding with a single competitor, Defendant CMKG. The effect of the arrangement allowing Defendant CMKG to be the only accredited provider is to suppress competition by fixing prices of accredited training programs by bundling and tying CMKG training products and services inclusive with all CMA membership levels. What Defendants CMA and CMKG are claiming is that for example, Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of Defendants CMA/CMKG training only.

302.     Defendant CMA's new "membership" requirements, decisions surrounding access to association services and activities and the agreement between Defendant CMA and CMKG unreasonably restrain competition and is thus per se illegal. The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and reduces output. Intent is not required here. Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition in violation of §16720.

### Evidence of a Monopoly, Conspiracy to Gain & Maintain a Monopoly, Attempted Monopolization

*Monopoly & Conspiracy to Gain & Maintain a Monopoly*

303.     Defendant CMA unlawfully gained and maintained a monopoly in the Relevant Markets; conspired to gain and maintain a monopoly in the Relevant Markets as evidenced by its joint venture with CMKG described herein; or, in the alternative, attempted to gain and maintain a monopoly in the Relevant Markets.

304.     Defendant CMA's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product and LE was injured by the Defendants' unlawful monopolization of the Relevant Markets.

305.     Defendant CMA's market share (its percentage of the products or services bought or sold in the relevant market by all competitors) is now 100% market share for training for certification, eliminating third party accredited providers). The textbook rule is that 30% to 40% or more market foreclosure is likely to have cognizable anticompetitive effects.

306.     Defendant CMA is unique in that it is the only CPG/retail trade association that offers industry "Accredited" training programs and an industry "Certification" specific to the CPG professionals who practice CM.

307.     The exclusive-dealing agreement *substantially foreclosed* LE from competing in a substantial share of the market *because the collusion between CMA and CMKG creates a business environment in which only CMKG is provided formal "Accreditation" (e.g. endorsement), thus creating a single-only source for "Accredited Training". This limits fair trade, choice for consumers and members, and suppresses (and indeed has eliminated) competition.* The extent of the foreclosure of competition here is substantial in that CMA is the only CPG/Retail trade industries association for Category Management and as the only "accreditation body" for Certified CM Professionals certification is blocking competition by creating an exclusive joint venture with CMKG and only offering third party training programs accreditation only to CMKG, and further outright blocked LE as of February 2019 to renew its accreditation or use "CMA Accredited" on its website and marketing.

308.     In February 2019, when Defendant CMA formally announced the exclusivity agreement with CMKG it crossed the line from pro-competition to anti-competition. The restraint here is the exclusivity agreement, a non-price vertical restraint that affected product and service distribution. Defendant CMA agreed to only purchase from one particular "Seller", Defendant CMKG for a set period of time. This arrangement harms competition either by foreclosing sales outlets to Defendant CMKG's competitors (namely LE) and by cutting off other market participants' (namely LE) access to important business relationships.

309.     Defendant CMKG is now the only CMA accredited training provider. (others would have been TPG, a direct LE competitor and others - Acosta, Nielsen, Information Resources Inc. (hereinafter "IRI"), and any higher education that wants to have an accredited program. These latter companies have other branches of their business and training is just an offshoot for their overall enterprise.

310.     In the past Defendant CMA's website would list all CMA accredited companies – it now only shows accredited university programs, all the third-party training companies are deleted.

311.     Barriers to entry include Defendant CMA's rules and regulations (in making CMA/CMKG training required in order to be accredited/certified), controls over necessary inputs, specialized joint marketing practices as described herein, and the reputation of the entities already participating in the market (or the brand name recognition of their products or services) – i.e. Defendant CMA's usage of its status as a "trade association" to imply that training, education, software, hosting must occur through its now exclusive partner. These barriers to entry make it difficult for new competitors to encounter the Relevant Markets in a meaningful and timely way.

312.     The Relevant Markets are characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. To begin with, the costs to develop professional corporate quality e-learning coursework modules is substantial. It required tens of thousands of dollars for LE's initial development, and then hundreds of thousands more to sustain and maintain the product content relevancy to meet specific new CMA updates made to the CMA Professional Standard Guide over the years. For instance, LE has invested over a million and a half dollars in research and development to develop content, sustain content relevancy and maintain technical usefulness of its CM Training Library consisting of 34 course-work modules ranging from 30 minutes to 1 hour each, associated pre- and post-assessment tests and CMA Professional practice exams.

313.     Another barrier to entry for the Relevant Markets lies in customers' long purchase cycles when implementing off-the-shelf training programs for sales and marketing teams. For example, it took approximately nine (9) years for LE to build its customer base with an average sales cycle of 9-12 months. This means that competitors have limited opportunities to significantly enter and expand their market share in this specific market space.

314.     As Defendant CMA publicly promotes, it now claims with its exclusive joint venture with Defendant CMKG to be the leader in CM training. Thus, a further barrier to entry is created by the simple fact of Defendant CMA's dominance. Given the costs for customers, and the presence of bundled offerings as part of CMA membership, any potential new CM training provider entrant would not be able to receive endorsement or accreditation as once granted by the CMA.

315.     Alternatively, if a new entrant offers only a limited number of courses, those products must greatly exceed the quality of Defendant CMA's and at a much lower price to induce a customer to switch. Defendant CMA's conduct will reduce the number of 'accredited' training coursework programs available from a customer perspective, and only serves to further increase these already very high barriers to entry.

316.     Defendant CMA's anticompetitive policy changes with respect to revoking LE's ability to receive CMA accreditation creates a particularly insurmountable barrier to sell into the market. Defendant CMA's demand to cease and desist the use of copyright and trademark of "CMA Accredited" training logo and language forces customers who wish to use LE as an alternative program to forgo the use of LE's competitive products.

317.     Defendant CMA's subsequent announcement in February 2019 to members and the market that its entered into an exclusive joint venture with CMKG, notwithstanding its prior representations, and its communications to the industry that LE is not an "accredited" training provider which does not follow "CMA industry standards," has created a barrier for LE and other potential third party training providers to sell into the market. The CMA's cease and desist demand to LE to no longer use CMA logos or language has caused some members and customers to refrain from purchasing a non-Defendant CMA/CMKG training product.

318.     Defendant CMA's own website and marketing statements using "Accredited Training", demonstrates how its revoking accreditation to LE and others acts as a barrier to compete. As Defendant CMA knows, its members, LE and other training solutions providers have made a significant investment over the years with the CMA, and in the creation and support of an industry CatMan 2.0 and the Certified Professional credential an individual may achieve through training and certification.

319.     *LE built its business and reputation in alignment and reliance on Defendant CMA's prior representations of being a neutral and unbiased industry advocate, providing CMA Accreditation to third party solutions providers who qualified.* Being denied the ability to achieve CMA Accreditation for

its training programs has imposed on LE a fear, an uncertainty and a doubt about the viability of its entire business and customer base and harms the market more broadly. Defendant CMA, in its anticompetitive conduct, substantially suppresses competition and increases barriers to entry for others in the market.

320.     Given these barriers to entry and expansion, competition on the merits in the Relevant Markets is critical to ensure the resulting benefits to consumers and the market. If Defendant CMA's anticompetitive conduct is not stopped, the anticompetitive harm in the Relevant Markets will be long term and likely irreversible.

321.     Defendant CMA's competitors are not capable of effectively competing. The financial strength, market shares and number of competitors cannot act as a check on the Defendants' ability to price its products or services. Defendant CMA's competitors including LE have been rendered weak with a now declining market share.

322.     Defendant CMA has the ability to profitably raise and maintain these output prices substantially above the competitive level for a significant period of time. Defendant CMA has the power to do so by themselves  that is, without the assistance of, and despite competition from any existing or potential competitors.

323.     Defendant CMA has the ability to exclude competition. For example, if Defendant CMA attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Defendants do not have monopoly power.

324.     An ability to sell at higher prices or earn higher profit margins than other companies for similar goods or services over a long period of time may be evidence of monopoly power. Defendant CMA has no valid claim that its success is due to a superior products or services, the ability to maintain an efficient business operation, superior advertising or marketing, or unique structure of the industry. Defendant CMA wouldn't lose a substantial amount of sales if it raised prices substantially as they have in effect locked out the competition through the CMKG joint venture, bundling and tying tactics and other affirmative efforts to deter parties from using LE's services.

325.     Defendant CMA willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct.

326.     Defendant CMA's conduct was anticompetitive rather than legitimate business conduct because Defendant CMA's conduct is not consistent with competition on the merits, the conduct provides no benefits to consumers, and the conduct does not make business sense apart from any effect it has on excluding competition or harming competitors.

327.     The conduct that has resulted or will result in monopoly power have made it very difficult or impossible for LE and others to compete with other legitimate business reason other than locking out a strong competitor. Defendant CMA's current position is not due to superior foresight and skill, natural advantages, economic or technological efficiency, securing of a patent or because changes in cost or taste have driven out all but one supplier. Their position is due to a coordinated effort to become the only source in the Relevant Markets.

328.     For the purpose of acquiring monopoly power, Defendant CMA committed numerous acts, including:

329.     (i) Carrying out a decade long policy since its inception, that encouraged both members and independent third party training and solutions providers to become active CMA members and sponsors to participant in Defendant CMA events, and to support and utilize Defendant CMA's Professional Standards Guide for individual certification as a CPCA, CPCM and CPSA, only to reverse that policy when Defendants CMA and CMKG formed an exclusive joint venture and revoked LE's ability to compete as an accredited product in the market;

330.     (ii) Engaging in associated intimidation sales and marketing tactics pursuant to its policy change and overall scheme to hinder competition; and

331.     (iii) Unfairly influencing Defendant CMA members seeking to renew their memberships to implement the CMA's new "Training Credits with Membership" programs into their organizations, a tying and price fixing tactic.

332.     (iv) Unjustifiably revoking of LE's accreditation status;

333.     (v) Unjustifiability denying a board seat to Mr. Matthews;

334.     (vi) Unjustifiability denying LE access to CM trade shows;

335.     (vi) Unjustifiably, revoking accredited providers, specifically, universities, which used LE to gain accreditation and now forcing them to redevelop (cost to them) and get re-accredited (cost to them, revenue to Defendant CMA).

336.     Defendant CMA has excluded competitor LE, from each of the Relevant Markets and has deprived consumers of the benefits of a free and open market system and deprives members economic benefits that are based on the law of supply and demand.

337.     Defendant CMA does not have a legitimate business purpose for any of its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. Defendant CMA's conduct does not result in any greater ability to reduce costs in producing or innovating CM training it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Defendant CMA's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets. The only "benefit" of Defendant CMA's conduct is a reduction in competition, and that benefit inures only to Defendant CMA's advantage, not to that of customers or competition on the merits.

338.     Defendant CMA's unlawful monopolization has injured competition in each of the Relevant Markets, suppressed sales of LE's products and the products of other competitors, diminished LE's future sales opportunities and the sales opportunities of other competitors, and increased LE's operating costs and the operating costs of other competitors.

339.     LE has proven to design, build and deliver superior quality E-Learning Coursework, modules, videos, resource materials and LMS platform technologies, at lower prices and provides higher quality and faster service, as confirmed by numerous LE clients. Another advantage of LE's solution is the LMS technology platform used to deliver, track and report results of training programs.

340.     Defendant CMA's overall course of conduct has and will continue to, inter alia, maintain supra-competitive prices to customers in each of the Relevant Markets, harm innovation associated with the products offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice of technology on the merits

341.     LE has been harmed by the Defendant CMA's willful anticompetitive maintenance of its monopoly and its exclusion of all competitors.

*Attempted Monopolization*

342.     If Defendant CMA have not yet achieved an actionable "monopoly", Defendants nonetheless attempted to monopolize the Relevant Markets.

343.     Defendant CMA had a specific intent to achieve monopoly power in a relevant market as shown by their actions taken with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the Relevant Markets. Direct statements of Defendant CMA's intent to obtain a monopoly in the relevant market are shown by comments made by its representatives at trade shows and to LE clients. Defendant CMA's words and conduct indicated not merely an intent to compete aggressively, but rather a true intent to acquire monopoly power using anticompetitive means as described herein.

344.     Even if no direct evidence that Defendants actually intended to obtain a monopoly, the natural and probable consequences of Defendants' conduct in the Relevant Markets was to give Defendant CMA control over prices and to exclude or destroy competition. This was plainly foreseeable by Defendant CMA upon engaging its exclusive joint venture with CMKG, bundling and tying "Member Training Credits", its denial of accreditation to LE, its denial of a board seat to Mr. Matthews, and its denial of access to CM trade shows. These actions taken in the aggregate show at minimum, dangerous probability (a real likelihood) that Defendant CMA would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Defendant CMA would ultimately acquire monopoly power if they continued to engage in the same or similar conduct.

345.     Defendant CMA's overall course of conduct has and will continue to, inter alia, maintain supra-competitive prices to customers in each of the Relevant Markets, harm innovation associated with the products offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice of technology on the merits.

### Applicable Standard

346.     The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and is thus per se illegal or in the alternative, on balance, its anti-competitive benefits are outweighed under the Rule of Reason.

347.     There exists an unreasonable restraint of trade considering the circumstances surrounding the agreement, including, among other things: the nature of the CM training services, products and accreditation industry, facts that are unique to the CM industry, the

exclusive nature of the alleged agreement and restraint, the actual effect on locking LE out of the industry, the history of Defendant CMA and CMKG's conduct in carrying out the restraint, the reason for adopting this practice -- to lock competitor LE out through an exclusive dealing contract, the fact that an individual competitor LE (among others) has lost its freedom to compete on an even plane, and the fact that prices and output will be unresponsive to consumer preferences in this market.

*Substantial Competitive Harm in the Relevant Markets*

348.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

349.    Defendant CMA's conduct has or is likely to have a substantial harmful effect on (reduction in) competition in that market that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality. Higher prices and lower quality have and will continue to ensue in the market, rendering Defendant CMA and CMKG's conduct wholly unreasonable.

350.    The other players in the market hindered by the conduct of CMA include Acosta (which uses LE's program internally for employees and is an LE-authorized re-seller partner to deliver a course via their Acosta University online LMS), TPG (a non-accredited training provider who offers online), LE's higher education partners: the WMU, University of Texas Tyler, Texas Tech University, and Ryerson University.

351.    Beyond the obvious and immediate effects, ramifications to the market resulting from Defendant CMA and CMKG's conduct will likely be felt in ways not immediately obvious to those outside the retail and CM industries. Yet, it is likely that this type of conduct will lead to the larger and more powerful organizations exerting increased influence over CMA and affecting the way retailers, manufactures, and shoppers get serviced. What Defendants CMA and CMKG are claiming is that Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of CMA/CMKG training only. Defendants CMA and CMKG are now getting Walmart, Sam's and Kroger to say, "Don't put sales and marketing CM professionals in front of us unless they're CMA-certified". Defendant CMA has always wanted retailer endorsement from companies like Walmart, Sam's and Kroger, but now they want it all -- the joint partnership creating one "required" go-to for training that results in certification and the big retailer push to their platform only -- that's the whole market. This

results in substantial competitive harm due to the size and influence Walmart/Sam's and Kroger have over CPG brands and suppliers.

352.      This is the stated reason for AB InBev, Hershey and others to cut ties and terminate their relationships with LE. Those harmed include LE, but also Acosta, the aforementioned universities and all others who would provide training outside of that offered by Defendant CMA and its new exclusive partner, Defendant CMKG.

353.      The importance here reaches down through the supply chain and is likely to directly impact how the average American household buys products. For example, if a smaller company ("off brand") cannot afford membership and training with Defendant CMA, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

354.      Put simply, the harm to competition generally here is the inability and deterrence of any new players to enter the markets for education, training, software, and hosting in the CM industry.

*Duration and Terminability.*

355.      The duration of the exclusivity agreement between Defendants CMA and CMKG is unknown but LE will propound this information through the civil discovery process.

*Denial of Access to Trade Show*

356.      LE was also denied access to a trade show sponsored by Defendant CMA – the CMA Annual Conference. Defendant CMA has not offered LE a legitimate rationale as to why LE was excluded and there is no evidence that the rules dictating presence at this trade show were objective. LE's presence at the conference is vital to its ability to compete in the market because it shows LE's commitment and support of the industry, enables LE to set up meetings between existing clients and higher education partners, and affords LE an opportunity to present goods and services to new CMA member companies and contacts. The denial of access to this show, fused with Defendants conduct at the trade show outlined in detail in this Complaint that led to LE's injuries. Any argument by Defendant CMA about "limited room" will be contradictory as Defendant CMA's leadership itself (in the persons of Defendant Ross and Mr. McDonald) informed LE that "under the circumstances" (the CMA

and CMKG Joint Venture announcement), LE would not be allowed in attendance or welcomed to sponsor the conference. It appeared that the once neutral trade association had modified its rules regarding presence at this trade show to be entirely subjective and applied in a discriminatory manner.

*Denial of Ability to be Certified*

357.     Certification programs can determine whether products comply with a standard or whether professionals have sufficient ability, education and experience. Not certifying a product or a professional can create competitive harm. The manner in which this joint and exclusive certification program is being implemented ultimately harms rivals like LE and is detrimental to the consumer. Here the "decision-maker" in the certification process is actually a competitor (Defendant CMA, now aligned with Defendant CMKG). As well, even after repeated attempts by LE to receive certification criteria, Defendant CMA has not provided as much and has left LE uncertain as to whether such criteria are indeed objective and related to the function being certified. The criteria is clearly being applied in a discriminatory manner. It is also unknown whether Defendant CMA's procedures were followed in the certification process, which would be important to the extent that it will show that a refusal to certify was fueled by anti-competitive goals.

*Standard Setting as Anti-Competitive Tactic*

358.     Defendant CMA is using standards to insulate itself and Defendant CMKG from competition by excluding competing companies and products from conforming to the industry standard.

359.     Even if Defendant CMA's standards promote the goal it is seeking to advance, such as safety, uniformity, or quality, timely notice for standard setting was not given to all parties believed to have direct and material stake in the standard. The standard setting process did not permit all parties with a direct and material stake in the standard (including LE) the right to participate in the process as evidenced by the fact that the CMA PSG and the process by which it is updated and revised is carried out by a CMA industry committee (members). The chairperson providing "oversight" of this is Mr. Strunk, both a minority equity owner in CMA and a head of HEB (University partners). This causes a conflict of interest and bias for the CMA/CMKG partnership and harms competition. Also, the ad-hoc standard update process is not done on a defined, regularly scheduled basis. Due to this exclusive arrangement between Defendant CMA and Defendant CMKG, members of the standard setting process

did not hail from various parts of industry. To date, LE has been denied a written record of the standard setting process and knows of no unbiased review or appeal process if LE has questions about the chosen standard.

360. To the extent this new standard is limiting access to the market for some firms (LE), that exclusion must be justified.

361. The process of standard setting within CMA appears to be dominated by economically interested parties and not all parties that had a stake in the standard had an opportunity to participate meaningfully in the process.

362. Defendant CMA's arrangement with Defendant CMKG appears to be a concerted effort to enforce the standard.

*Lack of a Compliance Program*

363. Strong compliance programs may ensure that a trade association such as CMA and its members, CMKG, comply with the antitrust laws. Compliance programs that go beyond mere policy statements and create a "culture of compliance". There is no evidence that CMA has instituted a program to ensure all staff and members are sensitive to antitrust issues, containing features like Regular training for association staff and member representatives; Training for new member representatives prior to participating in association activities; Review of agendas by counsel in advance of association meetings; Providing a reminder of antitrust rules at the start of association meetings; Monitoring of association meetings by counsel; Checkpoints for antitrust risk assessments before new resolutions or policies are adopted; Review of new programs or activities by counsel prior to launch; and Audits of existing programs, including information sharing programs or benchmarking studies.

364. At minimum the joint agreement with CMA and CMKG (and CMA's other concerted actions toward LE) should have been put to board as a resolution and vote.

365. There are no countervailing pro-competitive benefits. There is no evidence that Defendants CMA and CMKG's conduct resulted or will result in increased product quality and consistency; improved efficiency; greater predictability; increased marketing; increased promotion and greater availability of consumer information; expanded product availability; increased investment. The purported pro-competitive aspects of such agreements like encouraging a retailer to provide a high level of service by focusing on a single manufacturer or ensuring consistent supply and predictable pricing to consumers don't hold sway here because no such danger was present and LE consistently produced quality material.

366.    To the extent there are benefits, the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, and thus they cannot be used to justify the restraint.

367.    Consequently, there exist no pro-competitive benefits and even if there were, the restraint was not necessary to achieve the purported benefits.

368.    LE asserts that even if not deemed per se illegal, and a naked Rule of Reason analysis is applied and pro-competitive benefits are deemed to exist, the agreements between Defendant CMA and Defendant CMKG nonetheless have anticompetitive that outweigh the pro-competitive benefits.

369.    The harm here is to competition and consumers, not just to a single competitor or group of competitors.

### (iii)    Antitrust Injury to LE

370.    LE repeats each and every allegation contained in paragraphs 139-150 above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

371.    As will be set forth in greater detail herein, Defendants CMA and CMKG hatched a conspiracy against LE and competition in the Relevant Markets more broadly causing the type of injury that antitrust laws were designed to protect against.

372.    The full amount of damages will be calculated after discovery and upon proof at trial.

### Propriety of a Preliminary and Permanent Injunction

373.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

374.    LE is also seeking a preliminary and permanent injunction to prevent Defendant CMA from its conduct violating §16720.

375.    If an injunction is not issued LE will continue to sustain severe, unceasing and irreparable harm to its business model and revenue streams.

376.    These injuries outweigh any harm to Defendants CMA and CMKG because the partners would still be permitted to carry out their arrangement on a non-exclusive basis and without some of the anti-competitive attributes of their arrangement.

377.    The public interest is best served by granting an injunction here because the current state of Defendant CMA, in its relationship with Defendant CMKG is actively harming the marketplace. Before the Defendant MGMT3D acquisition, the CMA was an unbiased

industry trade association which promoted and facilitated strategic collaboration between retailers, suppliers and third-party solution providers. CMA events offered an open marketplace for many accredited training providers to offer its services to CPG manufactures and retailers to help them train and skill up their people to industry standards developed by the CMA members.

378.     Today, however that marketplace is under attack from the CMA and CMKG in an attempt to monopolize the training and online education business. The CMA and CMKG exclusive joint venture effectively blocks and ultimately works to eliminate companies like LE from competing. As noted, LE invested over $500,000 and took the initial risk in creating the first online CM coursework modules and technology platform to 100% align with the CMA PSG. An injunction would not just remedy the fact that LE is no longer allowed to provide "accredited" training, but remedy the suppression of competition, and the restriction of options from a once unbiased trade industry association.

379.     The ramifications to the market of Defendant CMA and CMKG's conduct will be felt in ways that might not be immediately obvious. Yet, this type of conduct will likely lead to the larger and more powerful organizations exerting influence over CMA and affecting the way retailers, manufactures, and shoppers get serviced. The importance of here reaches down through the supply chain and is likely to impact how the average American household buys products.

380.     For example, if a smaller company (i.e. an "off-brand") cannot afford membership and training with Defendant CMA, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

## 5. FIFTH CLAIM AGAINST DEFENDANT CMA
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

381.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

382.     Section 16727 of Cal. Bus. & Prof. Code provides, inter alia, that it is unlawful to sell or lease goods, or give a rebate or price discount, on the condition that the purchaser not deal in goods of a competitor where the effect is to substantially lessen competition or tend to create a monopoly.

**(i)     Exclusive Dealing and Tying Arrangement**

383.     The exclusive agreement between Defendants CMA and CMKG (a single competitor, now exclusive partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and *tying* of "Member Training Credits" as part of membership. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. The tied product is "Member Training Credits" and the service is membership benefits. Membership is only granted with the purchase of "Member Training Credits". This practice establishes a stabilized or fixed and tied price for training and does not allow for competitive alternatives CMA certification.

384.     Defendant CMKG and LE were both CMA members and "Accredited" Training Providers. Once Defendants CMA and CMKG formed this exclusive joint venture, they directly set and fixed or tied the price members are charged for accredited training, now only available from Defendants CMA/CMKG.

385.     Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix the price and tied the conditions for CMA certification.

386.     Agreements by trade association and members that compete with each other outside the association to set or fix the prices that the members charge (or will pay) for a tied particular good or service present serious significant antitrust risks and are often *per se* unlawful, whether the agreement is entered directly or through association rules. There are no other vendors for "Member Training Credits" and no negotiating the amount of "Member Training Credits" one receives. In essence, "price" has been eliminated as a variable for customers' decision-making process because Defendants CMA and CMKG have bundled price as part of the relationship.

387.     These actions fused with the Defendant CMA's contemporaneous conduct in interfering with LE's customers as part of its plan with Defendant CMKG, as well as its

substantial market power as the only provider of these goods/services (and the coercive nature of these actions) are a substantial factor in causing harm to LE and thus constitute a violation of the Rule of Reason per §16727.

### (ii)    Propriety of a Preliminary and Permanent Injunction

388.    LE is also seeking a preliminary and permanent injunction to prevent Defendant CMA from its conduct violating §16727.

389.    LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## 6. SIXTH CLAIM AGAINST DEFENDANT CMA
## (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

390.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

### (i)  Unfair Competition

391.    Defendant CMA's conduct constitutes unfair, unlawful, and/or fraudulent business practices that have harmed competition in California and elsewhere threaten significant harm to competition in the future. Such practices are unlawful because they violate the federal Sherman Antitrust Act §§ 1 and 2. They are objectively unfair because they offend an established public policy of free, open and unbiased third party supplier accreditation and competition and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers (in this case, members) because they limit free and open competition that benefits members by ensuring new and better products and competitive prices.

392.    Defendant CMA's practices are fraudulent in that the public is likely to be deceived because the members are likely to be deceived because they think "accredited" coursework is better and also required for an individual to sit for and be able to pass the CMA certification exams. Defendants CMA and CMKG also are making claims that the world's largest retailer Walmart/Sam's and one of the USA largest grocery store chain Kroger are both mandating the use of Defendants CMA and CMKG training in order to do business with them. LE has been informed by trusted sources at AB InBev, Hershey, Acosta, etc. that these statements are being made.

393.     Defendant CMA's conduct is a direct and proximate cause of injury to California consumers and to LE.

394.     As a result of those practices, LE suffered damages in an amount to be determined at trial and is entitled to reasonable attorney's fees.

**(ii) Propriety of a Preliminary and Permanent Injunction**

395.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMA from its conduct violating §17200.

396.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## 7. SEVENTH CLAIM AGAINST DEFENDANT CMA
### (FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

397.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

398.     The total known harm attributable to Defendants interference with LE's contracts is $270,390.76, representing direct renewal invoice losses in 2019.

**(i) Counts**

COUNT 1: AS TO LE CUSTOMER – THE HERSHEY COMPANY

399.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

400.     LE has an existing contractual relationship with Hershey, a client since 2013.

401.     Defendant CMA knew of this contract as evidenced by the fact that there was a shared customer list, LE was in competition with CMKG, and Defendant CMA reached out to Hershey and referenced the need to switch from LE's content.

402.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult. A representative of Defendant CMA contacted Hershey directly and misled the Hershey team by indicating that in order for Hershey employees to earn a CMA certification they must use CMA training content instead of LE's.

403.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by

CMA's indicating to Hershey that it must use CMA training and not LE training -- CMA knew LE's agreement to provide training with Hershey would be damaged, revoked, or not renewed. The last customer payment was on March 12, 2019.

404.     LE was harmed in the loss of the $42,496 in annual revenue it generates from its relationship with Hershey.

405.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Hershey indicates that it would have been kept intact for years to come.

<u>COUNT 2: AS TO LE CUSTOMER - ANHEUSER-BUSCH INBEV</u>

406.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

407.     LE has an existing contractual relationship with AB InBev dating back to 2011.

408.     Defendant CMA knew of this contract as evidenced by a shared customer list, and competition with CMKG.

409.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult by contacting AB InBev directly and misled the AB InBev team by indicating that in order for AB InBev employees to earn a CMA certification they must use CMA training content and not LE. The last customer payment was made on April 2, 2019

410.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by CMA's indicating to AB InBev that AB InBev must use CMA training and not LE, our agreement to provide training with AB InBev would be damaged, revoked, or not renewed.

411.     Defendant CMA's LE was harmed in the loss of $45,000 --the annual revenue LE earns from its relationship with AB InBev.

412.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and AB InBev indicates that it would have been kept intact for years to come.

<u>COUNT 3: AS TO LE CUSTOMER - PROCTOR & GAMBLE COMPANY</u>

413.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

414.     LE has an existing contractual relationship with P&G that dates back to 2013.

415.     Defendant CMA knew of this contract as evidenced by a shared customer list and the fact that LE is competition with CMKG.

416.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult in that its representatives contacted P&G directly and misled the P&G team by indicating that in order for P&G employees to earn a CMA certification they must use CMA training content and not LE.

417.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by indicating that P&G must use CMA training and not Learning Evolution, our agreement to provide training with P&G would be damaged, revoked, or not renewed..

418.     Defendant CMA's LE was harmed in the loss of $50,000 --the annual revenue LE earns from its relationship with P&G.

419.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and P&G indicates that it would have been kept intact for years to come.

<u>COUNT 4: AS TO LE CUSTOMER – CONAIR CORPORATION</u>

420.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

421.     LE has an existing contractual relationship with Conair that dates back to 2013.

422.      Defendant CMA knew of this contract as evidenced by a shared customer list and LE's competition with CMKG.

423.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult by the fact that it contacted Conair directly and misled the Conair team by indicating that in order for Conair employees to earn a CMA certification they must use CMA training content and not LE.

424.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by indicating to Conair that the company must use CMA training and not that of LE. In so doing, Defendant CMA at a minimum knew that LE's agreement to provide training with Conair would be damaged, revoked, or not renewed.

425.     LE was harmed in the amount of its loss of annual revenue from this relationship -- $5,840.00.

426.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Conair indicates that it would have been kept intact for years to come.

COUNT 5: AS TO LE CUSTOMER - NESTLE PURINA PETCARE COMPANY

427.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

428.     LE has an existing contractual relationship with Nestle Purina Petcare Company (hereinafter "Nestle") dating back to 2013.

429.     Defendant CMA knew of this contract as evidenced by a shared customer list, and LE's competition with CMKG.

430.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult as evidence by the fact that CMA contacted Nestle directly and misled the Nestle team by indicating that in order for Nestle employees to earn a CMA certification, they must use CMA training content and not Learning Evolution.

431.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur by indicating that Nestle must use CMA training and not LE's, our agreement to provide training with Nestle would be damaged, revoked, or not renewed.

432.     LE was harmed in the amount of its loss of annual revenue from this relationship -- $84,554.76. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services.

433.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Nestle indicates that it would have been kept intact for years to come.

COUNT 6: AS TO LE CUSTOMER - ADVANTAGE SOLUTIONS

434.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

435.     LE has an existing contractual relationship with Advantage Solutions (hereinafter "Advantage") dating back to 2016.

436.     Defendant CMA knew of this contract as evidenced by a shared customer list, and LE's competition with CMKG.

437.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult by the fact that it contacted Advantage directly and misled the Advantage team by indicating that in order for Advantage employees to earn a CMA certification they must use CMA training content and not LE.

438.     Defendant CMA intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur by indicating that Advantage must use CMA training and not LE, our agreement to provide training with Advantage would be damaged, revoked, or not renewed.

439.     LE was harmed in the loss of the full amount of its annual revenue from this relationship -- $42,500.

440.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Advantage indicates that it would have been kept intact for years to come.

(ii) **Propriety of a Preliminary and Permanent Injunction**

441.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMA from its conduct interfering w/ LE's existing contractual relationships.

442.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

# 8. EIGHTH CLAIM AGAINST DEFENDANT CMA
## (FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

443.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

444.     LE customers itemized in each count below have been loyal LE customers for many years and there was a high probability that they would continue to do business with LE at the same, if not, increased levels than before.

445.     Defendant CMA intentionally interfered with LE's relationships with these customers by making false statements that LE's services are of lower quality, that LE is not an accredited training provider of the Defendant CMA and that LE content will not support professionals seeking a Defendant CMA credential.

446.     Defendant CMA's conduct was wrongful and beyond the means allowed in fair competition due to the fact that: (a) their statements were false, and (b) the only way they were able to target LE's high volume customers was wrongfully positioning LE content and services against Defendant CMA's own content and services in relation to their new partnership with CMKG.

447.     As a result of Defendant CMA's interference, LE has lost revenue from these customers in an estimated amount of $1,351,953.80, the true amount to be proven at trial. LE has been informed by the clients listed below that they will not be renewing – this amount totals $270,390.76. This figure multiplied by a period of five years expectancy equates to $1,351,953.80.

448.     The true amount of LE's damages attributable to this tort will be proven at trial.

449.     At the time of their communications with LE's customers, Defendant CMA knew that they were LE's customers and intended to interfere with LE's business relationship with these customers.

450.     Defendant CMA's conduct directing those customers away from LE and soliciting LE's own customers using such information and by making false claims to such customers was fraudulent and malicious and entitles LE to the recovery of punitive damages.

**(i)**     **Counts**

COUNT 1:  AS TO LE CUSTOMER – THE HERSHEY COMPANY

451.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

452.     Defendant CMA intentionally interfered with an economic relationship between it and Hershey that probably would have resulted in an economic benefit to LE.

453.     LE and Hershey were in an economic relationship that probably would have resulted in an economic benefit to LE. Hershey has been an LE client since 2013.

454.     Defendant CMA knew of this economic relationship as evidenced by the fact that there was a shared customer list and that LE was in competition with CMKG.

455.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult by indicating that Hershey must use CMA training and not LE, LE's, agreement to provide training with Hershey would be damaged, revoked, or not renewed. The last customer payment was on March 12, 2019.

456.      Defendant CMA intended to disrupt the performance of this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by Defendant CMA's contacting of Hershey directly and misleading the Hershey team by indicating that in order for Hershey employees to earn a CMA certification they must use CMA training content and not LE.

457.      LE was harmed in the loss of the $42,496 in annual revenue it generated from its relationship with Hershey multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

458.      Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Hershey indicates that it would have been kept intact for years to come.

COUNT 2:  AS TO LE CUSTOMER - ANHEUSER BUSCH INBEV

459.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

460.      Defendant CMA intentionally interfered with an economic relationship between it and AB InBev that probably would have resulted in an economic benefit to LE.

461.      LE and AB InBev were in an economic relationship that indeed was resulting in an economic benefit to LE -- LE has an existing contractual relationship with AB InBev that began in 2011 and was performed upon smoothly and successfully.

462.      Defendant CMA knew of this relationship as evidenced by a shared customer list, and competition with CMKG.

463.      Defendant CMA's conduct prevented performance or made performance more expensive or difficult by contacting AB InBev directly and misled the AB InBev team by indicating that in order for AB InBev employees to earn a CMA certification they must use CMA training content and not that of LE. The last customer payment was made on April 2, 2019.

464.      Defendant CMA intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by CMA's indicating to AB InBev that AB InBev must use CMA training and not LE, LE's agreement to provide training with AB InBev would be damaged, revoked, or not renewed.

465.     Defendant CMA's LE was harmed in the loss of $45,000 --the annual revenue LE reaps from its relationship with AB InBev -- multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

466.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and AB InBev indicates that it would have been kept intact for years to come.

### COUNT 3: AS TO LE CUSTOMER PROCTER & GAMBLE COMPANY

467.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

468.     Defendant CMA intentionally interfered with an economic relationship between it and P&G that probably would have resulted in an economic benefit to LE.

469.     LE has an existing economic relationship (dating back to 2013) with P&G that probably would have resulted in an economic benefit to LE.

470.     Defendant CMA knew of this economic relationship as evidenced directly by a shared customer list and circumstantially by the fact that LE is in direct competition with CMKG.

471.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult in that its representatives contacted P&G directly and misled the P&G team by indicating that in order for P&G employees to earn a CMA certification they must use CMA training content and not that of LE.

472.     Defendant CMA intended to disrupt the performance of this relationship or at least knew that disruption of the relationship was certain or substantially certain to occur as evidenced by indicating that P&G must use CMA training and not LE, LE's agreement to provide training with P&G would be damaged, revoked, or not renewed..

473.     Defendant CMA's LE was harmed in the loss of $50,000 -- the annual revenue LE reaps from its relationship with P&G, multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

474.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and P&G indicates that it would have been kept intact for years to come.

### COUNT 4:  AS TO LE CUSTOMER – CONAIR CORPORATION

475.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

476.    Defendant CMA intentionally interfered with an economic relationship between it and Conair Corporation ("Conair") that probably would have resulted in an economic benefit to LE.

477.    LE and Conair were in an economic relationship dating back to 2013 that probably would have resulted in an economic benefit to LE.

478.    Defendant CMA knew of this economic relationship as evidenced directly by a shared customer list and circumstantially by the fact that LE was in competition with CMKG.

479.    Defendant CMA's conduct prevented this relationship from going further or made the relationship more expensive or difficult by the fact that it contacted Conair directly and misled the Conair team by indicating that in order for Conair employees to earn a CMA certification they must use CMA training content and not LE.

480.    Defendant CMA intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by indicating that Conair must use CMA training and not LE, LE's agreement to provide training with Conair would be damaged, revoked, or not renewed.

481.    LE was harmed in the amount of its loss of annual revenue from this relationship -- $10,000 multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

482.    Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Conair indicates that it would have been kept intact for years to come.

COUNT 5: AS TO LE CUSTOMER - NESTLE PURINA PETCARE COMPANY

483.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

484.    In contacting Nestle directly and misleading the Nestle team by indicating that in order for Nestle employees to earn a CMA certification they must use CMA training content and not that of LE, Defendant CMA intentionally interfered with an economic relationship between it and Nestle that probably would have resulted in an economic benefit to LE as evidenced by the existing economic relationship with Nestle dating back to 2013.

485.     Defendant CMA knew of this economic relationship as evidenced directly by a shared customer list, and circumstantially by the fact that LE was in competition with CMKG.

486.     Defendant CMA's conduct prevented performance or made performance more expensive or difficult as evidence by the fact that CMA contacted Nestle directly and misled the Nestle team by indicating that in order for Nestle employees to earn a CMA certification they must use CMA training content and not that of LE.

487.     Defendant CMA intended to disrupt this relationship or at least knew that disruption of the relationship was certain or substantially certain to occur by indicating that Nestle must use CMA training and not that of LE. Defendant CMA was at minimum aware that LE's agreement to provide training with Nestle would be damaged, revoked, or not renewed.

488.     LE was harmed in the amount of its loss of annual revenue from this relationship -- $84,554.76 (the total contract value for services in 2019 included online coursework, and instructor led training services) multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

489.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMA's conduct and the strength of the relationship between LE and Nestle indicates that it would have been kept intact for years to come.

COUNT 6: AS TO LE CUSTOMER - ADVANTAGE SOLUTIONS

490.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

491.     Defendant CMA intentionally interfered with an economic relationship between it and Advantage Solutions ("Advantage") that probably would have resulted in an economic benefit to LE.

492.     LE and Advantage were in an economic relationship that was consistently resulting in an economic benefit to LE -- LE and Advantage have had an annual agreement dating back to 2016 and this arrangement was performed to satisfaction on both sides.

493.     Defendant CMA knew of this relationship as evidenced directly by a shared customer list, and circumstantially LE's competition with Defendant CMKG.

494.     Defendant CMA's conduct prevented continued relations or made the relationship more expensive or difficult by the fact that it contacted Advantage directly and misled the

Advantage team by indicating that in order for Advantage Solutions employees to earn a CMA certification they must use Defendant CMA's training content and not LE.

495.     Defendant CMA intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur by indicating that Advantage must use CMA training and not that of LE. Defendant CMA, at minimum, knew that LE's agreement to provide training with Advantage would be damaged, revoked, or not renewed.

496.     LE was harmed in the loss of the full amount of its annual revenue from this relationship -- $42,500 multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total sum to be proven at trial.

497.     Defendant CMA's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent Defendant CMA's conduct and the strength of the relationship between LE and Advantage indicates that it would have been kept intact for years to come.

498.     The true amount of LE's damages attributable to this tort will be proven at trial.

### (ii) Propriety of a Preliminary and Permanent Injunction

499.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMA from its conduct interfering w/ LE's prospective economic relations.

500.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## 9. NINTH CLAIM AGAINST DEFENDANT CMA
## (FOR UNJUST ENRICHMENT)

501.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

502.     Defendant CMA received a benefit from LE (as part of a good faith agreement, since LE was a CMA member and an accredited training provider) of approximately 200+ multiple choice and true/false questions and answers as part of an Assessment Test for LE's CPCA and CPCM coursework modules. These pre- and post-assessment tests were provided to CMA as part of a joint agreement to help move the individual certification exam online.

Defendant CMA via Defendant Strunk also received a shared client list, the LMS methodology, and key performance indicators from LE.

503.  Defendant CMA received this benefit via wrongful conduct through a mistake, fraud, coercion or request as evidenced by the CMA later using and implementing these Questions and Answers as part of the CMA CPCA and CPCM online examination, developing its own version of the LMS methodology and utilizing key performance indicators.

504.  Defendant CMA is unjustly retaining the benefit of this wrongdoing at the expense of LE because Defendants CMA and CMKG formed an exclusive joint agreement to lock out LE, and not allow LE to retain "Accredited" coursework status.

# B.   CLAIMS AGAINST DEFENDANT CMKG

## 1. FIRST CLAIM AGAINST DEFENDANT CMKG
(FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

505.  LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

### (i) Contract, Combination or Conspiracy

#### Agreement

506.  Two separate entities have reached an agreement as evidenced by Defendant CMA's "Exclusive Joint Venture" with Defendant CMKG for Defendant CMKG to provide exclusive CM training services for Defendant CMA. This agreement when fused with the surrounding words and conduct of both Defendant CMA and CMKG demonstrates a collective desire and plan to unfairly control the Relevant Markets.

#### Conspiracy

507.  Defendants CMA and CMKG participated in a conspiracy to restrain trade in their agreement when they entered the exclusive joint partnership agreement that they would act together for the unlawful purpose of restraining trade and monopolizing the Relevant Markets. Defendants CMA and CMKG knowingly became members of this conspiracy with the intent to further its purposes when they embarked on a joint strategy to undermine competition (including LE) sometime around 2018 or before. A formal or written agreement

(though not required) is evidenced by the language in a February 25, 2019 joint press release regarding the CMA and CMKG Joint Venture.

508.     The agreement between Defendants CMA and CMKG demonstrates a conscious commitment to a common scheme and purpose designed to force competitors (including LE) out of the CM training market altogether, an unlawful objective suppressing competition.

**(ii) <u>Unreasonable Restraint on Trade: Anti-Competitive Purpose or Effect</u>**

509.     The agreement between Defendants CMA and CMKG is an unreasonable restraint on trade.

<u>Per Se Illegality:</u>

510.     The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and is thus per se illegal.

*Evidence of Price Fixing and/or Tying*

511.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

512.     The exclusive agreement between CMA and CMKG (a single competitor, now partner) was designed to accomplish and indeed executed a "lock out" of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and tying of "Member Training Credits" as part of membership. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. This practice establishes a stabilized or fixed and tied price for training and does not allow for competitive alternatives CMA certification. The Joint Venture is a direct written agreement with a competitor (now exclusive partner).

513.     Here, CMKG and LE were both CMA members and "Accredited" Training Providers. Once CMA and CMKG formed an exclusive joint venture to bundle "Member Training Credits" as part of CMA Membership fees they directly set, fixed and tied the price that members are charged for accredited training, now only available from Defendants CMA/CMKG.

514.    This joint venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix and tie the price and conditions for CMA certification.

515.    Agreements by trade association members that compete with each other outside the association to set or fix and tie the prices that the members charge (or will pay) for a particular good or service typically, and in this case do, present significant antitrust risks and could be challenged as *per se* unlawful, whether the agreement is entered directly or through association rules.

516.    Trade association rules and conduct can give rise to antitrust risks if they could be viewed as an agreement among members to refuse to deal with a non-member competitor. Similarly, if participants in a trade association jointly agree not to buy from or sell to a company, this also constitute an unlawful restraint on trade.

*Evidence of a Group Boycott*

517.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

518.    Here, at the time Defendants CMA and CMKG formed their exclusive joint venture agreement, they simultaneously and expressly refused LE the ability to continue to as a full participating member of CMA and to achieve accreditation as a third-party solutions provider.

519.    Defendants CMA and CMKG in effect collaborated and agreed not to deal with a competing firm (LE), a pure form of a group boycott. Defendant CMA used its dominant market power to affect suppliers or customers by forming this exclusive joint venture agreement, colluding with a single competitor, CMKG. The effect of the arrangement allowing CMKG to be the only accredited provider in the Relevant Markets is to suppress competition by fixing prices of accredited training programs by bundling and tying CMKG training products and services inclusive with all CMA membership levels. What Defendants CMA and CMKG are claiming is that for example, Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of CMA/CMKG training only.

520.    Defendant CMKG's role in Defendant CMA's new "membership" requirements, decisions surrounding access to association services and activities, and the agreement itself

between Defendant CMA and CMKG together unreasonably restrain competition in trade or commerce and is thus per se illegal conduct.

521.     The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and reduces output. Intent is not required here but both CMKG's role in this Joint Venture and the subsequent bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition.

522.     There exists an unreasonable restraint of trade considering the circumstances surrounding the agreement, including, among other things: the nature of training and accreditation industry, the exclusive nature of the agreement and restraint, the actual effect on locking LE out of the industry, the history of Defendant CMA and CMKG's conduct in carrying out the restraint, the reasons for adopting the practice -- to lock competitor LE out through an exclusive dealing contract, the fact that an individual competitor LE has lost its freedom to compete on an even plane, and the fact that prices and output will be unresponsive to consumer preferences in the Relevant Markets.

*Substantial Competitive Harm in the Relevant Markets*

523.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

524.     Defendant CMKG's conduct has or is likely to have a substantial harmful effect on (reduction in) competition in that market that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality. Higher prices and lower quality have and will continue to ensue in the market, rendering Defendant CMA and CMKG's conduct wholly unreasonable.

525.     The other players in the market hindered by the conduct of CMKG include Acosta (which uses LE's program internally for employees and is an LE-authorized re-seller partner to deliver a course via their Acosta University online LMS), TPG (a non-accredited training provider who offers online), LE's higher education partners: the WMU, University of Texas Tyler, Texas Tech University, and Ryerson University.

526.     Beyond the obvious and immediate effects, ramifications to the market resulting from Defendant CMA and CMKG's conduct will likely be felt in ways not immediately obvious to those outside the retail and CM industries. Yet, it is likely that this type of conduct will lead to

the larger and more powerful organizations exerting increased influence over CMA and affecting the way retailers, manufactures, and shoppers get serviced. What Defendants CMA and CMKG are claiming is that Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of CMA/CMKG training only. Defendants CMA and CMKG are now getting Walmart, Sam's and Kroger to say, "Don't put sales and marketing CM professionals in front of us unless they're CMA-certified". Defendant CMA has always wanted retailer endorsement from companies like Walmart, Sam's and Kroger, but now they want it all -- the joint partnership creating one "required" go-to for training that results in certification and the big retailer push to their platform only -- that's the whole market. This results in substantial competitive harm due to the size and influence Walmart/Sam's and Kroger have over CPG brands and suppliers.

527.    This is the stated reason for AB InBev, Hershey and others to cut ties and terminate their relationships with LE. Those harmed include LE, but also Acosta, the aforementioned universities and all others who would provide training outside of that offered by Defendant CMA and its new exclusive partner, Defendant CMKG.

528.    The importance here reaches down through the supply chain and is likely to directly impact how the average American household buys products. For example, if a smaller company ("off brand") cannot afford membership and training with Defendant CMKG, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

529.    Put simply, the harm to competition generally here is the inability and deterrence of any new players to enter the markets for education, training, software, and hosting in the CM industry.

*Denial of Access to Trade Show*

530.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

531.    LE was also denied access to a trade show sponsored by Defendant CMA after its agreement with CMKG. As noted, Defendant CMA has not offered LE a legitimate rationale as to why LE was excluded and there is no evidence that the rules dictating presence at this

trade show were objective. Further, LE's presence at the trade show is very important to competition in the market because the CMA Annual Conference showed LE's commitment and support of the Industry and enabled LE to set up meetings between existing clients, higher education partners, and be introduced to and have an opportunity to present goods and services to new CMA member companies and contacts. Any argument by Defendant CMA about there being limited room is disingenuous because the CMA leadership itself (in the persons of Defendant Ross and Mr. McDonald) informed LE that "under the circumstances" (the CMA and CMKG Joint Venture announcement) that LE would not be allowed or welcomed to sponsor or attend the CMA conference. It seems any rules regarding presence were applied in a discriminatory manner and wholly subjective criteria for participation at the show, namely that Defendant CMA had entered into an exclusive deal with Defendant CMKG, a company that was present at the event as the only representative in the Relevant Markets.

*Denial of Ability to be Certified*

532.     The manner in which this joint and exclusive certification program is being implemented ultimately harms rivals like LE and is detrimental to the consumer. Here the "decision-maker" in the certification process is actually a competitor (Defendants CMA/CMKG). As well, even after repeated attempts by LE to receive certification criteria, Defendant CMA has not provided as much and has left LE uncertain as to whether such criteria are indeed objective and related to the function being certified. The criteria is clearly being applied in a discriminatory manner – indeed Defendant CMKG is the only sourced for accredited/certified training. It is also unknown whether Defendant CMA's procedures were followed in the certification process, which would be important to the extent that it will show that a refusal to certify LE, and a blanket certification to Defendant CMKG was fueled by CMA/CMKG's collective anti-competitive goals.

*Standard Setting as Anti-Competitive Tactic*

533.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

534.     Defendant CMA is using standards to insulate itself and Defendant CMKG from competition by excluding competing companies and products from conforming to the industry standard.

535.     Even if Defendant CMA's standards promote the goal it is seeking to advance, such as safety, uniformity, or quality, timely notice for standard setting was not given to all parties believed to have direct and material stake in the standard. The standard setting process did not permit all parties with a direct and material stake in the standard (including LE) the right to participate in the process as evidenced by the fact that the CMA PSG and the process by which it is updated and revised is carried out by a CMA industry committee (members). The chairperson providing "oversight" of this is Mr. Strunk, both a minority equity owner in CMA and a head of Higher Education Committee (University partners). This causes a conflict of interest and bias for the CMA/CMKG partnership and harms competition. Also, the ad-hoc standard update process is not done on a defined, regularly scheduled basis. Due to this exclusive arrangement between Defendant CMA and Defendant CMKG, members of the standard setting process did not hail from various parts of industry. To date, LE has been denied a written record of the standard setting process and knows of no unbiased review or appeal process if LE has questions about the chosen standard.

536.     To the extent this new standard is limiting access to the market for some firms (LE), that exclusion must be justified.

537.     The process of standard setting within CMA appears to be dominated by economically interested parties and not all parties that had a stake in the standard had an opportunity to participate meaningfully in the process.

538.     Defendant CMA's arrangement with Defendant CMKG appears to be a concerted effort to enforce the standard.

539.     There are no countervailing pro-competitive benefits. There is no evidence that Defendants CMA and CMKG's conduct resulted or will result in increased product quality and consistency; improved efficiency; greater predictability; increased marketing; increased promotion and greater availability of consumer information; expanded product availability; increased investment. The purported pro-competitive aspects of such agreements like encouraging a retailer to provide a high level of service by focusing on a single manufacturer or ensuring consistent supply and predictable pricing to consumers don't hold sway here because no such danger was present and LE consistently produced quality material.

540.     To the extent there are benefits, the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, and thus they cannot be used to justify the restraint.

541.     Consequently, there exist no pro-competitive benefits and even if there were, the restraint was not necessary to achieve the purported benefits.

542.     The harm here is to competition and consumers, not just to a single competitor or group of competitors.

**(iii) Antitrust Injury**

543.     LE repeats each and every allegation contained in paragraphs 139-150 above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

544.     As will be set forth in greater detail herein, Defendants CMA and CMKG hatched a conspiracy against LE and competition in the Relevant Markets more broadly causing the type of injury that antitrust laws were designed to protect against.

545.     The full amount of damages will be calculated after discovery and upon proof at trial.

## 2. SECOND CLAIM AGAINST DEFENDANT CMKG
### (FOR MONOPOLIZATION, ATTEMPTED MONOPOLIZATION, OR COMBINATION OR CONSPIRACY TO MONOPOLIZE IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

546.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

547.     Defendant CMKG unlawfully gained and maintained a monopoly in the Relevant Markets conspired to gain and maintain a monopoly in the Relevant Markets as evidenced by its joint venture with CMKG described herein, or, in the alternative, attempted to gain and maintain a monopoly in the Relevant Markets.

548.     Defendant CMKG's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Markets, in violation of § 2 of the Sherman Act, and LE was injured by the Defendant CMKGs' unlawful monopolization of the Relevant Markets.

**Monopolization and/or Conspiracy or Combination to Monopolize**

549.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

550.     Defendant CMKG's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product Markets, in violation of § 2 of the Sherman

Act and LE was injured by the Defendants' unlawful monopolization of the Relevant Markets. A conspiracy or combination to monopolize is evidence by Defendant CMA's exclusive joint venture and joint marketing tactics with Defendant CMKG as alleged herein.

*Defendant CMKG's Market Power*

551.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

552.    Defendant CMKG's market share (its percentage of the products or services bought or sold in the relevant market by all competitors) is now 100% market share for training for certification, eliminating third party accredited providers). The textbook rule is that 30% to 40% or more market foreclosure is likely to have cognizable anticompetitive effects.

553.    Defendant CMKG views itself now as to the go to source for accredited training services as will be illustrated by testimony of individuals regarding the nature of Relevant Markets and the barriers to entry now appear impermeable.

554.    Defendant CMA is unique in that it is the only CPG/Retail trade association that offers industry "Accredited" training programs (provided solely by Defendant CMKG) and an industry "Certification" specific to the CPG professionals who practice CM. This power is now leveraged by Defendant CMKG and represents a shared 100% market share.

*Market Foreclosure.*

555.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

556.    The exclusive-dealing agreement *substantially foreclosed* LE from competing in a substantial share of the market *because the collusion between Defendants CMA and CMKG creates a business environment in which only Defendant CMKG is provided formal "Accreditation" (e.g. endorsement), thus creating a single-only source for "Accredited Training". This limits fair trade, choice for consumers and members, and suppresses (and indeed has eliminated) competition.* The extent of the foreclosure of competition here is substantial in that Defendant CMA is the only CPG/Retail trade industries association for CM and as the only "accreditation body" for Certified CM Professionals certification is blocking competition by creating an exclusive joint venture with Defendant CMKG and only offering third party training programs accreditation only to

Defendant CMKG, and further outright blocked LE as of February 2019 to renew its accreditation or use "CMA Accredited" on its website and marketing.

557.    As noted, in February 2019, when Defendant CMA formally announced the exclusivity agreement with Defendant CMKG, the two companies crossed the line from pro-competition to anti-competition. The restraint here is the exclusivity agreement, a non-price vertical restraint that affected product and service distribution. Defendant CMA agreed to only purchase from one particular "Seller", Defendant CMKG for a set period of time. This arrangement harms competition either by foreclosing sales outlets to Defendant CMKG's competitors (namely LE) and by cutting off other market participants' (namely LE) access to important business relationships.

558.    Defendant CMKG is now the only CMA accredited training provider. (others would have been TPG, a direct LE competitor and others - Acosta, Nielsen, IRI, and any higher education that wants to have an accredited program. These latter companies have other branches of their business and training is just an offshoot for their overall enterprise.

559.    In the past Defendant CMA's website would list all CMA accredited companies – it now only shows accredited university programs, with all the third-party training companies having been deleted, except for Defendant CMKG.

*Barriers to Entry*

560.    LE repeats each and every allegation contained in the paragraphs 228-238 and incorporates by reference each preceding paragraph as though fully set forth at length herein.

*Number and Size of Competitors*

561.    LE repeats each and every allegation contained in the paragraphs 239-247 above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

*No Legitimate Business Purpose*

562.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

563.    Defendant CMKG's conduct cannot be said to have been carried out for "legitimate business purposes." Defendant CMA's purpose is far from legitimate as it accomplishes this

objective through excluding and harming competitors (LE), harming the consumer in the Relevant Markets in the process.

564.     Defendant CMKG's current position is not due to superior foresight and skill, natural advantages, economic or technological efficiency, securing of a patent or because changes in cost or taste have driven out all but one supplier. Their position is due to coordinated actions with the industry trade association to become the only source for training goods and services in the Relevant Markets.

565.     Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. Defendant CMKG's conduct does not result in any greater ability to reduce costs in producing or innovating CM training it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Defendant CMKG's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets. The only "benefit" of Defendant CMKG's conduct is a reduction in competition, and that benefit inures only to Defendant CMKG (and Defendant CMA), not to customers, nor competition on the merits.

### Attempted Monopolization

566.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

567.     If Defendant CMKG have not yet achieved an actionable "monopoly", Defendants nonetheless attempted to monopolize the Relevant Markets.

568.     Defendant CMKG had a specific intent to achieve monopoly power in the Relevant Markets as shown by their actions taken with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the Relevant Markets. Direct statements of Defendant CMA's intent to obtain a monopoly in the relevant market are shown by comments made by its representatives at trade shows and to LE clients.

569.     Defendant CMKG words and conduct indicated not merely an intent to compete aggressively, but rather a true intent to acquire monopoly power using anticompetitive means as described herein.

570.     Even if no direct evidence that Defendant CMKG actually intended to obtain a monopoly, the natural and probable consequences of Defendants' conduct in the Relevant

Markets was to give Defendant CMKG control over prices and to exclude or destroy competition. This was plainly foreseeable by Defendant CMKG's conduct in colluding and acquiescing to and benefitting from:

571.    (i) Reversing of CMA's decade long policy (since its inception) that encouraged both members and independent third party training and solutions providers to become active CMA members and sponsors, to participate in Defendant CMA events, and to support and utilize Defendant CMA's Professional Standards Guide for individual certifications, in favor of a new policy selecting only one "acceptable" provider in the Relevant Market, its new exclusive partner Defendant CMKG, and simultaneously revoking LE's ability to compete as an accredited product/service in the market;

572.    (ii) Engaging in associated intimidation sales and marketing tactics pursuant to its policy change and overall scheme to hinder competition;

573.    (iii) Unfairly influencing Defendant CMA members seeking to renew their memberships to implement the CMA's new "Training Credits with Membership" programs into their organizations. Membership in the CMA is now conditioned on the purchase of these "Member Training Credits" that then get distributed to and then spent by members on accredited courses and programs, case studies, and certification prep materials". The benefactor is the joint CMKG bottom line.

574.    (iv) Unjustifiably revoking of LE's accreditation status;

575.    (v) Unjustifiability denying a board seat to Mr. Matthews;

576.    (vi) Unjustifiability denying LE access to CM trade shows;

577.    (vi) Unjustifiably, revoking accreditation of providers, specifically, universities, which used LE to gain accreditation and now forcing them to redevelop (cost to them) and get re-accredited (cost to them, revenue to Defendant CMA).

578.    Defendant CMKG is thus using its monopoly power in the Relevant Service Markets to maintain its monopoly power in each of the Relevant Markets.

579.    When coupled with the fact that LE has proven (as affirmed by its clients) to design, build and deliver superior quality training and technology delivery systems, at lower prices and provides higher quality and faster service (including its LMS technology platform used to deliver, track and report results of training programs), these actions show at a minimum, a dangerous probability (a real likelihood) that Defendant CMKG would ultimately acquire monopoly power if they continued to engage in the same or similar conduct.

**Injury**

580.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

581.     Defendant CMKG has and will continue to, inter alia, maintain supra-competitive prices to customers in each of the Relevant Markets, harm innovation associated with the products offered in each of the Relevant Markets, and otherwise rob customers of their ability to make an unfettered choice of technology.

582.     Defendant CMKG's unlawful monopolization, conspiracy to monopolize, or attempted monopolization has injured competition in each of the Relevant Markets, suppressed sales of LE's products and the products of other competitors, diminished LE's future sales opportunities and the sales opportunities of other competitors, and increased LE's operating costs and the operating costs of other competitors as alleged in this Complaint.

583.     LE has been harmed by the Defendant CMKG's willful anticompetitive maintenance of its monopoly and its exclusion of all competitors, the true amount to be proven at trial.

## 3. THIRD CLAIM AGAINST DEFENDANT CMKG
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

584.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

585.     Section 3 of the Clayton Act rules out practices that lessen competition such as exclusive dealings or the attempt to create a monopoly. A manufacturer who offers service for the goods or service it sells is prohibited from favoring its own service organization. Generally, manufacturers may not require the use of the manufacturer's own service.

586.     The activities of trade associations allow members to work cooperatively in a manner that is generally considered procompetitive, but when two competitors unite in an effort to hinder a group of their competitors' ability to compete, an actionable antitrust injury is present. The exclusive agreement between Defendants CMA and CMKG (a single competitor, now exclusive partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and *tying* of "Member Training Credits" as part of membership. Defendant

CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. This practice establishes a stabilized or fixed and tied price for training and does not allow for competitive alternatives CMA certification.

587.     Defendant CMKG and LE were both CMA members and "Accredited" Training Providers. Once Defendants CMA and CMKG formed this exclusive joint venture, they directly set and fixed or tied the price members are charged for accredited training, now only available from Defendants CMA/CMKG.

588.     Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix the price and tied the conditions for CMA certification.

589.     Agreements by trade association and members that compete with each other outside the association to set or fix the prices that the members charge (or will pay) for a tied particular good or service present serious significant antitrust risks and are often *per se* unlawful, whether the agreement is entered directly or through association rules. There are no other vendors for "Member Training Credits" and no negotiating the amount of "Member Training Credits" one receives. In essence, "price" has been eliminated as a variable for customers' decision-making process because Defendants CMA and CMKG have bundled price as part of the relationship.

590.     These actions, fused with Defendant CMA and CMKG's conduct in interfering with LE's customers as part of its plan with Defendant CMKG, constitute a violation of Section 3.

## 4. FOURTH CLAIM AGAINST DEFENDANT CMKG
## (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

591.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

592.     Section 16720 of the Cal Bus. & Prof. Code prohibits trusts, defined as any "combination" of capital, skill or acts by two or more persons to, inter alia, carry out restrictions in commerce, prevent competition, or fix prices."

### (i) Combination of Capital, Skill, or Acts by Two or More [Entities]

<u>Agreement</u>

593.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

594.    Two separate entities, Defendant CMA and Defendant CMKG, have reached an agreement or understanding in the form of their exclusive Joint Partnership for Defendant CMKG to serve as the exclusive CM training services provider for Defendant CMA certification.

595.    This agreement when fused with the surrounding words and conduct of both Defendant CMA and CMKG to exclude competitors from competing and from forums where opportunity to compete is explored, redefine accreditation standards, interfere with existing competitor contracts and expectancies demonstrates a collective objective and mutual assent to unfairly control the Relevant Markets.

<u>Conspiracy</u>

596.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

597.    Defendants CMA and CMKG participated in a conspiracy to restrain trade in their agreement. Defendants CMA and CMKG entered the exclusive joint partnership agreement that they would act together for the unlawful purpose of restraining trade and monopolizing the CM training services market. Defendants CMA and CMKG knowingly became members of this conspiracy with the intent to further its purposes. Defendants CMA and CMKG's "Exclusive Joint Venture" strategy to undermine competition (including LE) began in 2018 or before. A formal or written agreement (though not required) is evidenced by the language in a February 25, 2019 joint press release regarding the CMA and CMKG Joint Venture.

598.    The email from new CMA President McMahon to former LE client Mr. Burkemper shows clear bias (supported by false and unscientific analysis) against all competitor third-party training solutions providers. The data that was shared with LE to support this claim is misleading and inaccurate as demonstrated by the words of Defendant Strunk and other evidence in this Complaint.

599.     The agreement between Defendants CMA and CMKG demonstrates a conscious commitment to a common scheme and purpose designed to force competitors (including LE) out of the CM training market altogether, an unlawful objective suppressing competition.

**(ii) Restrictions in Commerce, Prevention of Competition, Price Fixing**

600.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

601.     The agreement between Defendants CMA and CMKG is an unreasonable restraint on trade for the reasons set forth below.

**Evidence of Price Fixing, Exclusive Arrangement and/or Tying**

602.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

603.     The exclusive agreement between CMA and CMKG (a single competitor, now partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and tying of "Member Training Credits" as part of membership. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. CMA/CMKG training and CMA accreditation are now tied. This practice establishes a stabilized or fixed price for training and does not allow for competitive alternatives CMA certification. The Joint Venture is a direct written agreement with a competitor (now exclusive partner).

604.     CMKG and LE were both CMA members and "Accredited" Training Providers. Once CMA and CMKG formed an exclusive joint venture to bundle "Member Training Credits" as part of CMA Membership fees, they directly set and fixed the price members are charged for accredited training, now only available from Defendants CMA/ CMKG.

605.     Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix and tie the price and conditions for CMA certification.

606.     Agreements by trade association members that compete with each other outside the association to set or fix and tie the prices that the members charge (or will pay) for a

particular good or service presents significant antitrust risks and are *per se* unlawful, whether the agreement is entered directly or through association rules. In the case of Defendants CMA and CMKG, there are no other vendors for "Member Training Credits" and no negotiating the amount of "Member Training Credits" you get. There is, in essence, no price because they've bundled it as part of the relationship.

### Evidence of a Group Boycott

607.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

608.     Trade association rules and conduct can violate §16720 if they are an agreement among members to refuse to deal with a non-member competitor. Similarly, if participants in a trade association jointly agree not to buy from or sell to a company, this also constitutes a §16720 violation.

609.     Here, when Defendants CMA / CMKG formed their exclusive joint venture agreement they directly refused LE ability to continue to be a full participating member and to achieve accreditation as a third-party solutions provider.

610.     Defendants CMA and CMKG, in effect, collaborated and agreed not to deal with competing firm LE -- a pure form of a group boycott. Defendant CMA used its dominant market power to affect suppliers or customers by forming this exclusive joint venture agreement, colluding with a single competitor, Defendant CMKG. The effect of the arrangement allowing Defendant CMKG to be the only accredited provider is to suppress competition by fixing prices of accredited training programs by bundling and tying CMKG training products and services inclusive with all CMA membership levels. What Defendants CMA and CMKG are claiming is that for example, Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of Defendants CMA/CMKG training only.

611.     Defendant CMA's new "membership" requirements, decisions surrounding access to association services and activities and the agreement between Defendant CMA and CMKG unreasonably restrain competition and is thus per se illegal. The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and reduces output. Intent is not required here. Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition in violation of §16720.

612.     When competitors combine to deny a competitor benefits enjoyed by members of the group, such horizontal boycotts may give rise to per se liability. Vertical boycotts -- those among entities at different levels of distribution -- may violate the Cartwright Act under a rule of reason analysis.

**Monopolization, Conspiracy to Gain & Maintain a Monopoly, Attempted Monopoly**

613.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

614.     Defendant CMKG unlawfully gained and maintained a monopoly in the Relevant Markets, conspired to gain and maintain a monopoly in the Relevant Markets as evidenced by its joint venture with CMKG described herein, or, in the alternative, attempted to gain and maintain a monopoly in the Relevant Markets.

*Monopolization and Conspiracy to Gain & Maintain a Monopoly*

615.     Defendant CMKG's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Product and LE was injured by the Defendants' unlawful monopolization of the Relevant Markets.

616.     Defendant CMKG's market share (its percentage of the products or services bought or sold in the relevant market by all competitors) is now 100% market share for training for certification, eliminating third party accredited providers). The textbook rule is that 30% to 40% or more market foreclosure is likely to have cognizable anticompetitive effects.

617.     Defendant CMA is unique in that it is the only CPG/retail trade association that offers industry "Accredited" training programs and an industry "Certification" specific to the CPG professionals who practice CM.

618.     The exclusive-dealing agreement with Defendant CMKG *substantially foreclosed* LE from competing in a substantial share of the market *because the collusion creates a business environment in which only CMKG is provided formal "Accreditation" (e.g. endorsement), thus creating a single-only source for "Accredited Training". This limits fair trade, choice for consumers and members, and suppresses (and indeed has eliminated) competition.* The extent of the foreclosure of competition here is substantial in that CMA is the only CPG/Retail trade industries association for Category Management and as the only "accreditation body" for Certified CM Professionals certification

is blocking competition by creating an exclusive joint venture with CMKG and only offering third party training programs accreditation only to CMKG, and further outright blocked LE as of February 2019 to renew its accreditation or use "CMA Accredited" on its website and marketing.

619.     In February 2019, when Defendant CMA formally announced the exclusivity agreement with CMKG it crossed the line from pro-competition to anti-competition. The restraint here is the exclusivity agreement, a non-price vertical restraint that affected product and service distribution. Defendant CMA agreed to only purchase from one particular "Seller", Defendant CMKG for a set period of time. This arrangement harms competition either by foreclosing sales outlets to Defendant CMKG's competitors (namely LE) and by cutting off other market participants' (namely LE) access to important business relationships.

620.     Defendant CMKG is now the only CMA accredited training provider. (others would have been TPG, a direct LE competitor and others - Acosta, Nielsen, IRI, and any higher education that wants to have an accredited program). These latter companies have other branches of their business and training is just an offshoot for their overall enterprise.

621.     In the past Defendant CMA's website would list all CMA accredited companies – it now only shows accredited university programs, all the third-party training companies are deleted.

622.     Barriers to entry include Defendant CMA's rules and regulations (in making CMA/CMKG training required in order to be accredited/certified), controls over necessary inputs, specialized joint marketing practices as described herein, and the reputation of the entities already participating in the market (or the brand name recognition of their products or services) – i.e. Defendant CMA's usage of its status as a "trade association" to imply that training, education, software, hosting must occur through its now exclusive partner, CMKG. These barriers to entry make it difficult for new competitors to encounter the Relevant Markets in a meaningful and timely way.

623.     The costs to develop professional corporate quality e-learning coursework modules is substantial. It required tens of thousands of dollars for LE's initial development, and then hundreds of thousands more to sustain and maintain the product content relevancy to meet specific new CMA updates made to the CMA Professional Standard Guide over the years. For instance, LE has invested over a million and a half dollars in research and development to develop content, sustain content relevancy and maintain technical usefulness of its CM

Training Library consisting of 33 course-work modules ranging from 30 minutes to 1 hour each, associated pre- and post-assessment tests and CMA Professional practice exams.

624.    Another barrier to entry for the Relevant Markets lies in customers' long purchase cycles when implementing off-the-shelf training programs for sales and marketing teams. For example, it took approximately nine (9) years for LE to build its customer base with an average sales cycle of 9-12 months. This means that competitors have limited opportunities to significantly enter and expand their market share in this specific market space.

625.    As Defendant CMKG publicly promotes, it now claims with its exclusive joint venture with Defendant CMA to be the leader in CM training. Thus, a further barrier to entry is created by the simple fact of Defendant CMKG's dominance. Given the costs for customers, and the presence of bundled offerings as part of CMA membership, any potential new CM training provider entrant would not be able to receive endorsement or accreditation as once granted by the CMA.

626.    Alternatively, if a new entrant offers only a limited number of courses, those products must greatly exceed the quality of Defendant CMKG's and at a much lower price to induce a customer to switch. Defendant CMKG's conduct will reduce the number of 'accredited' training coursework programs available from a customer perspective, and only serves to further increase these already very high barriers to entry.

627.    Defendant CMA's anticompetitive policy changes with respect to revoking LE's ability to receive CMA accreditation creates a particularly insurmountable barrier to sell into the market, now dominated by Defendant CMKG. Defendant CMA's demand to cease and desist the use of copyright and trademark of "CMA Accredited" training logo and language forces customers who wish to use LE as an alternative program to forgo the use of LE's competitive products.

628.    Defendant CMA's subsequent announcement in February 2019 to members and the market that its entered into an exclusive joint venture with CMKG, notwithstanding its prior representations, and its communications to the industry that LE is not an "accredited" training provider which does not follow "CMA industry standards," has created a barrier for LE and other potential third party training providers to sell into the market. The CMA's cease and desist demand to LE to no longer use CMA accredited logos or language has caused some members and customers to refrain from purchasing a non-Defendant CMA/CMKG training product.

629.     Defendant CMA's own website and marketing statements using "Accredited Training", demonstrates how its revoking accreditation to LE and others acts as a barrier to compete. As Defendant CMA knows, its members, LE and other training solutions providers have made a significant investment over the years with the CMA, and in the creation and support of an industry CatMan 2.0 and the Certified Professional credential an individual may achieve through training and certification.

630.     *LE built its business and reputation in alignment and reliance on Defendant CMA's prior representations of being a neutral and unbiased industry advocate, providing CMA Accreditation to third party solutions providers who qualified.* Being denied the ability to achieve CMA Accreditation for its training programs has imposed on LE a fear, an uncertainty and a doubt about the viability of its entire business and customer base and harms the market more broadly. Defendant CMKG's role in executing this joint strategy substantially suppresses competition and increases barriers to entry for others in the market.

631.     Given these barriers to entry and expansion, competition on the merits in the Relevant Markets is critical to ensure the resulting benefits to consumers and the market. If Defendant CMKG's anticompetitive conduct is not stopped, the anticompetitive harm in the Relevant Markets will be long term and likely irreversible.

632.     Defendant CMKG's competitors are not capable of effectively competing. The financial strength, market shares and number of competitors cannot act as a check on the Defendants' ability to price its products or services. Defendant CMA's competitors including LE have been rendered weak with a now declining market share.

633.     Defendant CMKG can profitably lower and maintain the prices it pays for its inputs substantially below the competitive level for a significant period of time, or if it can profitably raise and maintain the prices it charges for its outputs substantially above the competitive level for a significant period of time. Defendant CMKG has the power to do so by themselves, that is, without the assistance of, and despite competition from any existing or potential competitors.

634.     Defendant CMKG has the ability to exclude competition. If Defendant CMKG attempted to maintain prices above competitive levels, but new competitors could enter the relevant market or existing competitors could expand their sales and take so much business that the price increase would become unprofitable and would have to be withdrawn, then Defendant CMKG would not have monopoly power. This is not the case here.

635.     Defendant CMKG has no valid claim that its success is due to a superior products or services, the ability to maintain an efficient business operation, superior advertising or marketing, or unique structure of the industry. Defendant CMKG wouldn't lose a substantial amount of sales if it raised prices substantially as they have in effect locked out the competition through the CMA joint venture, bundling and tying tactics and other affirmative efforts to deter parties from using LE's services.

636.     Defendant CMKG willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct, rather than legitimate business conduct. Defendant CMKG's conduct is not consistent with competition on the merits, the conduct provides no benefits to consumers, and the conduct does not make business sense apart from any effect it has on excluding competition or harming competitors.

637.     The conduct that has resulted or will result in monopoly power have made it very difficult or impossible for LE and others to compete with other legitimate business reason other than locking out a strong competitor. Indeed, LE provides superior Quality E-Learning Coursework modules, videos, resource materials and LMS platform technologies and provides higher quality and faster service as confirmed by numerous LE clients.

638.     Defendant CMKG's current position is not due to superior foresight and skill, natural advantages, economic or technological efficiency, securing of a patent or because changes in cost or taste have driven out all but one supplier. Their position is due to a coordinated effort to become the only source in the Relevant Markets.

639.     For the purpose of acquiring monopoly power, Defendant CMKG committed numerous acts, including:

640.     (i) Scheming with and acting as the sole beneficiary to Defendant CMA's switch from a policy that encouraged both members and independent third party training and solutions providers to become active CMA members and sponsors to participant in Defendant CMA events, and to support and utilize Defendant CMA's Professional Standards Guide for individual certification as a CPCA, CPCM and CPSA, to the new policy (after this joint venture) and revoking of LE's ability to compete as an accredited product in the market;

641.     (ii) Participating in intimidation sales and marketing tactics pursuant to Defendant CMA's policy change and overall scheme to hinder competition; and

642.     (iii) Scheming with and acting as the sole beneficiary of Defendant CMA requiring members seeking to renew their memberships to implement the CMA's new "Training

Credits with Membership" programs into their organizations. Defendant CMA's "Member Training Credits" are distributed to and then spent by members on accredited courses and programs, case studies, and certification prep materials", thus using its monopoly power in the Relevant Service Markets to maintain its monopoly power in each of the Relevant Markets.

643.     (iv) Benefitting from the unjustifiable revocation of LE's accreditation status;

644.     (v) Benefiting from the unjustifiable denial of a board seat to Mr. Matthews;

645.     (vi) Benefiting from the unjustifiable denial of LE's access to CM trade shows;

646.     (vi) Benefitting from the unjustifiable revocation of the accreditation of university providers.

647.     Defendant CMKG has excluded competitor LE, from each of the Relevant Markets and has deprived consumers of the benefits of a free and open market system and deprives members economic benefits that are based on the law of supply and demand.

648.     Defendant CMKG does not have a legitimate business purpose for any of its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the obvious competitive circumstances and associated marketplace conduct inconsistent with any such benefit. Defendant CMKG's conduct does not result in any greater ability to reduce costs in producing or innovating CM training it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Defendant CMKG's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Markets. The only "benefit" of Defendant CMKG's conduct is a reduction in competition, and that benefit inures only to Defendant CMKG's advantage, not to that of customers or competition on the merits.

649.     Defendant CMKG's willful monopolization has injured competition in each of the Relevant Markets, suppressed sales of LE's products and the products of other competitors, diminished LE's future sales opportunities and the sales opportunities of other competitors, and increased LE's operating costs and the operating costs of other competitors.

*Attempted Monopolization*

650.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

651.     If Defendant CMKG has not yet achieved an actionable "monopoly", it nonetheless attempted to monopolize the Relevant Markets.

652.     Defendant CMKG had a specific intent to achieve monopoly power in a relevant market as shown by their actions taken with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the Relevant Markets. Direct statements of Defendant CMKG's intent to obtain a monopoly in the relevant market are shown by comments made by its representatives at trade shows and to LE clients. Defendant CMKG's words and conduct indicated not merely an intent to compete aggressively, but rather a true intent to acquire monopoly power using anticompetitive means as described herein.

653.     Even if no direct evidence that Defendant CMKG actually intended to obtain a monopoly, the natural and probable consequences of Defendant CMKG's conduct in the Relevant Markets was to give Defendant CMKG control over prices and to exclude or destroy competition. This was plainly foreseeable by Defendant CMKG upon engaging its exclusive joint venture with CMA, bundling and tying "Member Training Credits", its denial of accreditation to LE, its denial of a board seat to Mr. Matthews, and its denial of access to CM trade shows. These actions taken in the aggregate show at minimum, dangerous probability (a real likelihood) that Defendant CMKG would ultimately acquire monopoly power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Defendant CMKG would ultimately acquire monopoly power if they continued to engage in the same or similar conduct.

**Applicable Standard**

654.     The agreement between Defendant CMA and CMKG is so pernicious that it automatically restrains competition and is thus per se illegal or, in the alternative, on Balance, Anti-Competitive Benefits are Outweighed under the Rule of Reason.

655.     There exists an unreasonable restraint of trade considering the circumstances surrounding the agreement, including, among other things: the nature of the CM training services, products and accreditation industry, facts that are unique to the CM industry, the exclusive nature of the alleged agreement and restraint, the actual effect on locking LE out of the industry, the history of Defendant CMA and CMKG's conduct in carrying out the restraint, the reason for adopting this practice -- to lock competitor LE out through an

exclusive dealing contract, the fact that an individual competitor LE (among others) has lost its freedom to compete on an even plane, and the fact that prices and output will be unresponsive to consumer preferences in this market.

*Substantial Competitive Harm in the Relevant Markets*

656.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

657.    Defendant CMKG's conduct has or is likely to have a substantial harmful effect on (reduction in) competition in that market that results in the loss of some of the benefits of competition, such as lower prices, increased output, and higher product quality. Higher prices and lower quality have and will continue to ensue in the market, rendering Defendant CMA and CMKG's conduct wholly unreasonable.

658.    The other players in the market hindered by the conduct of CMKG include Acosta (which uses LE's program internally for employees and is an LE-authorized re-seller partner to deliver a course via their Acosta University online LMS), TPG (a non-accredited training provider who offers online), LE's higher education partners: the WMU, University of Texas Tyler, Texas Tech University, and Ryerson University.

659.    Beyond the obvious and immediate effects, ramifications to the market resulting from Defendant CMA and CMKG's conduct will likely be felt in ways not immediately obvious to those outside the retail and CM industries. Yet, it is likely that this type of conduct will lead to the larger and more powerful organizations exerting increased influence over CMA and affecting the way retailers, manufactures, and shoppers get serviced. What Defendants CMA and CMKG are claiming is that Walmart, Sam's and Kroger (all CMA members) "will require" or "do require" the use of CMA/CMKG training only. Defendants CMA and CMKG are now getting Walmart, Sam's and Kroger to say, "Don't put sales and marketing CM professionals in front of us unless they're CMA-certified". Defendant CMA has always wanted retailer endorsement from companies like Walmart, Sam's and Kroger, but now they want it all -- the joint partnership creating one "required" go-to for training that results in certification and the big retailer push to their platform only -- that's the whole market. This results in substantial competitive harm due to the size and influence Walmart/Sam's and Kroger have over CPG brands and suppliers.

660.      This is the stated reason for AB InBev, Hershey and others to cut ties and terminate their relationships with LE. Those harmed include LE, but also Acosta, the aforementioned universities and all others who would provide training outside of that offered by Defendant CMA and its new exclusive partner, Defendant CMKG.

661.      The importance here reaches down through the supply chain and is likely to directly impact how the average American household buys products. For example, if a smaller company ("off brand") cannot afford membership and training with Defendant CMKG, they'd be unable to get onto Walmart's shelves because if Walmart determines they only wish to collaborate with suppliers that have certified by the CMA then a smaller company may not have the appropriate resources to get certified and they will also have only one singular option to get training.

662.      Put simply, the harm to competition generally here is the inability and deterrence of any new players to enter the markets for education, training, software, and hosting in the CM industry.

*Denial of Access to Trade Show*

663.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

664.      LE was also denied access to a trade show sponsored by Defendant CMA -- the CMA Annual Conference. Defendant CMA has not offered LE a legitimate rationale as to why LE was excluded and there is no evidence that the rules dictating presence at this trade show were objective. LE's presence at the conference is vital to its ability to compete in the market because it shows LE's commitment and support of the industry, enables LE to set up meetings between existing clients and higher education partners, and affords LE an opportunity to present goods and services to new CMA member companies and contacts. Any argument by Defendant CMA about "limited room" will be contradictory as Defendant CMA's leadership itself (in the persons of Defendant Ross and Mr. McDonald) informed LE that "under the circumstances" (the CMA and CMKG Joint Venture announcement), LE would not be allowed in attendance or welcomed to sponsor the conference. It appeared that the once neutral trade association had modified its rules regarding presence at this trade show to be entirely subjective and applied in a discriminatory manner.

*Denial of Ability to be Certified*

665.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

666.     Certification programs can determine whether products comply with a standard or whether professionals have sufficient ability, education and experience. Not certifying a product or a professional can create competitive harm. The manner in which this joint and exclusive certification program is being implemented ultimately harms rivals like LE and is detrimental to the consumer. Here the "decision-maker" in the certification process is actually a competitor (Defendant CMA, now aligned with Defendant CMKG). As well, even after repeated attempts by LE to receive certification criteria, Defendant CMA has not provided as much and has left LE uncertain as to whether such criteria are indeed objective and related to the function being certified. The criteria is clearly being applied in a discriminatory manner. It is also unknown whether Defendant CMA's procedures were followed in the certification process, which would be important to the extent that it will show that a refusal to certify was fueled by anti-competitive goals.

*Standard Setting as Anti-Competitive Tactic*

667.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

668.     Defendant CMA is using standards to insulate itself and Defendant CMKG from competition by excluding competing companies and products from conforming to the industry standard.

669.     Even if Defendant CMA's standards promote the goal it is seeking to advance, such as safety, uniformity, or quality, timely notice for standard setting was not given to all parties believed to have direct and material stake in the standard. The standard setting process did not permit all parties with a direct and material stake in the standard (including LE) the right to participate in the process as evidenced by the fact that the CMA PSG and the process by which it is updated and revised is carried out by a CMA industry committee (members). The chairperson providing "oversight" of this is Mr. Strunk, both a minority equity owner in CMA and a head of Higher Education Committee (University partners). This causes a conflict of interest and bias for the CMA/CMKG partnership and harms competition. Also, the ad-hoc standard update process is not done on a defined, regularly scheduled basis. Due to this exclusive arrangement between Defendant CMA and Defendant CMKG, members of the standard setting process did not hail from various parts of industry. To date, LE has been

denied a written record of the standard setting process and knows of no unbiased review or appeal process if LE has questions about the chosen standard.

670.    To the extent this new standard is limiting access to the market for some firms (LE), that exclusion must be justified.

671.    The process of standard setting within CMA appears to be dominated by economically interested parties and not all parties that had a stake in the standard had an opportunity to participate meaningfully in the process.

672.    Defendant CMA's arrangement with Defendant CMKG appears to be a concerted effort to enforce the standard.

673.    There are no countervailing pro-competitive benefits. There is no evidence that Defendants CMA and CMKG's conduct resulted or will result in increased product quality and consistency; improved efficiency; greater predictability; increased marketing; increased promotion and greater availability of consumer information; expanded product availability; increased investment. The purported pro-competitive aspects of such agreements like encouraging a retailer to provide a high level of service by focusing on a single manufacturer or ensuring consistent supply and predictable pricing to consumers don't hold sway here because no such danger was present and LE consistently produced quality material.

674.    To the extent there are benefits, the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, and thus they cannot be used to justify the restraint.

675.    Consequently, there exist no pro-competitive benefits and even if there were, the restraint was not necessary to achieve the purported benefits.

676.    LE asserts that even if not deemed per se illegal, and a naked Rule of Reason analysis is applied and pro-competitive benefits are deemed to exist, the agreements between Defendant CMA and Defendant CMKG nonetheless have anticompetitive that outweigh the pro-competitive benefits.

677.    The harm here is to competition and consumers, not just to a single competitor or group of competitors.

### (iii)    Antitrust Injury to LE

678.    LE repeats each and every allegation contained in paragraphs 139-150 above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

679.     As will be set forth in greater detail herein, Defendants CMA and CMKG hatched a conspiracy against LE and competition in the Relevant Markets more broadly causing the type of injury that antitrust laws were designed to protect against.

680.     The full amount of damages will be calculated after discovery and upon proof at trial.

**(iv) Propriety of a Preliminary and Permanent Injunction**

681.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from its conduct violating §16720.

682.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

# 5. FIFTH CLAIM AGAINST DEFENDANT CMKG
## (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

683.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

684.     Section 16727 of Cal. Bus. & Prof. Code provides, inter alia, that it is unlawful to sell or lease goods, or give a rebate or price discount, on the condition that the purchaser not deal in goods of a competitor where the effect is to substantially lessen competition or tend to create a monopoly. The Rule of Reason is applied and invalidates exclusive agreements with the requisite anticompetitive effects.

**(i) Exclusive Dealing & Tying Arrangement**

685.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

686.     The exclusive agreement between Defendants CMA and CMKG (a single competitor, now exclusive partner) was designed to accomplish and indeed executed a lock-out of third-party competitor LE by setting a fixed price as part of CMA Membership fees, with the bundling and *tying* of "Member Training Credits" as part of membership. Defendant CMA, as part of annual membership fees charged to members, now "bundles" (includes) "Member Training Credits" to be used for online and ILT training programs and services provided by Defendants CMA and CMKG exclusively. The tied product is "Member Training Credits" and the service is membership benefits. Membership is only granted with the purchase of

"Member Training Credits". This practice establishes a stabilized or fixed and tied price for training and does not allow for competitive alternatives CMA certification.

687.     Defendant CMKG and LE were both CMA members and "Accredited" Training Providers. Once Defendants CMA and CMKG formed this exclusive joint venture, they directly set and fixed or tied the price members are charged for accredited training, now only available from Defendants CMA/CMKG.

688.     Both Defendants' Joint Venture and the bundling and tying of "Member Training Credits" as part of the CMA Membership fees are a direct and successful attempt to lock-out competition and fix the price and tied the conditions for CMA certification.

689.     Agreements by trade association and members that compete with each other outside the association to set or fix the prices that the members charge (or will pay) for a tied particular good or service present serious significant antitrust risks and are often *per se* unlawful, whether the agreement is entered directly or through association rules. There are no other vendors for "Member Training Credits" and no negotiating the amount of "Member Training Credits" one receives. In essence, "price" has been eliminated as a variable for customers' decision-making process because Defendants CMA and CMKG have bundled price as part of the relationship.

690.     These actions fused with the Defendant CMA's contemporaneous conduct in interfering with LE's customers as part of its plan with Defendant CMKG, as well as its substantial market power as the only provider of these goods/services (and the coercive nature of these actions) are a substantial factor in causing harm to LE and thus constitute a violation of §16727.

### (ii) Propriety of a Preliminary and Permanent Injunction

691.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from its conduct violating §16727.

692.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## 6. SIXTH CLAIM AGAINST DEFENDANT CMKG
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

### (i)  Unfair Competition

693.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

694.     Defendant CMKG's conduct constitutes unfair, unlawful, and/or fraudulent business practices that have harmed competition in California and elsewhere threaten significant harm to competition in the future. Such practices are unlawful because they violate the federal Sherman Antitrust Act §§ 1 and 2 as pled herein. Defendant CMKG's conduct is objectively unfair because they offend an established public policy of free, open and unbiased third-party supplier accreditation and competition and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers (in this case, members) because they limit competition that benefits members by ensuring them new and better products and competitive prices.

695.      Defendant CMKG's conduct is fraudulent in that the public is likely to be deceived because the members are likely to be deceived because they think "accredited" coursework is better and also required for an individual to sit for and be able to pass the CMKG certification exams. Defendant CMKG is making claims that the world's largest retailer Walmart/Sam's and one of the USA largest grocery store chain Kroger are both mandating the use of CMKG in order to do business with them. LE has been informed by trusted sources at AB InBev, Hershey, Acosta, etc. that these statements are being made.

696.     Defendant CMKG's conduct is a direct and proximate cause of injury to California consumers and to LE as there is no reason (such as ordinary market forces) other than Defendant CMKG's conduct that has caused LE's injuries.

697.     As a result of those practices, LE suffered damages in an amount to be determined at trial and is entitled to reasonable attorney's fees.

**(ii)     Propriety of a Preliminary and Permanent Injunction**

698.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from its conduct violating §16727.

699.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

# 7. SEVENTH CLAIM AGAINST DEFENDANT CMKG
## (FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

### (i) **Counts**

#### COUNT 1: AS TO LE CUSTOMER – THE HERSHEY COMPANY

700.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

701.     LE has an existing contractual relationship with Hershey since 2013.

702.     Defendant CMKG knew of this contract as evidenced by the fact that there was a shared customer list and that LE was in competition with CMKG.

703.     Defendant CMKG's conduct prevented performance or made performance more expensive or difficult by indicating that Hershey must use Defendant CMKG's training (and not that of LE), knowing that LE's agreement to provide training with Hershey would be damaged, revoked, or not renewed. The last customer payment was made on March 12, 2019.

704.     Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by Defendant CMKG's knowledge that Defendant CMA was contacting Hershey directly and misleading the Hershey team indicating that in order for Hershey employees to earn a CMA certification they must use Defendant CMKG's training content, and not that of LE.

705.     LE was harmed in the loss of the $42,496 in annual revenue that it generates from its relationship with Hershey. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services

706.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and Hershey indicates that it would have remained amicable and mutually fruitful for years to come.

#### COUNT 2: AS TO LE CUSTOMER - ANHEUSER-BUSCH INBEV

707.     Plaintiff repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

708.     LE has an existing contractual relationship with AB InBev since 2011.

709.     Defendant CMKG knew of this contract as evidenced by a shared customer list, and competition with CMKG.

710.      Defendant CMKG's conduct prevented performance or made performance more expensive or difficult by contacting AB InBev directly and misled the AB InBev team by indicating that in order for AB InBev employees to earn a CMA certification they must use CMKG training content and not LE. The last customer payment was made on April 2, 2019

711.      Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by Defendant CMKG's indicating to AB InBev that AB InBev must use CMKG training and not LE, our agreement to provide training with AB InBev would be damaged, revoked, or not renewed.

712.      LE was harmed in the loss of $45,000 --the annual revenue LE reaps from its relationship with AB InBev. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services

713.      Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and AB InBev indicates that it would have remained amicable and mutually fruitful for years to come.

### COUNT 3: AS TO LE CUSTOMER - PROCTOR & GAMBLE

714.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

715.      LE has an existing contractual relationship with P&G since 2013.

716.      Defendant CMKG knew of this contract as evidenced by a shared customer list and the fact that LE is competition with CMKG.

717.      Defendant CMKG's conduct prevented performance or made performance more expensive or difficult in that it contacted P&G directly and misled the P&G team by indicating that in order for P&G employees to earn a CMA certification they must use CMKG training content and not LE.

718.      Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by indicating that P&G must use CMKG/CMA training and not that of LE. Defendant CMKG at a minimum knew that LE's agreement to provide training to P&G would be damaged, revoked, or not renewed.

719.     LE was harmed in the loss of $50,000 --the annual revenue LE reaps from its relationship with P&G. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services.

720.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and P&G indicates that it would have remained amicable and mutually fruitful for years to come.

## COUNT 4: AS TO LE CUSTOMER – CONAIR CORPORATION

721.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

722.     LE has an existing contractual relationship with Conair since 2013.

723.      Defendant CMKG knew of this contract as evidenced by a shared customer list, competition with CMKG.

724.     Defendant CMKG's conduct prevented performance or made performance more expensive or difficult by the fact that it contacted Conair directly and misled the Conair team by indicating that in order for Conair employees to earn a CMA certification they must use CMKG training content and not LE.

725.     Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur as evidenced by indicating that Conair must use Defendant CMKG's training and not LE, our agreement to provide training with Conair would be damaged, revoked, or not renewed.

726.     LE was harmed in the amount of its loss of annual revenue from this relationship -- $5,840.00. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services.

727.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and Conair indicates that it would have remained amicable and mutually fruitful for years to come.

## COUNT 5: AS TO LE CUSTOMER - NESTLE PURINA PETCARE COMPANY

CIVIL ANTITRUST, UNFAIR COMPETITION, AND TORT COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

728.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

729.      LE has an existing contractual relationship with Nestle since 2013.

730.      Defendant CMKG knew of this contract as evidenced by a shared customer list, and LE's competition with CMKG.

731.      Defendant CMKG's conduct prevented performance or made performance more expensive or difficult as evidence by the fact that its new contracting partner, shortly after the joint venture was inked contacted Nestle directly and misled the Nestle team by indicating that in order for Nestle employees to earn a CMA certification they must use CMKG training content and not that of LE.

732.      Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur by ratifying the benefits of its new exclusive contracting partner CMA's indication to Nestle that it must use CMKG training and not that of LE, our agreement to provide training with Nestle would be damaged, revoked, or not renewed. .

733.      LE was harmed in the amount of its loss of annual revenue from this relationship -- $84,554.76. This amount represents the total contract value for services in 2019 included online coursework, and instructor led training services.

734.      Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and Nestle indicates that it would have remained amicable and mutually fruitful for years to come.

COUNT 6: AS TO LE CUSTOMER - ADVANTAGE SOLUTIONS

735.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

736.      LE has an existing contractual relationship with Advantage since 2016.

737.      Defendant CMKG knew of this contract as evidenced by a shared customer list, and LE's competition with CMKG.

738.      Defendant CMKG's conduct prevented performance or made performance more expensive or difficult through its benefiting from the actions of its new exclusive contracting partner (CMA) and CMA's direct misleading of the Advantage team, indicating that in order

for Advantage employees to earn a CMA certification they must use CMKG training content and not LE.

739.     Defendant CMKG intended to disrupt the performance of this contract or at least knew that disruption of performance was certain or substantially certain to occur when it benefitted from CMA's indication to Advantage that it must use CMKG training (and not that of LE), knowing that LE's agreement to provide training with Advantage would be damaged, revoked, or not renewed.

740.     LE was harmed in the loss of the full amount of its annual revenue from this relationship -- $42,500.

741.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and Advantage indicates that it would have remained amicable and mutually fruitful for years to come.

742.     The true amount of LE's damages attributable to this tort will be proven at trial.

### (ii) Propriety of a Preliminary and Permanent Injunction

743.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from its conduct interfering with all aforementioned contracts.

744.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## 8. EIGHTH CLAIM AGAINST DEFENDANT CMKG
## (FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

### (i) Counts

745.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

746.     LE customers itemized in each count below have been loyal LE customers for many years and there was a high probability that they would continue to do business with LE at the same, if not, increased levels than before.

747.    Defendant CMKG intentionally interfered with LE's relationships with these customers by making false statements that LE's services are of lower quality, that LE is not an accredited CMA training provider (after LE had been strategically denied accreditation), and that LE content will not support professionals seeking a CMA credential.

748.    Defendant's conduct was wrongful and beyond the means allowed in fair competition due to the facts that: (a) their statements were false or misleading and (b) the only way they were able to target LE's high volume customers was wrongfully positioning LE content and services against their own content and services in relation to their new partnership with trade association, CMA.

749.    As a result of Defendant CMKG's interference, LE has lost revenue from these customers in the amounts alleged herein, the true amount to be proven at trial.

750.    At the time of Defendant CMA's communications with LE's customers, Defendant CMKG knew that the same were indeed LE's customers and intended to interfere with LE's business relationship with these customers.

751.    Defendant's malicious conduct directing these customers away from LE and soliciting LE's own customers by making false and misleading claims to such customers and entitles LE to the recovery of punitive damages.

COUNT 1:  AS TO LE CUSTOMER – THE HERSHEY COMPANY

752.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

753.    Defendant CMKG intentionally interfered with an economic relationship between LE and Hershey that would have or probably would have resulted in an economic benefit to LE.

754.    LE and Hershey were in an economic relationship that probably would have resulted in an economic benefit to LE. Hershey has been an LE client since 2013. There was no evidence of dissatisfaction in any aspect the two companies' dealings.

755.    Defendant CMKG knew of this economic relationship as evidenced by the fact that they were privy to a shared customer list and that LE was in direct competition with CMKG.

756.    Defendant CMKG's conduct prevented performance or made performance more expensive or difficult by acquiescing as its new exclusive partner CMA indicated to Hershey that Hershey must use CMKG training and not that LE. This was highly likely to result in LE's agreement with Hershey to provide training would be damaged, revoked, or not renewed. The last customer payment was tendered on March 12, 2019.

757.     Defendant CMKG intended to disrupt the performance of this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by Defendant CMKG's retaining the benefit of Defendant CMA's contacting Hershey directly to mislead the Hershey team by informing them that in order for Hershey employees to earn a CMA certification they must use CMKG training content and not that of LE.

758.     LE was harmed in the loss of the $42,496 in annual revenue it generated from its relationship with Hershey multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

759.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent Defendant CMKG's conduct and the strength of the relationship between LE and Hershey indicates that it would have been remained amicable and mutually fruitful to come.

COUNT 2:  AS TO LE CUSTOMER - ANHEUSER BUSCH INBEV

760.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

761.     Defendant CMKG intentionally interfered with an economic relationship between it and AB InBev that probably would have resulted in an economic benefit to LE.

762.     LE and AB InBev were in an economic relationship that indeed was resulting in an economic benefit to LE -- LE has an existing contractual relationship with AB InBev dating back to 2011 that went along without a hitch.

763.     Defendant CMKG knew of this relationship as evidenced by a shared customer list, and competition with CMKG.

764.     Defendant CMKG's conduct prevented performance or made performance more expensive or difficult by contacting AB InBev directly and misled the AB InBev team by indicating that in order for AB InBev employees to earn a CMA certification they must use CMKG training content and not LE. The last customer payment was made on April 2, 2019.

765.     Defendant CMKG intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by CMKG's retaining the benefits of its new exclusive partner's (Defendant CMA) conduct when CMA indicated to AB InBev that AB InBev must use CMKG training and not that of

LE. In doing so, Defendant CMKG at least knew that LE's agreement to provide training with AB InBev would be damaged, revoked, or not renewed.

766. LE was harmed in the loss of $45,000 --the annual revenue LE reaps from its relationship with AB InBev -- multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

767. Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and AB InBev indicates that it would have been remained amicable and mutually fruitful for years to come.

<u>COUNT 3: AS TO LE CUSTOMER PROCTER & GAMBLE</u>

768. LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

769. Defendant CMKG intentionally interfered with an economic relationship between it and P&G that probably would have resulted in an economic benefit to LE.

770. LE has an existing economic relationship (dating back to 2013) with P&G that probably would have resulted in an economic benefit to LE.

771. Defendant CMKG knew of this economic relationship as evidenced directly by a shared customer list and circumstantially by the fact that LE is in direct competition with CMKG.

772. Defendant CMKG's conduct prevented performance or made performance more expensive or difficult in that it reaped the benefits of its new exclusive partner (CMA)'s contacting of P&G directly and misleading the P&G team by indicating that in order for P&G employees to earn a CMA certification they must use CMKG training content and not LE.

773. Defendant CMKG intended to disrupt the performance of this relationship or at least knew that disruption of the relationship was certain or substantially certain to occur as evidenced by its reaping the benefits of its new exclusive partner (Defendant CMA)'s contacting P&G personnel and informing them that the company must use Defendant CMKG's training and not that of LE. In doing so, Defendant CMKG knew that LE's agreement to provide training with P&G would be damaged, revoked, or not renewed..

774.     Defendant CMKG's LE was harmed in the loss of $50,000 -- the annual revenue LE reaps from its relationship with P&G, multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

775.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and P&G indicates that it would have been remained amicable and mutually fruitful for years to come.

COUNT 4:  AS TO LE CUSTOMER - CONAIR

776.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

777.     Defendant CMKG intentionally interfered with an economic relationship between it and Conair that probably would have resulted in an economic benefit to LE.

778.     LE and Conair were in an economic relationship dating back to 2013 that probably would have resulted in an economic benefit to LE.

779.     Defendant CMKG knew of this economic relationship as evidenced directly by a shared customer list and circumstantially by the fact that LE was in competition with CMKG.

780.     Defendant CMKG's conduct prevented this relationship from going further or made the relationship more expensive or difficult by the fact that it contacted Conair directly and misled the Conair team by indicating that in order for Conair employees to earn a CMA certification they must use CMKG training content and not LE.

781.     Defendant CMKG intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur as evidenced by sitting idly by and reaping the benefits of its new exclusive partner (CMA)'s indication to Conair that it must use CMKG training and not that of LE. In doing so, Defendant CMKG at least knew that LE's agreement to provide training with Conair would be damaged, revoked, or not renewed.

782.     LE was harmed in the amount of its loss of annual revenue from this relationship -- $10,000 multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

783.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship

between LE and Conair indicates that it would have remained amicable and mutually fruitful for years to come.

COUNT 5: AS TO LE CUSTOMER - NESTLE PURINA PETCARE

784.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

785.    In contacting Nestle directly and misleading the Nestle team by indicating that in order for Nestle employees to earn a CMA certification they must use Defendant CMKG's training content and not LE, Defendant CMKG intentionally interfered with an economic relationship between it and Nestle that probably would have resulted in an economic benefit to LE.

786.    LE has an existing economic relationship with Nestle dating back to 2013.

787.    Defendant CMKG knew of this economic relationship as evidenced directly by a shared customer list, and circumstantially by the fact that LE was in competition with Defendant CMKG.

788.    Defendant CMKG's conduct prevented performance or made performance more expensive or difficult as evidence by the fact that Defendant CMKG contacted Nestle directly and misled the Nestle team by indicating that in order for Nestle employees to earn a CMA certification they must use Defendant CMKG's training content and not LE.

789.    Defendant CMKG intended to disrupt this relationship or at least knew that disruption of the relationship was certain or substantially certain to occur by silent reaping the benefits of its new exclusive partner (CMA)'s indication to Nestle that it must use Defendant CMKG's training and not LE. Defendant CMKG at least knew that LE's agreement to provide training with Nestle would be damaged, revoked, or not renewed.

790.    LE was harmed in the amount of its loss of annual revenue from this relationship -- $84,554.76 (the total contract value for services in 2019 included online coursework, and instructor led training services) multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total to be proven at trial.

791.    Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent Defendant CMKG's conduct and the strength of the relationship between LE and Nestle indicates that it would have remained amicable and mutually fruitful for years to come.

COUNT 6: AS TO LE CUSTOMER - ADVANTAGE SOLUTIONS

792.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

793.     Defendant CMKG intentionally interfered with an economic relationship between LE and Advantage that probably would have resulted in an economic benefit to LE.

794.     LE and Advantage were in an economic relationship that was resulting in an economic benefit to LE evinced by the parties' annual agreement dating back to 2016, all obligations performed with satisfaction on both sides.

795.     Defendant CMKG knew of this relationship as evidenced directly by a shared customer list, and circumstantially LE's competition with CMKG.

796.     Defendant CMKG's conduct prevented continued relations or made the relationship more expensive or difficult by the fact that sat idly by and reaped the benefits when its new exclusive partner (CMA) contacted Advantage directly and misled the Advantage team by indicating that in order for Advantage employees to earn a CMA certification they must use Defendant CMKG's training content and not that of LE.

797.     Defendant CMKG intended to disrupt this relationship or at least knew that disruption of this relationship was certain or substantially certain to occur by its silent reaping of the benefits of Defendant CMA's indication to Advantage that it must use CMKG training and not LE. Defendant CMKG at least knew that LE's agreement to provide training with Advantage would be damaged, revoked, or not renewed.

798.     LE was harmed in the loss of the full amount of its annual revenue from this relationship -- $42,500 multiplied by a reasonable number of years LE could expect to maintain this business relationship, the total sum to be proven at trial.

799.     Defendant CMKG's conduct was a substantial factor in causing LE's harm as this loss would not have happened absent CMKG's conduct and the strength of the relationship between LE and Advantage indicates that it would have remained amicable and mutually fruitful for years to come.

800.     The true amount of LE's damages attributable to this tort will be proven at trial.

801.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from interfering with LE's prospective economic relations.

**(iii)   Propriety of a Preliminary and Permanent Injunction**

802.     LE is also seeking a preliminary and permanent injunction to prevent Defendant CMKG from its conduct interfering with LE's prospective economic advantages.

803.     LE repeats each and every allegation contained in the paragraphs 373-380 above and incorporates by reference each paragraph as though fully set forth at length herein.

## C.   CLAIMS AGAINST DEFENDANT MGMT3D

### 1. FIRST CLAIM AGAINST DEFENDANT MGMT3D
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

804.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

805.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's anticompetitive conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the antitrust conduct of its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's anticompetitive conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's anticompetitive conduct. Defendant MGMT3D is the primary beneficiary of the anticompetitive conduct of its portfolio company, Defendant CMA.

### 2. SECOND CLAIM AGAINST DEFENDANT MGMT3D
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 2)

806.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

807.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's anticompetitive conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the antitrust conduct of its portfolio company, Defendant CMA, an

entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's anticompetitive conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's anticompetitive conduct. Defendant MGMT3D is the primary beneficiary of the anticompetitive conduct of its portfolio company, Defendant CMA.

### 3. THIRD CLAIM AGAINST DEFENDANT MGMT3D
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

808.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

809.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's anticompetitive conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the antitrust conduct of its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's anticompetitive conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's anticompetitive conduct. Defendant MGMT3D is the primary beneficiary of the anticompetitive conduct of its portfolio company, Defendant CMA.

### 4. FOURTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

810.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

811.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's anticompetitive conduct goes beyond "mere ownership". Defendant MGMT3D actively and

directly participated in the antitrust conduct of its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's anticompetitive conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's anticompetitive conduct. Defendant MGMT3D is the primary beneficiary of the anticompetitive conduct of its portfolio company, Defendant CMA.

## 5. FIFTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

812.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

813.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's anticompetitive conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the antitrust conduct of its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's anticompetitive conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's anticompetitive conduct. Defendant MGMT3D is the primary beneficiary of the anticompetitive conduct of its portfolio company, Defendant CMA.

## 6. SIXTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

814.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

815.     Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's conduct

goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the unfair competition engaged in by its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's acts of unfair competition alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's acts of unfair competition. Defendant MGMT3D is indeed the primary beneficiary of the acts of unfair competition engaged in by its portfolio company, Defendant CMA.

## 7. SEVENTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

816.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

817.    Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's tortious conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly participated in the tortious conduct of its portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large scale decisions such as Defendant CMA's conduct alleged herein, would not take place without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's tortious conduct. Defendant MGMT3D is indeed the primary beneficiary of the tortious conduct of its portfolio company, Defendant CMA.

## 8. EIGHTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS)

818.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

819.    Suitable grounds exist to pierce the corporate veil of Defendant CMA and sue Defendant MGMT3D directly. Defendant MGMT3D's interest in Defendant CMA's tortious

conduct goes beyond "mere ownership". Defendant MGMT3D actively and directly
participated in the tortious conduct of its portfolio company, Defendant CMA, an entity in
which it owes a controlling stake. Large scale decisions such as Defendant CMA's conduct
alleged herein, would not take place without the approval of the largest institutional
shareholder. The relationship between Defendant Skillingstad, as Managing Partner of
Defendant MGMT3D and board member and advisor of Defendant CMA further
demonstrates active involvement by Defendant MGMT3D in Defendant CMA's tortious
conduct. Defendant MGMT3D is the primary beneficiary of the tortious conduct of its
portfolio company, Defendant CMA.

## 9. NINTH CLAIM AGAINST DEFENDANT MGMT3D
### (FOR UNJUST ENRICHMENT)

820.     LE repeats each and every allegation contained in the paragraphs above and
incorporates by reference each preceding paragraph as though fully set forth at length herein.

821.     Defendant MGMT3D is directly and unjustly enriched as the primary beneficiary of
the wrongful conduct of its portfolio company, Defendant CMA. Defendant CMA received a
benefit from LE (as part of a good faith agreement, since LE was a CMA member and an
accredited training provider) of approximately 200+ multiple choice and true/false questions
and answers as part of an Assessment Test for LE's CPCA and CPCM coursework modules.
These pre- and post-assessment tests were provided to Defendant CMA as part of a joint
agreement to help move the individual certification exam online. Defendant CMA via
Defendant Strunk also received a shared client list, the LMS methodology, and key
performance indicators from LE.

822.     Defendant CMA received this benefit via wrongful conduct through a mistake, fraud,
coercion or request as evidenced by Defendant CMA later using and implementing these
Questions and Answers as part of the CMA CPCA and CPCM online examination,
developing its own version of the LMS methodology and utilizing key performance
indicators.

823.     Defendant MGMT3D's interest in Defendant CMA's conduct goes beyond "mere
ownership". Defendant MGMT3D actively and directly participated in the conduct of its
portfolio company, Defendant CMA, an entity in which it owes a controlling stake. Large
scale decisions such as Defendant CMA's conduct alleged herein, would not take place

without the approval of the largest institutional shareholder. The relationship between Defendant Skillingstad, as Managing Partner of Defendant MGMT3D and board member and advisor of Defendant CMA further demonstrates active involvement by Defendant MGMT3D in Defendant CMA's wrongful conduct.

824.     Defendant MGMT3D via CMA is unjustly retaining the benefit of this wrongdoing at the expense of LE because Defendants CMA and CMKG formed an exclusive joint agreement to compete lock out LE, and not allow LE to retain "Accredited" coursework status.

## D.    CLAIMS AGAINST DEFENDANT ROSS

### 1. FIRST CLAIM AGAINST DEFENDANT ROSS
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

825.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

826.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 2. SECOND CLAIM AGAINST DEFENDANT ROSS
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

827.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

828.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 3. THIRD CLAIM AGAINST DEFENDANT ROSS
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

829.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

830.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT ROSS
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

831.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

832.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT ROSS
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

833.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

834.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT ROSS
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

835.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

836.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Ross, President of Defendant CMA serves as an officer who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Ross additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## E.   CLAIMS AGAINST DEFENDANT WADE

### 1. FIRST CLAIM AGAINST DEFENDANT WADE
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

837.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

838.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 2. SECOND CLAIM AGAINST DEFENDANT WADE
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

839.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

840.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT WADE
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

841.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

842.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT WADE
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

843.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

844.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT WADE
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

845.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

846.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct.

Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT WADE
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

847.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

848.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Wade, formerly the senior vice president for best practices, now Director Emeritus for Defendant CMA served as an officer, now director or other agent who acted on behalf of a Defendant CMA while Defendant CMA engaged in such conduct. Defendant Wade additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## F.     CLAIMS AGAINST DEFENDANT DRAKE

### 1. FIRST CLAIM AGAINST DEFENDANT DRAKE
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

849.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

850.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 2. SECOND CLAIM AGAINST DEFENDANT DRAKE
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

851.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

852.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT DRAKE
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

853.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

854.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT DRAKE
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

855.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

856.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT DRAKE
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

857.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

858.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT DRAKE
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

859.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

860.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Drake, Senior Vice President, CM Best Practices Team for Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## G.     CLAIMS AGAINST DEFENDANT STRUNK

### 1. FIRST CLAIM AGAINST DEFENDANT STRUNK
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

861.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

862.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant

times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 2. SECOND CLAIM AGAINST DEFENDANT STRUNK FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

863.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

864.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT STRUNK (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

865.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

866.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Strunk additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT STRUNK (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

867.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

868.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT STRUNK
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

869.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

870.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT STRUNK
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

871.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

872.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Strunk, instrumental in the development of Defendant CMA's certification program and the Chairman of Defendant CMA's HEB, at all relevant times served as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct and additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

# H.   CLAIMS AGAINST DEFENDANT SKILLINGSTAD

## 1. FIRST CLAIM AGAINST DEFENDANT SKILLINGSTAD
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

873.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

874.      There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 2. SECOND CLAIM AGAINST DEFENDANT SKILLINGSTAD
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

875.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

876.      There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT SKILLINGSTAD
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

877.      LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

878.      There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct.

Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT SKILLINGSTAD
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

879.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

880.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT SKILLINGSTAD
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

881.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

882.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT SKILLINGSTAD
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

883.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

884.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Skillingstad serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct.

Defendant Skillingstad additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

# I.  CLAIMS AGAINST DEFENDANT MCGRATH

## 1. FIRST CLAIM AGAINST DEFENDANT MCGRATH
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

885.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

886.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 2. SECOND CLAIM AGAINST DEFENDANT MCGRATH
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

887.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

888.    There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT MCGRATH
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

889.    LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

890.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT MCGRATH
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

891.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

892.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT MCGRATH
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

893.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

894.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT MCGRATH
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

895.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

896.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McGrath serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McGrath additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## J.     CLAIMS AGAINST DEFENDANT MCMAHON

### 1. FIRST CLAIM AGAINST DEFENDANT MCMAHON
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

897.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

898.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 2. SECOND CLAIM AGAINST DEFENDANT MCMAHON
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

899.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

900.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 3. THIRD CLAIM AGAINST DEFENDANT MCMAHON
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

901.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

902.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT MCMAHON
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

903.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

904.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT MCMAHON
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

905.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

906.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT MCMAHON
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

907.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

908.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant McMahon, President of Defendant CMA serves as an officer, director or other agent who acted on behalf of Defendant CMA while Defendant CMA engaged in such conduct. Defendant McMahon additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## K.     CLAIMS AGAINST DEFENDANT NICHOLLS

### 1. FIRST CLAIM AGAINST DEFENDANT NICHOLLS
### (FOR VIOLATION OF SHERMAN ANTITRUST ACT 15 U.S.C. § 1)

909.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

910.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

### 2. SECOND CLAIM AGAINST DEFENDANT NICHOLLS
### FOR MONOPOLIZATION IN VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 2)

911.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

912.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 3. THIRD CLAIM AGAINST DEFENDANT NICHOLLS
### (FOR VIOLATION OF § 3 OF THE CLAYTON ANTITRUST ACT)

913.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

914.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 4. FOURTH CLAIM AGAINST DEFENDANT NICHOLLS
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16720 OF CAL. BUS. & PROF. CODE)

915.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

916.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 5. FIFTH CLAIM AGAINST DEFENDANT NICHOLLS
### (FOR VIOLATION OF THE CARTWRIGHT ACT PER § 16727 OF CAL. BUS. & PROF. CODE)

917.     LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

918.     There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

## 6. SIXTH CLAIM AGAINST DEFENDANT NICHOLLS
### (FOR UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE § 17200 et seq.)

919.   LE repeats each and every allegation contained in the paragraphs above and incorporates by reference each preceding paragraph as though fully set forth at length herein.

920.   There may be personal liability for those who participate in or knowingly approve of an antitrust violation. Defendant Nicholls, Founder and President of Defendant CMKG serves as an officer, director or other agent who acted on behalf of Defendant CMKG while Defendant CMKG engaged in such conduct. Defendant Nicholls additionally participated in the unlawful acts or acquiesced or ratified the unlawful actions of other corporate personnel.

# PRAYER FOR RELIEF

**WHEREFORE, Plaintiff prays for judgment from Defendant CMA as follows:**

1. Enter a temporary restraining order against Defendant CMA to enjoin it from continuing its illegal acts, tortious acts and acts constituting a statutory violation;

2. Enter judgment against Defendant CMA on all claims;

3. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant CMA's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

4. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

5. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

6. Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this Complaint pursuant to 15 U.S.C.S. § 26 and Cal Bus. & Prof. Code § 17082;

7. For punitive damages according to proof per Cal Civil Code § 3294; and

8. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant CMKG as follows:**

1. Enter a temporary restraining order against Defendant CMKG to enjoin it from continuing its illegal acts, tortious acts and acts constituting a statutory violation;

2. Enter judgment against Defendant CMKG on all claims;

3. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant CMKG's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

4. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

5. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

6. Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this Complaint pursuant to 15 U.S.C.S. § 26 and Cal Bus. & Prof. Code § 17082;

7. For punitive damages according to proof per Cal Civil Code § 3294; and

8. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant MGMT3D as follows:**

1. Enter a temporary restraining order against Defendant MGMT3D to enjoin it from continuing its illegal acts, tortious acts and acts constituting a statutory violation;

2. Enter judgment against Defendant MGMT3D on all claims;

3. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant MGMT3D's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

4. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

5.  Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

6.  Grant permanent injunctive relief to prevent the recurrence of the violations for which redress is sought in this Complaint pursuant to 15 U.S.C.S. § 26 and Cal Bus. & Prof. Code § 17082;

7.  For punitive damages according to proof per Cal Civil Code § 3294; and

8.  Order any other such relief as the Court deems appropriate.


**WHEREFORE, Plaintiff prays for judgment from Defendant Ross as follows:**

1.  Enter judgment against Defendant Ross on all claims;

2.  Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Ross's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3.  Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4.  Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5.  For punitive damages according to proof per Cal Civil Code § 3294; and

6.  Order any other such relief as the Court deems appropriate.


**WHEREFORE, Plaintiff prays for judgment from Defendant Wade as follows:**

1.  Enter judgment against Defendant Wade on all claims;

2.  Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Wade's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3.  Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4.  Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5.  For punitive damages according to proof per Cal Civil Code § 3294; and

6.  Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant Drake as follows:**

1.  Enter judgment against Defendant Drake on all claims;

2.  Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Drake's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3.  Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4.  Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5.  For punitive damages according to proof per Cal Civil Code § 3294; and

6.  Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant Strunk as follows:**

1.  Enter judgment against Defendant Strunk on all claims;

2. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Strunk's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5. For punitive damages according to proof per Cal Civil Code § 3294; and

6. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant Skillingstad as follows:**

1. Enter judgment against Defendant Skillingstad on all claims;

2. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Skillingstad's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5. For punitive damages according to proof per Cal Civil Code § 3294; and

6. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant McGrath as follows:**

1. Enter judgment against Defendant McGrath on all claims;

2. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant McGrath's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5. For punitive damages according to proof per Cal Civil Code § 3294; and

6. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant McMahon as follows:**

1. Enter judgment against Defendant McMahon on all claims;

2. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant McMahon's actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5. For punitive damages according to proof per Cal Civil Code § 3294; and

6. Order any other such relief as the Court deems appropriate.

**WHEREFORE, Plaintiff prays for judgment from Defendant Nicholls as follows:**

1. Enter judgment against Defendant Nicholls on all claims;

2. Award LE compensatory "treble" damages in three times the amount sustained by it as a result of Defendant Nicholls' actions, to be determined at trial as provided in 15 U.S.C. § 15 and Bus. & Prof. Code §§ 17070;

3. Award LE pre- and post-judgment interest at the applicable rates on all amounts awarded, as provided in 15 U.S.C. § 15 and Cal Civil Code §§ 3287, 3289;

4. Award LE its costs and expenses of this action, including its reasonable attorney's fees necessarily incurred in bringing and pressing this case, as provided in 15 U.S.C. § 15 and Cal. Code of Civ. Proc. § 1021.5 or the Private Attorney General as this action will result in the enforcement of an important right affecting the public interest, a significant benefit will be conferred on the general public, and the necessity and financial burden of private enforcement were as such to make the award appropriate;

5. For punitive damages according to proof per Cal Civil Code § 3294; and

6. Order any other such relief as the Court deems appropriate.

CIVIL ANTITRUST, UNFAIR COMPETITION, AND TORT COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Federal Rule of Civil Procedure 38(b), LE respectfully requests trial by jury for all of the issues pled so triable.

DATED: November 3, 2020                                    EGENTHAL LAW GROUP

                                                          _____

                                                          Michael Egenthal
                                                          Attorney for Plaintiff

CIVIL ANTITRUST, UNFAIR COMPETITION, AND TORT COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF